Christopher Sproul (State Bar No. 126398)
Brian Orion (State Bar No. 239460)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com
Email: borion@enviroadvocates.com

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER,<br><br>              Plaintiff,<br><br>       v.<br><br>SSA Terminals, LLC; SSA Pacific, Inc.;<br>Pacific Maritime Services LLC,<br><br>              Defendants. | Civil Case No. 22-cv-1198<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et. seq.) |

Los Angeles Waterkeeper, by and through its counsel, hereby alleges:

## I.   JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. section 1251 *et seq*. (the "CWA"). This Court has subject matter jurisdiction over the claims in this action pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. section 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On December 8, 2021, Los Angeles Waterkeeper provided notice of violations of the CWA by Defendants SSA Terminals, LLC ("SSA Terminals"),

SSA Pacific, Inc. ("SSA Pacific"), and Pacific Maritime Services, LLC ("Pacific Maritime Services"), each with offices located at 1131 SW Klickitat Way, Seattle, WA 98134 and a shared mailing address of P.O. Box 24868, Seattle, WA 98124. (each a "Defendant" and collectively the "Defendants"), and of Los Angeles Waterkeeper's intention to file suit against the Defendants, to: the Defendants, SSA Marine, Inc. (as corporate parent of the Defendants); the Administrator of the United States Environmental Protection Agency ("EPA"); the Acting Regional Administrator of EPA Region IX; the Executive Director of the California State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Region 4 ("Regional Board"); and the U.S. Attorney General ("Notice Letter") as required by the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.     More than sixty days have passed since notice was sent to the Defendants and the state and federal agencies. Neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to CWA section 505(c)(1), 33 U.S.C. §1365(c)(1), because the sources of the violations are located within this judicial district.

## II.     __INTRODUCTION__

5.     This complaint seeks relief for unlawful discharges of pollutants from four industrial facilities comprising Piers A, C, F, and J at the Port of Long Beach. These four facilities are owned and operated by the Defendants. According to records filed by the Defendants under penalty of perjury with the California State Water Resources Control Board ("State Board"): Piers A and C are owned and

operated by SSA Terminals; Pier F is owned and operated by SSA Pacific; and Pier J is owned and operated by Pacific Maritime Services (Piers A, C, F, and J are collectively referred to as the "Facilities").

6.      The Facilities discharge stormwater to waters of the United States in violation of the CWA and the State of California's National Pollution Discharge Elimination System ("NPDES") General Permit for Storm Water Discharges Associated With Industrial Activities, Order NPDES No. CAS000001, California State Water Resources Control Board Water Quality Order 2014-0057-DWQ, as amended in 2015 and 2018 (Order 2015-0122-DWQ and November 6, 2018 Board Amended Requirements), and as may be amended from time to time ("General Permit").

7.      Violations of the CWA and the General Permit by industrial sites are recognized as a leading cause of significant, cumulative impacts to the water quality of waters throughout California. With every rainfall event, hundreds of millions of gallons of polluted rainwater flow off of local industrial facilities, such as the Defendants', and pour into storm drains and into downstream receiving waters. The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the aquatic environment each year.

8.      Stormwater runs off of industrial sites such as the Defendants', causing harm to humans and aquatic life. In particular, stormwater from such industrial facilities contains suspended sediment and heavy metals such as aluminum, iron, copper, and zinc. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological and reproductive effects. Fish are widely used to evaluate the health of aquatic systems because pollutants accumulate in fish, which are an important part of aquatic food

chains. Heavy metals have been shown to alter physiological activity in tissues and blood of fish.

9.      In addition, high concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water can make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.

10.     Defendants' stormwater discharges contribute to the ongoing stormwater pollution problem and exemplify the epidemic of violations of the General Permit that Los Angeles Waterkeeper is seeking to eliminate or reduce. These pollution discharges can and must be curtailed for the rivers and water bodies of Los Angeles to be restored to ecological health.

## III.  FACTUAL BACKGROUND

### A.    Los Angeles Waterkeeper

11.     Los Angeles Waterkeeper is a 501(c)(3) public benefit corporation, organized and existing under the laws of the State of California with a principal office at 120 Broadway, Suite 105, Santa Monica, California 90401. Los Angeles Waterkeeper was founded in 1993 with the mission of preserving, protecting, and defending the inland and coast waters of Los Angeles County from all sources of pollution and degradation.  In pursuit of this mission, Los Angeles Waterkeeper actively seeks federal and state implementation of the CWA, and where necessary, initiates enforcement actions under the CWA on behalf of itself and its members.

Members of Los Angeles Waterkeeper (including citizens, taxpayers, property owners, and residents) live, work, travel, recreate, own property and homes and reside in Los Angeles County. They use and enjoy the waters into which the Defendants cause pollutants to be discharged, including Long Beach Harbor, other Los Angeles County waterways, and the ocean and beaches into which those waters flow. Members of Los Angeles Waterkeeper use these waterways for recreational, educational, aesthetic, and spiritual purposes. Additionally, Los Angeles Waterkeeper and its members use these waters to engage in scientific study through pollution and habitat monitoring and conservation activities. As such, the aesthetic and recreational interests of the Plaintiffs' members of the Plaintiffs with standing have been diminished, limited, and harmed specifically from the Defendants' violations of the CWA.

12. The State Board maintains an online, publicly accessible database known as the Stormwater Multiple Application and Reporting Tracking System ("SMARTS") which provides the public with detailed information about storm water discharges from industrial sources whose discharges are regulated under the CWA. The information on SMARTS indicates the status of these industrial sources' compliance with the General Permit. This information includes the types and levels of pollutants in storm water discharges from each and every such industrial storm water discharger, the location of the industrial sources and the waters into which they discharge, the nature of any pollution control/best management practices implemented by these industrial sources, and the State Board's and Regional Board's regulatory oversight of these industrial sources including any enforcement actions taken by these agencies. This information allows members of the public to evaluate whether industrial sources are discharging unaddressed, problematic levels of pollution and whether the sources are complying with the General Permit and thus

the CWA. All the information other than information concerning the State Board's and Regional Board's regulatory oversight and enforcement actions that is available on SMARTS comes from the monitoring and reporting performed by the industrial sources themselves as required by the General Permit.

13.    Los Angeles Waterkeeper as an organization regularly logs on to SMARTS and reviews the information provided therein. Los Angeles Waterkeeper uses the information on SMARTS to advance key aspects of its environmental protection mission, including the information provided by industrial sources in response to the General Permit's requirements to submit annual reports (General Permit § XVI.A.), take and analyze storm water samples and upload the results of analysis of storm water runoff samples to SMARTS (General Permit § XI.B.4.), develop and submit Exceedance Response Action ("ERA") reports  (General Permit § XII.D.), prepare and submit and update Stormwater Pollution Prevention Plans ("SWPPPs") (General Permit § X.A., B.), and prepare and submit and update Monitoring Implementation Plans ("MIPs") (General Permit § X.I.). Plaintiff reviews the information in these documents for several purposes, including (1) to evaluate whether there are industrial facilities that are not complying with the General Permit and are discharging excessive levels of pollutants that threaten harm to the Plaintiffs' members and to the public by degrading the environment utilized by both, (2) to decide whether to exercise its statutory rights to bring citizen suit enforcement seeking remedies to curb polluted stormwater discharges, (3) to inform its members and the general public about industrial facilities that are discharging pollution at levels that risk damage to the environment and human health, and (4) to develop recommendations to the State Board, the Regional Boards and EPA—in public comment on proposed regulatory actions, in work groups, and public meetings—about policy and legal changes and/or administrative measures (including

enforcement) or changes in administrative approaches that would result in better protection against the environmental degradation caused by polluted storm water runoff from industrial sources. Plaintiff's members review information available on SMARTS to be informed about sources of pollution in the waters they use and whether these sources are taking steps to curb pollutant discharges. This information helps these members to protect themselves from the physical harm arising from recreational use of polluted waterways and to participate effectively along with Plaintiff in promoting public awareness of storm water pollution sources and the status of CWA compliance in California. This information further aids these members to participate in commenting to the State Board and Regional Boards on effective administration of the CWA in California.

14.    As described below, Defendants have failed to submit accurate and timely information to SMARTS as required by the General Permit. Defendants' failure to submit this required information has harmed Plaintiff as an organization and its members by depriving them of information they would use for the purposes described in the preceding paragraphs. While visual observations of the Facilities and data from each Defendant posted on SMARTS provides Plaintiff and its members with some information, each Defendant's failure to submit current and complete information to SMARTS as required by the General Permit has hampered Plaintiff in (1) evaluating the full extent to which each Facility is failing to comply with the General Permit and discharging excessive levels of pollutants that threaten harm to the Plaintiff's members and to the public by degrading the environment utilized by both, (2) informing its members and the general public about the extent to which each Facility is discharging pollution at levels that risk damage to the environment and human health, and (3) developing recommendations to the State Board, the Regional Boards and EPA about policy and legal changes and/or

administrative measures (including enforcement) or changes in administrative approaches that would result in better protection against the environmental degradation caused by polluted storm water runoff from industrial sources. Plaintiff's members have been similarly harmed.

**B.    The Facilities**

**1.    Characteristics of All Facilities**

15.    The four Facilities are largely similar in terms of pollution generating activities and pollutants handled. SWPPPs for the Pier A, Pier C, Pier F, and Pier J Facilities identify the following pollution generating activities conducted or present: vehicle/equipment fueling (e.g., trucks, forklifts), which is conducted at fixed locations as well as throughout the yard; chassis maintenance; vehicle/equipment maintenance (e.g. trucks, cranes, forklifts); chassis and yard vehicles tire replacement; vehicle/equipment washing and steam cleaning; high-pressure washing; loading and unloading of cargo containers from vessel; loading and unloading of cargo containers from trains; loading and unloading of cargo containers from trucks and chassis; container moving and storage; mobile fueling of equipment; spill cleanup; industrial parking lots; underground and aboveground storage tanks; exterior painting of buildings and asphalt; storage tanks for diesel and gasoline; highline for dock cranes; active rail yard; outdoor container storage; and dust and particulate pollution from machinery, trucks, and railcars.

16.    In addition, the industrial activities the Defendants conduct at the Facilities involve the use of a number of materials that are potential sources of pollutants in Defendants' storm water runoff, including used motor oil, brake fluid (mixed with used motor oil), gasoline, and hazardous materials (including but not limited to, diesel fuel and other oils and grease), used antifreeze, used battery acid, oil containing rags and absorbents, used oil filters, paints, detergents, lubricants and

solvents. In addition, Defendants generate dust, sediments, and fine metal particulates from the loading and unloading of containers from cranes onto rail cars and trucks, and truck chassis. Each Facility has material handling and storage areas, areas with spill or leak potential as well as dust and particulate generating activities that may be exposed to storm water discharges. The large number of vehicles and rail cars entering and leaving each Facility track oil, grease, sediments, fine metal particulates, and other pollutants off-site and onto roads where rainfall washes these pollutants into the catch basins and directly into waters of the United States.

17.     All of the Facilities lack sufficient and/or sufficiently well-maintained berms or other structural controls to retain stormwater onsite. The Defendants do not sufficiently treat contaminated stormwater prior to discharge from any of the four Facilities. The Defendants' annual reports and ad-hoc reports filed with the State Board and Regional Board indicate that discharges of stormwater from the Facilities have been consistently contaminated with higher levels of pollutants than permissible under the General Permit and that Defendants have consistently failed to comply with numerous requirements of the General Permit, including but not limited to, developing and implementing adequate Best Management Practices ("BMPs"), complying with all monitoring and reporting requirements, revising and updating the SWPPPs, developing an adequate monitoring implementation plan, conducting the requisite storm water sampling, and other activities noted below.

**2.     Pier A**

18.     The Pier A Facility's stormwater receiving water is Long Beach Harbor, and the Facility is 170 acres in size[1]. There are 63 catch basins located throughout the Facility, which collect stormwater and divert it to 11 outfalls

---

[1] According to the most recent NOI filed on June 16, 2021. A previous NOI indicated that Pier A was 200 acres.

[2] See Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties,

discharging directly into the receiving waters. Ten multi-story tall cranes move cargo from container ships, and cargo is transported to numerous outbound truck lanes and scales in furtherance of transport activities. The Facility is also served by eight on-dock rail tracks connected to the larger California rail network, which provide cargo transfers directly from ships. The Pier A Facility primarily handles container-based cargo.

19.     The SWPPP for Pier A states that most vehicle maintenance activities are done at the chassis, reefer, or crane shops, but some vehicle maintenance is conducted directly in yard areas. Cranes are also maintained on site. Cargo container and equipment cleaning is performed at the wash racks while tire inspection and replacement occurs at the tire and roadability shops. With respect to the location of stormwater pollutants, the SWPPP explains that the "entire outdoor yard of the facility can be a source because vehicle fueling is done throughout the yard using tanker trucks and the wheeled equipment can deposit dust from tires and brakes." There are only two stormwater sample points at the Pier A Facility.

### 3.     Pier C

20.     The Pier C Facility's stormwater receiving water is Long Beach Harbor, and the Facility is 70 acres in size. There are 25 catch basins located throughout the Facility, which collect stormwater and divert it to 13 outfalls discharging directly into the receiving waters. Three multi-story cargo cranes move cargo from container ships onto the dock where the cargo is transported to numerous outbound truck lanes and scales in furtherance of marine cargo handling activities. The Pier C Facility primarily handles container-based and refrigerated cargo.

21.     The SWPPP for Pier C states that most vehicle maintenance activities are done at the power, generator, or crane shops, but some vehicle maintenance is conducted directly in the yard area. Cranes are also maintained on site. Cargo

container and equipment cleaning is performed at the wash racks, and tire inspection and replacement occurs at the tire and roadability shops. According to the SWPPP, "[l]ocations of industrial activities may vary because vehicle fueling is done throughout the yard using tanker trucks and the wheeled equipment can deposit dust from tires and brakes." There are only two stormwater sample points at the Pier C Facility.

### 4.     Pier F

22.     The Pier F Facility's stormwater receiving water is Long Beach Harbor, and the Facility is 43 acres in size. There are 7 catch basins located throughout the Facility, which collect stormwater and divert it to 7 outfalls discharging directly into the receiving waters. The Facility is also served by eight on-dock rail tracks that are likewise part of the overall marine cargo handling activities. Two of the four berths at Pier F have direct on-rail docks that provide direct transfer of cargo from ship to the California rail network. Pier F handles breakbulk cargo, neo-bulk cargo, "roll-on, roll-off" cargo such as vehicles, project cargo (i.e. heavy-duty, high value, or complex pieces of equipment), and raw steel.

23.     The SWPPP for Pier F states that most vehicle maintenance activities are done at the power shop, but some vehicle maintenance is conducted directly in the yard areas. Tire inspection and replacement occurs at the power shop, and equipment cleaning is performed at the wash racks. With respect to the location of stormwater pollutants, the SWPPP explains that the "entire outdoor yard of the facility can be a source because vehicle fueling is done throughout the yard using tanker trucks and the wheeled equipment can deposit dust from tires and brakes." There is one stormwater sample point at the Pier F Facility.

### 5.     Pier J

24.     The Pier J Facility's stormwater receiving water is Long Beach

Harbor, and the Facility is 256 acres in size. There are 43 catch basins located throughout the Facility, which collect stormwater and divert it to 14 outfalls discharging directly into the receiving waters. Fourteen multi-story tall cranes move cargo from container ships, and cargo is diverted to several dozen inbound and outbound truck lanes and scales in furtherance of transport activities. The Facility is also served by multiple on-dock rail tracks that can service high volume rail cars and is connected to the larger California rail network which provide cargo transfers directly from ships. The Pier J Facility primarily handles container-based cargo.

25.    According to the Pier J SWPPP, most of maintenance activities are done at the power shop, chassis shop, crane shop, gearman yard, striping paint storage area, refrigerated cargo container equipment repair shop, tire shop, roadability shop, equipment wash rack, container wash rack, highline under cargo cranes, emergency generators and above ground fuel tank storage area, but some vehicle maintenance is conducted directly in the yard areas. Cranes are also serviced on site or at the shops. According to the SWPPP, "[l]ocations of industrial activities may vary because vehicle fueling is done throughout the yard using tanker trucks and the wheeled equipment can deposit dust from tires and brakes." There are currently two stormwater sample points at the Pier J Facility.

**C.    The Affected Receiving Waters**

26.    Stormwater discharged from Piers A, C, F, and J flows directly into Long Beach Harbor, San Pedro Bay, and into the Pacific Ocean. The CWA requires that water bodies like Long Beach Harbor, San Pedro Bay, and the Pacific Ocean meet water quality objectives that protect specific "beneficial uses." According to the Regional Board's Region 4 Basin Plan ("Basin Plan"),[2] the beneficial uses of

---

[2] *See* Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties, *available at*

these waters include: navigation; commercial and sport fishing; estuarine habitat; marine habitat; wildlife habitat; rare, threatened, or endangered species habitat; habitat for the migration of aquatic organisms; habitat for the spawning, reproduction, and/or early development of fish; and shellfish harvesting.

27.     Long Beach Harbor and San Pedro Bay provide habitat for numerous species, including many that are endangered, threatened, rare, and endemic to Southern California. Long Beach Harbor includes extensive soft bottom areas and eelgrass beds, and the outer harbor supports some kelp habitat. Over 100 species of birds occupy habitats in the Port of Long Beach including three species that are listed as threatened or endangered by either the State or federal government (California least tern, Western Snowy Plover, and Peregrine Falcon). At least 18 bird species nest in the Los Angeles – Long Beach Port area, including gulls and pigeons as well as seasonal snowy plovers, Caspian terns, least terns, black skimmers, Forster's terns, brown pelicans, great blue herons, sanderlings, western and least sandpipers, willets western, Clark's, and eared grebes, cormorants, occasional loons and ducks. Over 70 species of fish, and over 400 species of invertebrates, have been noted in Long Beach Harbor and San Pedro Bay, and this area is a significant marine fishery resource. In addition, California sea lions, harbor seals, elephant seals, dolphins and gray whale calves all use the Long Beach Harbor and San Pedro Bay for various parts of their life stages. These habitats remain vulnerable, however. Past habitat destruction and pollution have led to the extirpation of many species.

28.     The Basin Plan seeks to protect and maintain aquatic ecosystems and the resources those systems provide to society. The Basin Plan acknowledges discharges of urban industrial site stormwater as a potentially significant source of

---

https://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/basin_plan_documentation.html (last visited September 8, 2021).

pollution adversely affecting the quality of local waters. Contaminated stormwater discharges from the Facilities adversely impacts the water quality of Long Beach Harbor, San Pedro Bay, the Pacific Ocean, and nearby beaches, estuaries, waterways, and other coastal areas, and threaten the vulnerable and important ecosystems in these areas. Dominguez Channel and Los Angeles Harbor sediments act as a sink for bioaccumulative deposits of heavy metals, and strong winds and tidal currents continually re-suspend and redeposit these metals. Toxic chemicals are concentrated in the Dominguez Channel and Los Angeles Harbor's food web as toxic metals and other contaminants. These contaminants are absorbed and consumed by organisms lower on the food chain and then travel up the food chain, to be consumed by shellfish, fish, birds and eventually by humans. Contamination of the aquatic food chain disproportionately harms minority and poor communities, who typically eat a greater than average amount of fish.

## IV.   LEGAL BACKGROUND

### A.   Clean Water Act

29.   Congress declared that the CWA was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

30.   CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

31.   CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to

administer its own EPA-approved permit program for discharges. In California, the State Board has approval from EPA to administer an NPDES permit program for the state. The CWA and its implementing regulations require any person who discharges or proposes to discharge pollutants into waters of the United States in California to submit an NPDES permit application to the State Board. 40 C.F.R. §§ 122.21(a), 122.26(a)(ii); 33 U.S.C. § 1342(p)(2)(B). The State Board and its nine Regional Boards issue individual and general NPDES permits regulating discharges from various categories of dischargers. As relevant here, in 2015, the State Board adopted the General Permit effective July 1, 2015, and amended it in 2018.[3]

32.     CWA section 402(p), 33 U.S.C. § 1342(p) modifies the regulation of discharge of pollutants in storm water, providing that not all storm water discharges are subject to CWA NPDES regulation. Relevant here, CWA section 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B), mandates that storm water discharges water from "industrial activity" is NPDES regulated. EPA has promulgated a regulation, 40 C.F.R. § 122.26(b)(14), defining "industrial activity" to mean activity that falls within specified Standard Industrial Classification codes ("SIC Codes"). As relevant here, these include SIC Code 4491 (Marine Cargo Handling). *See* 40 C.F.R. § 122.26(b)(14)(viii); *see also* General Permit, Attachment A § 8.

33.     CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

34.     CWA section 505(a) authorizes a citizen suit action for injunctive

---

[3] A copy of the General Permit is available from the State Board's website at https://www.waterboards.ca.gov/water_issues/programs/stormwater/igp_20140057dwq.html

relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $56,460 per day per violation for violations occurring after November 2, 2015 and assessed on or after December 23, 2020, but before January 12, 2022, and $59,937 per day per violation for violations occurring after November 2, 2015 and assessed on or after January 12, 2022. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (EPA regulation adjusting the CWA's statutory civil penalties for inflation).

### B.      State Regulations

35.      The Basin Plan is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in Region 4, including Los Angeles. Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses. The Basin Plan sets forth narrative water quality objectives and numeric water quality standards for pH, dissolved oxygen and toxic pollutants, as well as site specific objectives for certain pollutants of concern such as copper, lead, and zinc.

36.      The Basin Plan establishes the following Water Quality Standards for Inland Surface Waters, Enclosed Bays and Estuaries (which includes the Los Angeles and Long Beach Harbors):

- Waters shall not contain oils, greases, waxes or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses. Basin Plan at 3-34.
- Waters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses. *Id*. at 3-44.
- All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life. *Id*. at 3-45.

- The survival of aquatic life in surface waters, subjected to a waste discharge or other controllable water quality factors, shall not be less than that for the same waterbody in areas unaffected by the waste discharge or, when necessary, other control water. *Id.*

- Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses. *Id*. at 3-46.

37.     In addition, the Basin Plan contains a list of receiving waters that are on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards. This includes Los Angeles and Long Beach Harbor as being impaired for copper, lead, and zinc.

38.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), 40 C.F.R. § 131.38, sets Water Quality Standards for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries. The CTR includes limits for several toxic metals.

**C.      The General Permit**

39.     In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity. The General Permit is an NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p), the current version of which took effect on July 1, 2015, and it was amended in 2018. To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the General Permit and comply with its terms or obtain and comply with an individual NPDES permit.

40.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

41.     The General Permit contains several prohibitions. Effluent Limitation

V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

42. Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

43. In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity, which have not obtained an individual NPDES permit, must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI").

44. Dischargers have been required to file NOIs since March 30, 1992.

45. Dischargers must develop and implement a SWPPP. The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from

the facility, and to implement BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

46.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X.B.

47.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet § I.1.

48.     Sections X.D – X.I of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges.

49.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

50.     The General Permit also requires that the SWPPP include BMP

Descriptions and a BMP Summary Table. General Permit, §§ X.H.4, 5.

51.    The General Permit requires dischargers to develop and implement an adequate written MIP and to conduct various monitoring and reporting obligations in connection therewith. The primary objective of these monitoring and reporting activities is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

52.    As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

53.    Section XI.B of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

54.    A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area. General Permit, § XI.B.2.

55.    Once the storm water samples have been collected, the General Permit requires that the discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report. General Permit, § XI.B.4.

56.    Facilities are also required to make monthly visual observations of

storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. General Permit, § XI.A.

57.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

58.     Under the General Permit, facilities must analyze storm water samples for pH, oil and grease ("O&G"), and TSS, as well as additional parameters indicated in the General Permit by facility type and those parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. General Permit, § XI.B.6.c.

59.     The EPA has established Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

60.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The General Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

61.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. An instantaneous maximum NAL exceedance occurs when two or more analytical

results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH. General Permit, § XII.A.

62. When a facility's storm water sampling reveals NAL exceedances, the Facility must then participate in the ERA program as it is described in Section XII of the General Permit.

63. When a discharger exceeds an NAL for a given pollutant, it is elevated to "Level 1 Status" for the applicable pollutant, which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status" for the given pollutant. General Permit, § XII.C.

64. For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit, § XII.D.

65. Section XVI.A of the General Permit requires that all dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

66. Furthermore, Section XXI.L of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the Facility, with the following certification:

> "I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system

Case No. 22-cv-1198                    Page 21                    Complaint

designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

67.     Section XXI.N of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both. *See* also CWA § 309(c)(4); 33 U.S.C. § 1319.

## V.     CWA VIOLATIONS

68.     Numerous pollutant-generating activities at the Facilities occur outdoors in uncovered areas exposed to rainfall and stormwater runoff. As a result, contaminated stormwater runs off the Facilities from the discharge points identified in the Defendants' SWPPPs and discharges to the receiving waters identified in the SWPPPs, including the receiving waters identified above. Pursuant to the General Permit, this contaminated stormwater discharge obligates the Defendants to develop, implement, update and revise a SWPPP for each Facility to minimize the discharge of pollutants to a level commensurate with application of BAT and BCT. In addition, the SWPPPs and the Defendants' implementation of the SWPPPs must prevent its discharges from causing or contributing to violations of Water Quality Standards for the waters which receive the discharges. The Defendants must also monitor and sample the Facilities' stormwater discharges, and meet various other limitations on its stormwater discharges.

69.     The Defendants have failed to comply with these and other requirements of the General Permit, as further described below, in violation of the CWA.

**A.     Discharges in Violation of the CWA and General Permit**

70.     The CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). "Any [NPDES] permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action." 40 C.F.R. § 122.41(a)(1) (applicable to federally-issued NPDES permits); *id*. § 123.25(a)(12) (incorporating this standard into state-issued NPDES permits, such as the General Permit).

71.     In California, a facility may discharge storm water associated with industrial activity only if the facility complies with the terms of the General Permit. The General Permit imposes several types of conditions on storm water dischargers, including effluent limitations (technology-based and receiving water-based), mandatory development and implementation of a SWPPP and monitoring implementation plan, and compliance with other monitoring and reporting requirements. Each of these types of General Permit conditions constitutes an "effluent standard or limitation" for purposes of CWA section 505(a)(1) and (f), 33 U.S.C. § 1365(a)(1) and (f). As set forth below, the Defendants have discharged polluted stormwater associated with industrial activity while violating each of these types of restrictions at each of the Pier A, C, F, and J Facilities, thereby violating CWA section 301(a), 33 U.S.C. § 1311(a), and section 505(a)(1) and (f), 33 U.S.C. § 1365(a)(1) and (f).

1. **Discharges in Violation of Technology-Based Effluent Limitations.**

72.     The General Permit contains technology-based effluent limitations that prohibit the Defendants' Facilities from discharging pollutants above the level commensurate with the application of BAT and BCT levels of control. *See* General Permit § V.A.

73.     As reflected in Attachment 1 to this Complaint, the Facilities have repeatedly discharged stormwater from the discharge locations ("outfalls") identified in the Defendants' SWPPPs containing pollutant levels exceeding Benchmark Values and NALs, which indicates that the Facilities have discharged pollutants above a level commensurate with application of BAT and BCT. Moreover, the Defendants have failed to implement BMPs at the Facilities that constitute BAT or BCT levels of control within the marine cargo handling industry.

74.     Attachment 1 compiles some of the self-monitoring data reported by the Facilities to the State Board reflecting the Facilities' sampling of actual stormwater discharges. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facilities' discharge of stormwater. Thus, every instance when the Facilities have discharged stormwater, including instances when the Facilities have discharged stormwater that it has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1.

a. **Inadequate BMPs at the Pier A Facility**

75.     SSA Terminals, the owner and/or operator of the Pier A Facility, has failed to implement BMPs at the Pier A Facility that constitute BAT or BCT levels of control. SSA Terminals' BMPs have proven inadequate to bring its pollutant discharges below the NALs, Benchmark Values, and applicable water quality

standards.

76.     At the Pier A Facility, several NAL exceedances triggered ERA Level 1 status after the 2015-2016 reporting year. In response, SSA Terminals submitted an ERA Level 1 Action Plan in December 2016 to address exceedances of aluminum, copper, iron, total suspended solids, and zinc. The BMPs SSA Terminals implemented on December 1, 2016, included adding SafeSorb mats under parked equipment, adding regular mechanical and hand sweeping to areas (not identified in the SWPPP), once a year power washing to the top loading area, tarping of metal scrap and tire storage areas, cleaning catch basins and trenches annually, and painting metal roof areas. SSA Terminals' ERA Level 1 Action Plan only reviewed drainage areas where sampling occurs even though there are several additional drainage areas throughout the 170-acre (then 200-acre) Facility where fueling and maintenance activities occur and therefore dozens of additional catch basins discharging into Long Beach Harbor.

77.     SSA Terminals continued to exceed the Annual NALs for aluminum, copper, iron, total, and zinc in 2016-2017, and consequently, the Pier A Facility went into Level 2 status for these pollutants. SSA Terminals submitted its ERA Level 2 Action Plan on December 13, 2017. The BMPs implemented included conducting additional Level 2 ERA storm water analyses at the discharge locations to better assess more effective BMPs, prioritizing catch basins for BMP installation, and focusing on effective housekeeping. Again, only two discharge areas were considered for the Action Plan. The BMPs were implemented on November 15, 2017, but SSA Terminals exceeded the Annual NALs for aluminum, copper, iron, lead, and zinc in 2017-2018.

78.     The General Permit required SSA Terminals to submit an ERA Level 2 Technical Report by January 1 of the reporting year following the submittal of the

ERA Level 2 Action Plan. SSA Terminals failed to comply with this requirement and submitted its ERA Level 2 Technical Report addressing aluminum, copper, iron, and zinc on June 28, 2019. The BMPs added included the installation of catch basin media filters in six catch basins and installation of a flume filters in the trench drain installed in the first quarter of 2019. No additional BMPs were implemented beyond those filters that were implemented the 2017 ERA Level 2 Action Plan. There are 63 catch basins throughout the 170-acre facility, and SSA Terminals has thus installed BMPs at less than 10% of its catch basins and has only sampled in two drainage areas despite the fact that vehicle maintenance and fueling occurs beyond these areas.

79.     In the 2019-2020 reporting year, SSA Terminals continued to exceed NALs for aluminum, copper, iron, and zinc. The General Permit requires an annual update to the ERA Level 2 Technical Report if there are additional NAL exceedances of the same parameter and same drainage area. General Permit § XII.D.3.c. In the 2020-2021 reporting year, SSA Terminals again exceeded the NAL for iron and zinc, but failed to submit an updated ERA Level 2 Technical Report in violation of the General Permit. This Facility is still in Level 2 status for aluminum and copper because SSA Terminals yet to report four samples below NALs as required by the General Permit to return to baseline status. General Permit § XII.D.4

80.     There have been no advanced BMPs such as active treatment or containment proposed at the Pier A Facility despite the ongoing exceedances over a five-year period. All the BMPs that SSA Terminals has implemented, including the SafeSorb mats, the drop inlet filters, have failed to constitute BAT or BCT levels of control, in violation of the General Permit. Indeed, the Pier A Facility has had consistent NAL exceedances for aluminum, copper, iron, lead, and zinc since the 2015-2016 reporting year. These ongoing discharges of significantly elevated levels

of metals indicates that SSA Terminals has not implemented BMPs that arise to the level of BAT or BCT levels of control at the Pier A Facility.

### b.    Inadequate BMPs at the Pier C Facility

81.    SSA Terminals, as owner and operator of the Pier C Facility, has failed to implement BMPs at the Pier C Facility that constitute BAT or BCT levels of control. SSA Terminals' BMPs have proven inadequate to bring its pollutant discharges below the NALs, Benchmark Values, and applicable water quality standards.

82.    At the Pier C facility, several NAL exceedances triggered ERA Level 1 status in the 2015-2016 reporting year. In response, SSA Terminals submitted an ERA Level 1 Action Plan in December 2016 to address exceedances of aluminum, copper, iron, and zinc. The BMPs SSA Terminals implemented on December 1, 2016, included replacing fiber rolls along the perimeter of the Facility with wattle containing metals reducing media, power washing the area outside of the Power Shop annually, covering metal scrap storage areas with tarps, and cleaning catch basins and trenches annually. SSA Terminals' ERA Level 1 Action Plan focused on two drainage areas even though there are several additional drainage areas throughout the 70-acre Facility with at least a dozen additional catch basins discharging into Long Beach Harbor.

83.    SSA Terminals continued to exceed the Annual NALs for aluminum, copper, iron, and zinc in 2016-2017, and consequently, the Pier C Facility went into Level 2 status for aluminum, iron, and zinc.[4] SSA Terminals submitted its ERA Level 2 Action Plan on December 13, 2017. The BMPs implemented included

---

[4] Although Pier C exceeded the NAL for copper in the 2016-2017 reporting year demonstrating that SSA Terminals' BMPs were not meeting BAT/BCT, SSA Terminals did not go into Level 2 status for this pollutant since several samples were below the NAL.

conducting additional ERA Level 2 storm water analyses at the discharge locations to better assess more effective BMPs, prioritizing catch basins for BMP installation, and staff training. Again, only BMPs in the Power Shop and Crane Shop discharge areas were considered for the Action Plan. The BMPs were implemented on November 15, 2017, but SSA Terminals exceeded the Annual NALs for aluminum, copper, iron, lead, and zinc in the 2017-2018 reporting year.

84.     The General Permit required SSA Terminals to submit an ERA Level 2 Technical Report by January 1 of the reporting year following the submittal of the ERA Level 2 Action Plan. SSA Terminals failed to comply with this requirement. However, SSA Terminals did submit an ERA Level 1 Action Plan for copper on December 17, 2018, due to the previous year's NAL exceedance. One of the advanced BMPs identified to address the copper exceedance, wattle containing metals reducing media, had already been implemented in December 2016 under the previous Level 1 Action Plan. The additional advanced BMP selected was the installation of catch basin filters and a flume filter.

85.     SSA Terminals eventually submitted its ERA Level 2 Technical Report for aluminum, iron, and zinc on June 28, 2019. The advanced BMPs added to control pollutants included once again the installation of media filters in six catch basins and a flume filter in the trench drain. The June 28, 2019 Plan indicated these BMPs were installed in the first quarter of 2019. However, according to the Level 1 ERA Action Plan for copper, the media and flume filter had already been installed in December 2018. No additional BMPs were implemented beyond those installed before the previous reporting year. Given SSA Terminals exceeded NALs for aluminum, copper, iron, lead, and zinc again in the 2018-2019 reporting year, these advanced BMPs were clearly inadequate. Nonetheless, on December 13, 2019, SSA Terminals submitted an ERA Level 2 Technical Report to address its ongoing

copper NAL exceedances. Once again, the media and flume filters were identified as advanced BMPs to be implemented even though they had been installed the previous year and did not adequately control the level of copper in SSA Terminals' discharges.

86.     SSA Terminals continued to exceed NALs for zinc in the 2019-2020 reporting year though the other metals were below NALs. Nonetheless, the General Permit requires an annual update to the ERA Level 2 Technical Report if there are additional NAL exceedances of the same parameter and same drainage area. General Permit § XII.D.3.c. SSA Terminals did not comply with this requirement for zinc. SSA Terminals did submit a Level 2 ERA Technical Report for copper on December 17, 2020. However, this plan just reiterated the BMPs already in use for the past two years discussed above.

87.     In the 2020-2021 reporting year, SSA Terminals again exceeded the NAL for aluminum, iron, and zinc at the Pier C Facility, and SSA Terminals is now in back in Level 1 status for aluminum and iron. SSA Terminals continues to be in Level 2 status for zinc.

88.     There have been no advanced BMPs such as active treatment or containment proposed at the Pier C Facility despite the ongoing exceedances over a five-year period. All the BMPs that SSA Terminals has implemented, including the media and flume filters, have failed to constitute BAT or BCT levels of control, in violation of the General Permit because SSA Terminals' Pier C Facility has had consistent NAL exceedances for aluminum, copper, iron, and zinc since the 2015-2016 reporting year. These ongoing discharges of significantly elevated levels of metals indicate that SSA Terminals has not implemented BMPs that arise to the level of BAT or BCT levels of control at the Pier C Facility.

### c.    Inadequate BMPs at the Pier F Facility

89.    SSA Pacific, as owner and operator of the Pier F Facility, has failed to implement BMPs at the Pier F Facility that constitute BAT or BCT levels of control. SSA Pacific's BMPs have proven inadequate to bring its pollutant discharges below the NALs, Benchmark Values, and applicable water quality standards.

90.    At the Pier F Facility, an annual NAL exceedance of aluminum triggered ERA Level 1 status after the 2015-2016 reporting year. SSA Pacific submitted an ERA Level 1 Action Plan on December 22, 2016, and the BMPs SSA Pacific implemented to address the exceedance included addition use of the mechanical sweeper, adding drip pans under mobile equipment when parked, moving metals to indoor locations or tarping them, and cleaning catch basins at least annually. SSA Pacific's Level 1 Action Plan focused on the drainage areas where the single sample location for this 43-acre Facility is located. There are six additional catch basins discharging into Long Beach Harbor that are not sampled.

91.    SSA Pacific exceeded the Annual NALs for aluminum, iron, and zinc in 2016-2017, and consequently, the Pier F Facility went into Level 1 status for iron and zinc and Level 2 status for aluminum. The December 5, 2017 ERA Level 1 Action Plan[5] added housekeeping related BMPs to address the metal exceedances including power washing oil stains and additional mechanical and hand sweeping when rusty cargo is removed from the yard. The ERA Level 2 Action Plan for aluminum, also dated December 5, 2017, did not implement any new housekeeping measures but instead indicated that additional Level 2 ERA storm water analyses would be conducted and catch basins would be prioritized for BMP installation.

---

[5] SSA Pacific's consultant entitled its reports as "ERA Evaluation and Report" rather than using the term "ERA Action Plan" or "ERA Technical Report" referenced in the General Permit. For purposes of this Complaint, Los Angeles Waterkeeper will treat these reports as the ERA Action Plan and ERA Technical Report, as applicable.

92.     The BMP and housekeeping efforts did not adequately control SSA Pacific's pollutants as evidenced by the Facility exceeding the annual NALs for aluminum, copper, iron, lead, zinc, and TSS in the 2017-2018 reporting year. This put SSA Pacific in Level 1 status for TSS and copper and Level 2 status for iron, and zinc. SSA Pacific also continued to maintain Your Level 2 status for aluminum. The December 17, 2018 Level 1 Action Plan for TSS and copper exceedances and the ERA Level 2 Technical Report for iron and zinc both called for the installation of LIDMAX and Fabco catch basin filters in all 7 catch basins in December 2018.

93.     The filters, installed in January 2019, did reduce the amount of metal in SSA Pacific's discharges initially, though overall, SSA Pacific exceeded NALs for aluminum, iron, TSS, and zinc in the 2018-2019 reporting year. The General Permit requires an annual update to any Level 2 ERA Technical Report if there are additional NAL exceedances of the same parameter and same drainage area. General Permit § XII.D.3.c. SSA Pacific did not comply with this requirement for aluminum. SSA Pacific completed the ERA Level 2 Action Plan in December 2017, but it did not submit the ERA Level 2 Technical Report until June 26, 2019. The ERA Level 2 Technical Report for aluminum reiterated the same BMPs already implemented under other ERA Reports such as focusing on staff education/training, additional sampling to gather more representative post-filter samples, increasing the use of a magnetic sweeper, and determining if the Facility can participate in off-site alternative compliance projects associated with the Port of Long Beach. However, alternative compliance projects were not considered to be BMPs or advanced BMPs under General Permit § XII.D.

94.     The ERA Level 2 Action Plan dated December 23, 2019, addressed the ongoing TSS NAL exceedances and reiterated the same BMPs already in place from the prior year. The ERA Level 2 Technical Report June 16, 2020, addressing

iron and zinc likewise repeated the same BMPs, though indicated that the filter inserts were installed at 6 of the 7 catch basins. Finally, the December 21, 2020 Level 2 ERA Technical Report addressing TSS again restated the existing housekeeping and filter usage that all SSA Pacific's ERA reports in the previous two years had discussed. SSA Pacific exceeded annual NALs for iron, zinc, and aluminum in the 2020-2021 reporting year.

95.     Despite the ongoing exceedances over a five-year period, SSA Pacific has not proposed or implemented more advanced BMPs such as active treatment or containment at the Pier F Facility. Despite the additional BMPs that SSA Pacific has implemented, including the media and flume filters, its BMPs have failed to constitute BAT or BCT levels of control, in violation of the General Permit, because the Pier F Facility has had consistent NAL exceedances for aluminum, iron, and zinc over the past 5 years. These ongoing discharges of significantly elevated levels of metals indicate that SSA Pacific has not implemented BMPs that arise to the level of BAT or BCT levels of control at the Pier F Facility.

### d.     Inadequate BMPs at the Pier J Facility

96.     Pacific Maritime Services, as the owner and operator of the Pier J Facility, has failed to implement BMPs at the Pier J Facility that constitute BAT or BCT levels of control. Pacific Maritime Services' BMPs have proven inadequate to bring its pollutant discharges below the NALs, Benchmark Values, and applicable water quality standards.

97.     At the Pier J Facility, an annual NAL exceedance of aluminum, copper, iron, and zinc triggered ERA Level 1 status after the 2015-2016 reporting year when Pacific Maritime Services sampled three locations.[6] Pacific Maritime

[6] In the 2015-2016 reporting period, Pacific Maritime Services collected samples at three locations including "Near the Fuel Station, CB G1 Near Power Shop, and

Services submitted an ERA Level 1 Action Plan on December 6, 2016, and the BMPs it implemented to address the exceedance included adding regular mechanical and hand sweeping to areas (not identified in the SWPPP), once a year power washing to the top loading area, tarping of the paint and tire storage areas, cleaning catch basins and trenches annually, and painting and maintenance of rusted containers. The ERA Level 1 Action Plan only reviewed drainage areas where sampling occurs even though there are several additional drainage areas throughout the 256-acre Facility where fueling and maintenance activities occur and therefore dozens of additional catch basins discharging into Long Beach Harbor.

98.     Pacific Maritime Services continued to exceed the Annual NALs for aluminum, iron, pH, and zinc in 2016-2017, and consequently, the Pier A Facility went into Level 2 status for these pollutants and Level 1 status for pH. Pacific Maritime Services stayed in Level 2 for copper since it did not collect four samples below NALs in 2016-2017, but it did not include copper in the ERA Level 2 Action Plan. Pacific Maritime Services submitted an ERA Level 1 Action Plan for pH on December 11, 2017, and the ERA Level 2 Action Plan on December 13, 2017.  The ERA Level 1 Action Plan for pH recommended additional monitoring to determine if the pH strips were faulty and to take additional samples if the first QSE was low again in the next year. The BMPs identified in the ERA Level 2 Action Plan for metals included conducting additional Level 2 ERA storm water analyses at the discharge locations to better assess more effective BMPs, prioritizing catch basins for BMP installation, and focusing on effective housekeeping. Again, only two discharge areas were considered for the Action Plan. The BMPs were implemented

Outfall Near Crane Shop," however it stopped sampling Near the Fuel Station in the 2016-2017 reporting year. Neither the 2015 SWPPP, 2016 Revised SWPPP or 2015-16 Annual Report explain the rationale for sampling in fewer locations.

on November 15, 2017.

99.     Pacific Maritime Services again exceeded the Annual NALs for aluminum, copper, iron, pH, TSS, and zinc in 2017-2018. Pacific Maritime Services therefore moved into Level 2 status for pH, Level 1 for TSS, and maintained Level 2 status for aluminum, copper, iron, and zinc. On December 22, 2018, Pacific Maritime Services submitted an ERA Level 2 Action Plan addressing the pH and copper exceedance. The pH exceedances were attributed to sampling procedures, and the BMPs implemented on January 1, 2019, to address the copper exceedances include the installation of LIDMAX and Fabco catch basin filters and flume filter and continued focus on effective housekeeping. However, the General Permit required Pacific Maritime Services to also submit an ERA Level 2 Technical Report by January 1 of the reporting year following the submittal of the Level 2 Action Plan for the other metals. Pacific Maritime Services failed to comply with this requirement and submitted your ERA Level 2 Technical Report addressing aluminum, iron, and zinc on June 28, 2019.

100.     In the 2018-2019 reporting year, Pacific Maritime Services exceeded the annual NALs for aluminum, iron, and zinc. In addition, Pacific Maritime Services maintained Level 2 status for copper even though the Facility-wide average did not exceed the Annual NAL. The June 28, 2019 ERA Level 2 Technical Report discussed BMPs including the previous installation of catch basin media filters in eight catch basins and installation of a flume filters near the crane shop installed in January 2019. Otherwise, the Technical Report indicated that the Facility would continue focusing on staff education and training, take addition samples to gather more representative post-filter samples, increasing the use of a magnetic sweeper, and determining if the Facility can participate in off-site alternative compliance projects associated with the Port of Long Beach. However, Pacific Maritime

Services did not consider alternative compliance projects as BMPs or advanced BMPs under General Permit § XII.D. No additional BMPs were implemented beyond the filters already in place. There are 43 catch basins throughout the 256-acre Facility, and Pacific Maritime Services has thus installed BMPs at 20% of its catch basins and has only sampled in two drainage areas even though vehicle maintenance and fueling occurs beyond these areas.

101.    In the 2018-2019 reporting year, Pacific Maritime Services maintained Level 2 status for copper since the Facility did not collect four consecutive samples below the NAL. Pacific Maritime Services submitted an ERA Level 2 Technical Report on December 17, 2019, addressing copper, which again reiterated all the BMPs already implemented and discussed in both the June 28, 2019 and December 22, 2018 reports for other pollutants.

102.    Pacific Maritime Services again exceeded the Annual NALs for copper and zinc in 2019-2020, and submitted Level 2 ERA Action Plan on December 22, 2020 addressing copper. The General Permit requires that a discharger first submit an Action Plan and then submit a Technical Report if the exceedance continues. General Permit § XII.D. The December 22, 2020 plan once again reiterated the BMPs in place though explained that issues in the Crane Shop drainage area was likely responsible for the exceedance.

103.    Pacific Maritime Services again exceeded the NAL for iron and zinc in the 2020-2021 reporting year, but Pacific Maritime Services has not submitted an updated ERA Level 2 Technical Report addressing Your consistent zinc exceedances since 2016 in violation of the General Permit. This Facility is still in Level 2 status for copper because Pacific Maritime Services has yet to report four samples below NALs as required by the General Permit to return to baseline status. General Permit § XII.D.4.

104.    Pacific Maritime Services has not proposed or implemented any advanced BMPs such as active treatment or containment at the Pier J Facility despite the ongoing exceedances over a five-year period. All the BMPs that Pacific Maritime Services has implemented, including housekeeping measures and the drop inlet filters, have failed to constitute BAT or BCT levels of control, in violation of the General Permit. Indeed, the Pier J Facility has had consistent NAL exceedances for aluminum, copper, iron, lead, and zinc since the 2015-2016 reporting year. These ongoing discharges of significantly elevated levels of metals indicates that Pacific Maritime Services has not implemented BMPs that arise to the level of BAT or BCT levels of control at the Pier J Facility.

## 2.    Discharges that Have Violated Water Quality-Based Effluent Limitations.

105.    In addition to technology-based effluent limitations, the General Permit also contains water quality-based effluent limitations. These water quality-based effluent limitations prohibit a facility from discharging pollutants at a level that: causes or contributes to an exceedance of any applicable Water Quality Standard; adversely affects human health or the environment; or threatens to cause pollution or a public nuisance. General Permit § VI.A-C. Water Quality Standards that are applicable to the Facilities are established in, *inter alia*, the Basin Plan[7] and California Toxics Rule.[8] Of note, the General Permit requires dischargers to go beyond implementing minimum BMPs necessary to meet technology-based effluent

---

[7] As noted above, the Basin Plan designates Beneficial Uses for receiving waters throughout Region 4. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to impairment of receiving waters' Beneficial Uses.

[8] Criteria for Priority Toxic Pollutants for the State of California. 65 Fed. Reg. 31712 (May 18, 2000); 40 C.F.R. § 131.38.

limitations if necessary to comply with any more stringent Water Quality Standards. *See* General Permit, Fact Sheet § II.D.1.

106.	The Basin Plan establishes the following Water Quality Standards for Inland Surface Waters, Enclosed Bays and Estuaries (which includes the Los Angeles and Long Beach Harbors):

- Waters shall not contain oils, greases, waxes or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses. Basin Plan at 3-34.
- Waters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses. *Id*. at 3-44.
- All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life. *Id*. at 3-45.
- The survival of aquatic life in surface waters, subjected to a waste discharge or other controllable water quality factors, shall not be less than that for the same waterbody in areas unaffected by the waste discharge or, when necessary, other control water. *Id.*
- Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses. *Id*. at 3-46.

107.	In addition, the Basin Plan contains a list of receiving waters that are 303(d) listed as impaired for pollutants that are likely to be associated with industrial stormwater. The Basin Plan lists Los Angeles and Long Beach Harbor, i.e. the waters receiving discharges from Your Facilities, as being impaired for copper, lead, and zinc under CWA § 303(d).

108.	The Defendants' discharges of stormwater from the Pier A, Pier C,

Pier F, and Pier J Facilities have caused or contributed to an exceedance of one or more of the above-listed Water Quality Standards. Attachment 1 to this Complaint compiles some of the self-monitoring data reported by the Pier A, Pier C, Pier F, and Pier J Facilities. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facilities' discharges of stormwater, including such discharges that the Defendants did not sample or analyze. Thus, in every instance when the Facilities have discharged stormwater, including instances when the Facilities have discharged stormwater that the Defendants have not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1.

109.    Attachment 1 indicates that the Facilities directly discharge stormwater to Los Angeles and Long Beach Harbor, a 303(d)-listed receiving water noted above, containing, *inter alia*, the following pollutants: TSS, aluminum, lead, copper, zinc, and iron. The levels of these pollutants in the Facilities' stormwater discharges indicate that the discharges have threatened to cause pollution or public nuisance and adversely affected the environment in violation of the water quality-based effluent limitations of the General Permit § VI.B-C and VII.B. In addition, the discharge of these pollutants has caused Long Beach Harbor to not attain or contributed to these waters not attaining one or more applicable Water Quality Standards in violation of the water quality-based effluent limitations of the General Permit. *See id*. § VI.A and VII.B. Moreover, the discharge of these pollutants has caused or contributed to Long Beach Harbor's failure to meet one or more of the designated beneficial uses for these waters established in the Basin Plan, including, but not limited to, beneficial uses for: commercial and sport fishing; estuarine habitat; marine habitat; wildlife habitat; rare, threatened, or endangered species habitat; habitat for the migration of aquatic organisms; habitat for the spawning,

reproduction, and/or early development of fish; and shellfish harvesting.

### 3. Violations of Other General Permit Requirements

#### a. Violations at the Pier A Facility

110. The Pier A Facility is over 170 acres in size with 63 catch basins and 11 outfalls spread over facility. However, SSA Terminals only samples stormwater at two locations (the Power Shop and the Crane Shop). Section XI.C.4 of the General Permit requires dischargers to complete a Representative Sampling Reduction in the SWPPP containing specific elements including a complete descriptions of drainage areas, the activities within them, and a rationale that demonstrates that the drainage area(s) and discharge location(s) are substantially similar. SSA Terminals has failed to comply with all the General Permit's requirements set forth in Section XI.C.4. Given the number of areas described in the SWPPP where various vehicle/equipment maintenance and fueling occurs, there are more than two pollution generating drainage areas at this Facility, and SSA Terminals is required to comply with the General Permit's sampling and monitoring requirements in those other areas of the Facility.

111. On information and belief, SSA Terminals has committed the following additional violations of the General Permit at Pier A:

- Failure to take samples at all drainage areas in violation of General Permit § XI.B.4 and XI.C.4.

- Failure to take all required stormwater samples in 2017-2018, as shown on Attachment 1.

- Failure to timely submit Your ERA LEVEL 2 Technical Report for aluminum, copper, iron, and zinc as discussed above in violation of General Permit § XII.D.2.

- Failure to submit either an update to the ERA Level 2 Technical Report

aluminum, copper, iron, and zinc in 2020, or a certification that there were no changes prompting an update of the Level 2 ERA Technical Report in violation of General Permit § XII.D.3.c.

- Failure to identify all pollution generating activities in the SWPPP, such as tracking, generation of metal particulates, and dust throughout all Facility drainage areas in violation of General Permit § §X.G.1.b, c.

- Failure to sample stormwater for all pollutants being generated in violation of General Permit § XI.B.6 including failure to assess pollutants contained in discharges in portions of the Facility where no stormwater sampling is conducted.

- Failure to identify all pollution generating areas on the Site Map in violation of General Permit § XI.E.

- Failing to call for the implementation of BMPs that meet BAT/BCT levels of control in accord with § X.A-X.I.

### b.    Violations at the Pier C Facility

112.    The Pier C Facility is 70 acres in size with 25 catch basins and 13 outfalls to receiving waters. However, SSA Terminals only samples stormwater at two locations (the Power Shop and the Crane Shop). Section XI.C.4 of the General Permit requires dischargers to complete a Representative Sampling Reduction in the SWPPP containing specific elements including a complete descriptions of drainage areas, the activities within them, and a rationale that demonstrates that the drainage area(s) and discharge location(s) are substantially similar. SSA Terminals has failed to comply with all the General Permit's requirements set forth in Section XI.C.4. Given the number of areas described in the SWPPP where various vehicle/equipment maintenance and fueling occurs, there are more than two pollution generating drainage areas at this Facility, and SSA Terminals is required to

comply with the General Permit's sampling and monitoring requirements in those other areas of the Facility.

113.    On information and belief, SSA Terminals has committed the following additional violations of the General Permit at Pier C:

- Failure to take samples at all drainage areas in violation of General Permit § XI.B.4 and XI.C.4.

- Failure to take all required stormwater samples in 2017-2018 and 2020-2021 considering the number of samples and dates collected at Your nearby Facilities at Pier A, Pier F, and Pier J, as shown on Attachment 1.

- Failure to timely submit Your ERA LEVEL 2 Technical Report for aluminum, iron, and zinc on June 28, 2019, as discussed above in violation of General Permit § XII.D.2.

- Failure to submit either an update to the ERA Level 2 Technical Report for zinc in 2020, or a certification that there were no changes prompting an update of the Level 2 ERA Technical Report in violation of General Permit § XII.D.3.c.

- Failure to identify all pollution generating activities in the SWPPP, such as tracking, generation of metal particulates, and dust throughout all Facility drainage areas in violation of General Permit § §X.G.1.b, c.

- Failure to sample stormwater for all pollutants being generated in violation of General Permit § XI.B.6 including failure to assess pollutants contained in discharges in portions of the Facility where no stormwater sampling is conducted.

- Failure to identify all pollution generating areas on the Site Map in violation of General Permit § XI.E.

- Failing to call for the implementation of BMPs that meet BAT/BCT levels

of control in accord with § X.A-X.I.

### c. Violations at the Pier F Facility

114.     The Pier F Facility is over 43 acres in size with 7 catch basins and 7 outfalls throughout the Facility. However, SSA Pacific only samples stormwater at one location (near Warehouse Berth 207). Section XI.C.4 of the General Permit requires dischargers to complete a Representative Sampling Reduction in the SWPPP containing specific elements including a complete descriptions of drainage areas, the activities within them, and a rationale that demonstrates that the drainage area(s) and discharge location(s) are substantially similar. SSA Pacific has failed to comply with all the General Permit's requirements set forth in Section XI.C.4. Given the number of areas described in the SWPPP where various vehicle/equipment maintenance and fueling occurs, there are more than two pollution generating drainage areas at this Facility, and SSA Pacific is required to comply with the General Permit's sampling and monitoring requirements in those other areas of the Facility.

115.     On information and belief, SSA Pacific has committed the following additional violations of the General Permit at Pier C:

- Failure to take samples at all drainage areas in violation of General Permit § XI.B.4 and XI.C.4.
- Failure to take all required stormwater samples in 2016-17, 2017-2018, and 2020-2021 considering the number of samples and dates collected at Your nearby Facilities at Pier A, Pier C, and Pier J, as shown on Attachment 1.
- Failure to timely submit Your ERA LEVEL 2 Technical Report for aluminum, iron, and zinc on June 28, 2019, as discussed above in violation of General Permit § XII.D.2.
- Failure to submit either an update to the ERA Level 2 Technical Report for

zinc in 2020, or a certification that there were no changes prompting an update of the Level 2 ERA Technical Report in violation of General Permit § XII.D.3.c.

- Failure to identify all pollution generating activities in the SWPPP, such as tracking, generation of metal particulates, and dust throughout all Facility drainage areas in violation of General Permit § §X.G.1.b, c.

- Failure to sample stormwater for all pollutants being generated in violation of General Permit § XI.B.6 including failure to assess pollutants contained in discharges in portions of the Facility where no stormwater sampling is conducted.

- Failure to identify all pollution generating areas on the Site Map in violation of General Permit § XI.E.

- Failing to call for the implementation of BMPs that meet BAT/BCT levels of control in accord with § X.A-X.I.

### d.    Violations at the Pier J Facility

116.    The Pier J Facility is 256 acres in size with 43 catch basins and 14 outfalls spread over facility. However, Pacific Maritime Services only samples stormwater at two locations (the Power Shop and the Crane Shop). Section XI.C.4 of the General Permit requires dischargers to complete a Representative Sampling Reduction in the SWPPP containing specific elements including a complete descriptions of drainage areas, the activities within them, and a rationale that demonstrates that the drainage area(s) and discharge location(s) are substantially similar. Pacific Maritime Services has failed to comply with all the General Permit's requirements set forth in Section XI.C.4. Given the number of areas described in the SWPPP where various vehicle/equipment maintenance and fueling occurs, there are more than two pollution generating drainage areas at this Facility, and Pacific

Maritime Services is required to comply with the General Permit's sampling and monitoring requirements in those other areas of the Facility.

117.    Pacific Maritime Services's Representative Sampling Reduction section in its 2016 SWPPP failed to explain why Pacific Maritime Services stopped sampling at 3 discharge locations after the 2015-16 reporting year. There were pollutants in the Fuel Station discharge point contributing to Pacific Maritime Services's exceedances. Its 2016 and onward SWPPPs indicate that Pacific Maritime Services samples in the two areas having the highest potential for pollution. To qualify for a Representative Sampling Reduction, dischargers must comply with General Permit § XI.C.4.b which requires presentation of the various drainage areas, their physical characteristics and industrial activities therein, and a "rationale that demonstrates that the industrial activities and physical characteristics of the drainage area(s) are substantially similar." Pacific Maritime Services failed to comply with these requirements when making its Representative Sampling Reduction determination.

118.    On information and belief, Pacific Maritime Services has committed the following additional violations of the General Permit at Pier J:

- Failure to take samples at all drainage areas in violation of General Permit § XI.B.4 and XI.C.4.

- Failure to take all required stormwater samples in 2016, 2017, 2017-2018, 2018-2019, and 2020-2021 considering the number of samples and dates collected at Your nearby Facilities at Pier A, Pier C, and Pier F, as shown on Attachment 1.

- Failure to timely submit Your ERA LEVEL 2 Technical Report for aluminum, iron, and zinc as discussed above in violation of General Permit § XII.D.2.

- Failure to submit either an update to the ERA Level 2 Technical Report Update for zinc, or a certification that there were no changes prompting an update of the Level 2 ERA Technical Report in violation of General Permit § XII.D.3.c.

- Failure to identify all pollution generating activities in the SWPPP, such as tracking, generation of metal particulates, and dust throughout all Facility drainage areas in violation of General Permit § §X.G.1.b, c.

- Failure to sample stormwater for all pollutants being generated in violation of General Permit § XI.B.6 including failure to assess pollutants contained in discharges in portions of the Facility where no stormwater sampling is conducted including failing to sample for oil and grease in the 2017-2018 reporting year.

- Failure to identify all pollution generating areas on the Site Map in violation of General Permit § XI.E.

- Failing to call for the implementation of BMPs that meet BAT/BCT levels of control in accord with § X.A-X.I.

## VI.    CLAIMS

### FIRST CLAIM FOR RELIEF

**Discharges in Violation of Technology-Based Effluent Limitations**
**(Violations Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1365(f))**

119.    Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

120.    The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

121.    Plaintiff is informed and believes, and thereupon alleges, that each

Defendant has failed to implement BAT and BCT at each applicable Facility for its discharges of aluminum, copper, iron, lead, zinc, TSS, and other potentially unmonitored pollutants, in violation of Effluent Limitation V(A) of the General Permit.

122.    Each day since each Defendant became a permittee subject to the General Permit that it has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit with respect to such Defendant. Such violations are continuous and on-going. Noncompliance with the General Permit constitutes an actionable violation of the CWA's effluent limitations. General Permit § XXI(A); 33 U.S.C. § 1365(f). Each Defendant is liable for civil penalties for all such violations occurring within five years and 60 days of the filing of this action. 33 U.S.C. §§ 1365(a), 1319(d).

## SECOND CLAIM FOR RELIEF

**Discharges of in Violation of Water Quality-Based Effluent Limitations**
**(Violations Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1365(f))**

123.    Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

124.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

125.    Plaintiff is informed and believes, and thereupon alleges, that since

each Defendant became a permittee subject to the General Permit, such Defendant has been discharging polluted storm water from the applicable Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

126.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at each Facility, becoming contaminated with aluminum, copper, iron, lead, zinc, solids, and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into Los Angeles and Long Beach Harbors.

127.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

128.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

129.     Every day since each Defendant became a permittee subject to the General Permit that it has discharged and continues to discharge polluted storm water from each applicable Facility in violation of the General Permit is a separate and distinct violation of the General Permit. Such violations are continuous and on-going. Noncompliance with the General Permit constitutes an actionable violation of the CWA's effluent limitations. General Permit § XXI(A); 33 U.S.C. § 1365(f). Each Defendant is liable for civil penalties for all such violations occurring within five years and 60 days of the filing of this action. 33 U.S.C. §§ 1365(a), 1319(d).

## THIRD CLAIM FOR RELIEF

**Failure to Prepare, Implement, Review, and Update an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1365(f))**

130.    Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

131.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP. This requirement is an effluent limitation within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f).

132.    As outlined herein, each Defendant has failed to develop and implement an adequate SWPPP for the applicable Facility in violation of the General Permit. General Permit §§ X.A through X.I.

133.    Each day since each Defendant became a permittee subject to the General Permit that it failed to develop, implement and update an adequate SWPPP for the applicable Facility is a separate and distinct violation of Section X of the General Permit. Such violations are continuous and on-going. Noncompliance with the General Permit constitutes an actionable violation of the CWA's effluent limitations. General Permit § XXI(A); 33 U.S.C. § 1365(a), (f). Each Defendant is liable for civil penalties for all such violations occurring within five years and 60 days of the filing of this action. 33 U.S.C. § 1365(a), 1319(d).

## FOURTH CLAIM FOR RELIEF

**Violations of Monitoring and Reporting Requirements**
**(Violation of Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1365(f))**

134.    Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

135.    The General Permit, sections X.I and XI.A through XI.D requires dischargers of storm water associated with industrial activity to have developed and

be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

136.    As outlined herein, each Defendant has failed to develop and implement an adequate monitoring and reporting program with respect to the applicable Facility.

137.    Defendants' ongoing failure to develop and implement an adequate monitoring and reporting program is evidenced by each Defendant's failure to collect storm water samples pursuant to the requirements of the General Permit.

138.    Each day since each Defendant became a permittee subject to the General Permit that it has failed to develop and implement an adequate monitoring and reporting program for the applicable Facility in violation of Section X.I and XI.A through XI.D of the General Permit is a separate and distinct violation of the General Permit. Such violations are continuous and on-going. Noncompliance with the General Permit constitutes an actionable violation of the CWA's effluent limitations. General Permit § XXI(A); 33 U.S.C. § 1365(f). Each Defendant is liable for civil penalties for all such violations occurring within five years and 60 days of the filing of this action. 33 U.S.C. § 1365(a), 1319(d).

## FIFTH CLAIM FOR RELIEF

### Violations of Exceedance Response Action Requirements
### (Violation of Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1365(f))

1.    Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

2.    The General Permit, Section XII, requires dischargers of storm water associated with industrial activity to comply with certain Exceedance Response Action requirements upon the occurrence of a discharge of storm water in violation of an applicable NAL.

3.     As outlined herein, each Defendant has failed to comply with the Exceedance Response Action process with respect to the applicable Facility in violation of the General Permit. General Permit § XII.

4.     Each day since each Defendant became a permittee subject to the General Permit that it has failed to comply with the Exceedance Response Action process for the applicable Facility in violation of Section XII of the General Permit is a separate and distinct violation of the General Permit. Such violations are continuous and on-going. Noncompliance with the General Permit constitutes an actionable violation of the CWA's effluent limitations. General Permit § XXI(A); 33 U.S.C. § 1365(f). Each Defendant is liable for civil penalties for all such violations occurring within five years and 60 days of the filing of this action. 33 U.S.C. § 1365(a), 1319(d).

## VII.    **RELIEF REQUESTED**

139.     Wherefore, Los Angeles Waterkeeper respectfully requests this Court enter judgment providing the following relief:

a.     Declare each Defendant to have violated and to be in violation of the CWA;

b.     Issue an injunction ordering each Defendant to operate its Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

c.     Enjoin each Defendant from discharging pollutants from its Facility until such time as it has complied with the General Permit, including by developing and implementing an adequate SWPPP, implementing appropriate BMPs, and implementing a proper monitoring implementation plan;

d.     Enjoin each Defendant from violating the substantive and procedural requirements of the CWA and the General Permit;

e.      Order each Defendant to pay civil penalties of up to $56,460 per day per violation for violations occurring after November 2, 2015 and assessed on or after December 23, 2020, but before January 12, 2022, and $59,937 per day per violation for violations occurring after November 2, 2015 and assessed on or after January 12, 2022. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (EPA regulation adjusting the CWA's statutory civil penalties for inflation).

f.      Award Plaintiff its reasonable costs of suit (including reasonable attorney, witness, expert, and consultant fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and

g.      Award such other relief as this Court may deem appropriate.

Dated: February 22, 2022                    ENVIRONMENTAL ADVOCATES

*Christopher A. Sproul*
_____
Christopher Sproul
Environmental Advocates
Attorneys for Plaintiff
LOS ANGELES WATERKEEPER