Christopher Sproul (State Bar No. 126398)
csproul@enviroadvocates.com
Brian Orion (State Bar No. 239460)
borion@enviroadvocates.com
Marla Fox (State Bar No. 349813)
mfox@enviroadvocates.com
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695

Barak Kamelgard (State Bar No. 298822)
barak@lawaterkeeper.org
Benjamin Avi Harris (State Bar No. 313193)
ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E. 2nd Street, Suite 250 Los Angeles, California 90012
Telephone: (310) 394-6162

*Attorneys for Plaintiff*
Los Angeles Waterkeeper

S. Wayne Rosenbaum (SBN 182456)
Grant R. Olsson (SBN: 317583)
**ENVIRONMENTAL LAW GROUP LLP VARCO & ROSENBAUM**
225 Broadway, Suite 1900 San Diego, California 92101
Tel: (619) 231-5858
swr@envirolawyer.com
golsson@envirolawyer.com

*Attorneys for Defendants*
*SSA TERMINALS, LLC; SSA PACIFIC, INC.;*
*PACIFIC MARITIME SERVICES, LLC; and*
*SSA Terminals (Pier A), LLC.*

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, A California non-profit corporation, | Civil Case No: 2:22-cv-01198-FWS-MRW |
| Plaintiff, <br> vs. | **CONSENT DECREE PIER A** |
| SSA Terminals, LLC; SSA Pacific, Inc.; Pacific Maritime Services, LLC; SSA Terminals (Pier A), LLC; City of Long Beach, | **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)** |
| Defendants. | |

### CONSENT DECREE

The following Consent Decree is entered into by and between Los Angeles Waterkeeper ("LA Waterkeeper"), and SSA Terminals (Pier A), LLC ("SSATA"). The entities entering this Consent Decree are each an individual "Settling Party" and collectively the "Settling Parties."

**WHEREAS,** LA Waterkeeper is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its primary office in Santa Monica, California;

**WHEREAS,** LA Waterkeeper is dedicated to the preservation, protection, and defense of the rivers, creeks, and coastal waters of Los Angeles County from all sources of pollution and degradation;

**WHEREAS,** SSATA is the lessee and operator of Pier A located at 700 Pier A Plaza, Long Beach, California 90813 ("Pier A");

**WHEREAS,** SSA Terminals, LLC is the lessee and operator of Pier C60 located at 1521 Pier C Street, Long Beach, California 90813 ("Pier C");

**WHEREAS,** SSA Pacific, Inc. is the operator of Pier F Berths 204 to 207 at Pier F Berth 206, Long Beach, California 90802 ("Pier F");

**WHEREAS,** Pacific Maritime Services, LLC is the lessee and operator of Pier J located at 1521 Pier J Avenue E., Long Beach, California 90802 ("Pier J");

**WHEREAS,** SSATA, SSA Terminals, LLC, SSA Pacific, Inc., and Pacific Maritime Services, LLC, are collectively referred to herein as the "SSA Entities";

**WHEREAS,** Piers A, C, F, and J are each owned by the City of Long Beach ("City of Long Beach" or "City");

**WHEREAS,** SSATA is an establishment primarily engaged in activities directly related to marine cargo handling for or from a vessel, that arrives at shipside, dock, pier, terminal, staging area, or in-transit area until cargo loading or unloading operations are completed (SIC Code 4491);

///

**WHEREAS,** SSATA contends that neither the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ and Order 2018-0028-DWQ ("Storm Water Permit"), nor the federal NPDES program for storm water discharges associated with industrial activities, apply to drainages at transportation facilities that are not associated with specified industrial activities, and LA Waterkeeper disputes this contention, but the Settling Parties have compromised to allow for settlement of this matter notwithstanding said disagreement, with the parties' legal obligations to each other defined by this Agreement, and each party reserving all rights unless expressly stated to the contrary herein;

**WHEREAS,** LA Waterkeeper alleges its members live, work, travel, recreate, own property and homes and reside in Los Angeles County. LA Waterkeeper's members use and enjoy the waters of Long Beach Harbor into which Pier A directly discharges storm water. LA Waterkeeper alleges that its members use and enjoy these waterways for recreational, educational, aesthetic, and spiritual purposes. Additionally, LA Waterkeeper alleges that it, and its members, use Long Beach Harbor, the Pacific Ocean, and the beaches into which these waters flow to engage in scientific study;

**WHEREAS,** subject to the Settling Parties' disagreement discussed above, storm water associated with vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication) and equipment cleaning as defined in 40 C.F.R. § 122.26(b)(14)(viii) from Pier A are regulated by the Storm Water Permit and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"), Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342 ("Regulated Industrial Activities");

**WHEREAS,** Pier A operates under SIC code 4491—Marine Cargo Handling; Pier A's Waste Discharger Identification Number ("WDID") is 4 19I025348;

///

///

**WHEREAS,** the Regulated Industrial Activities occurring at Pier A include vehicle maintenance and equipment washing as depicted on the Site Plan attached hereto as **Exhibit A**;

**WHEREAS,** the Storm Water Permit includes the following requirements for those regulated activities occurring at Pier A: (1) develop and implement a Stormwater Pollution Prevention Plan ("SWPPP"); (2) control pollutant discharges associated with industrial activities using, as appropriate, best available technology economically achievable ("BAT") or best conventional pollutant control technology ("BCT") to prevent or reduce pollutants; (3) implement BAT and BCT through the development and application of Best Management Practices ("BMPs"), which must be included and updated in the SWPPP; and (4) when necessary, implement additional BMPs to prevent or reduce any pollutants associated with industrial activities that are causing or contributing to any exceedance of water quality standards;

**WHEREAS**, this Consent Decree imposes requirements on SSATA that go beyond those set forth in the Storm Water Permit through the implementation of BMPs and informational sampling of storm water related to non-industrial areas of Pier A;

**WHEREAS,** on December 8, 2021, LA Waterkeeper sent the SSA Entities, the United States Environmental Protection Agency ("EPA"), EPA Region IX, the State Water Resources Control Board ("State Board"), and the Los Angeles Regional Water Quality Control Board ("Regional Board") a notice of intent to file suit ("Notice Letter") under Sections 505(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1365(a) and (b). The Notice Letter alleged violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at Pier A;

**WHEREAS,** on February 22, 2022, LA Waterkeeper filed a complaint against the SSA Entities in the United States District Court, Central District of California alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at Piers A, C, F, and J ("Complaint");

///

**WHEREAS,** on March 10, 2022, LA Waterkeeper sent the SSA Entities via letter its First Supplemental Notice of Clean Water Act Violations and Intent to File Suit ("Supplemental CWA Notice Letter");

**WHEREAS,** on May 9, 2022, the SSA Entities, including SSATA, filed their first motion to dismiss five of LA Waterkeeper's six claims in the Complaint for failure to state a claim and lack of subject matter jurisdiction, and a motion to strike portions of the sixth claim;

**WHEREAS,** on September 16, 2022, LA Waterkeeper sent the SSA Entities and the City a notice letter alleging violations of the Resource Conservation and Recovery Act ("RCRA Notice Letter");

**WHEREAS,** on January 10, 2023, LA Waterkeeper filed its first amended complaint ("FAC") against the SSA Entities and the City in the United States District Court, Central District of California alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), 28 U.S.C. § 1331, and violations of the Storm Water Permit at Piers A, C, F, and J;

**WHEREAS,** on March 13, 2023, the City filed a motion to dismiss LA Waterkeeper's FAC for failure to state a claim and lack of subject matter jurisdiction;

**WHEREAS,** on March 13, 2023, the SSA Entities, including SSATA, filed their second motion to dismiss five of LA Waterkeeper's six claims in the FAC for failure to state a claim and lack of subject matter jurisdiction, and a motion to strike portions of the sixth, on essentially the same bases as its prior motion to dismiss;

**WHEREAS,** on August 14, 2023, LA Waterkeeper filed a motion for leave to amend and supplement the FAC;

**WHEREAS,** on August 24, 2023, the SSA Entities and the City filed an opposition to LA Waterkeeper's motion for leave to amend;

**WHEREAS,** on October 14, 2023, Judge Fred W. Slaughter ruled on the motions to dismiss and the motion to amend and ordered:

    1.    The SSA Defendants' Motion to Dismiss (Dkt. 58) is GRANTED IN PART

AND DENIED IN PART. The Motion is DENIED as to Plaintiff's first, second, third, and fourth claims and pre-suit notice under RCRA. The Motion is GRANTED as to Plaintiff's sixth claim. The sixth claim under RCRA is DISMISSED WITH LEAVE TO AMEND.

      2.    Defendant City of Long Beach's Motion to Dismiss (Dkt. 59) is GRANTED IN PART AND DENIED IN PART. The Motion is DENIED as to Plaintiff's pre-suit notice and GRANTED as to Plaintiff's CWA and RCRA claims against Defendant City of Long Beach. Plaintiff's claims against Defendant City of Long Beach are DISMISSED WITH LEAVE TO AMEND.

      3.    Plaintiff's Motion to Amend the Complaint (Dkt. 73) is DENIED AS MOOT.

      4.    Plaintiff is ORDERED to file a Second Amended Complaint, consistent with the Court's Order, by December 15, 2023;

**WHEREAS,** on December 15, 2023, LA Waterkeeper filed a Second Amended Compliant ("SAC");

**WHEREAS,** LA Waterkeeper alleges SSATA to be in violation of the substantive and procedural requirements of the Storm Water Permit, the Clean Water Act, and RCRA with respect to Pier A;

**WHEREAS,** SSATA denies all allegations in the Notice Letters, Complaint, FAC, and SAC relating to Pier A;

**WHEREAS,** LA Waterkeeper and SSATA have agreed that it is in the Settling Parties' mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the Notice Letter, Complaint, FAC, and SAC with respect to Pier A without further proceedings; and

**WHEREAS,** all actions taken by the Parties pursuant to this Consent Decree shall comply with all applicable federal and state laws and local rules and regulations.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

      1.    The Court has jurisdiction over the subject matter of this action pursuant to

Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a).

2.      Venue is appropriate in the Central District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because Pier A is located within this District.

3.      The SAC alleges claims upon which relief may be granted pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1) and the Summons and Complaint shall be deemed served pursuant to Fed. R. Civ. P. 4.

4.      LA Waterkeeper has standing to bring this action.

5.      The Court shall retain jurisdiction over this matter for purposes of interpreting, modifying, or enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce this Consent Decree.

6.      The Court shall dismiss with prejudice all claims against the City of Long Beach with respect to the Federal Water Pollution Control Act (the "CWA"), 33 U.S.C. §§ 1251, *et seq*., including, and without limitation, all claims arising out of 33 U.S.C. §§ 1311(a), 1331, and 1342.

7.      The Court shall dismiss with prejudice all claims against the City of Long Beach and SSATA with respect to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq*., including, and without limitation, RCRA section 7002(a)(1), 42 U.S.C. § 6972.

I.  **OBJECTIVES**

8.      It is the express purpose of the Settling Parties entering this Consent Decree to further the objectives set forth in the Clean Water Act and to resolve those issues alleged by LA Waterkeeper in its SAC. Considering these objectives and as set forth fully below, the Settling Parties agree to comply with the provisions of this Consent Decree and SSATA agrees to comply with the applicable requirements of the Storm Water Permit and all applicable provisions of the Clean Water Act at Pier A.

///

## II. AGENCY REVIEW AND TERM OF CONSENT DECREE

9.     LA Waterkeeper shall submit this Consent Decree to the United States Department of Justice and the EPA (collectively "Federal Agencies") within three (3) days of the final signature of the Settling Parties for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) days after receipt by both agencies, as evidenced by written acknowledgement of receipt by the agencies or the certified return receipts, copies of which LA Waterkeeper shall provide to SSATA. If the Federal Agencies object to entry of this Consent Decree, the Settling Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies within a reasonable amount of time. Following the Federal Agencies' review, the Settling Parties shall submit the Consent Decree to the Court for entry.

10.     The term "Effective Date" as used herein shall mean the day that the Court enters the last of the Consent Decrees for Piers A, C, F, and J, or the next business day if such day is not a business day.

11.     This Consent Decree will terminate three (3) years from the Effective Date, unless prior to the termination date either Party has invoked the dispute resolution provisions of this Consent Decree and there is an ongoing, unresolved dispute regarding either Settling Party's compliance with this Consent Decree, in which case the Consent Decree will terminate upon final resolution of the dispute pursuant to the dispute resolution provisions contained herein.

## III. COMMITMENTS OF THE SETTLING PARTIES

### A. Storm Water Pollution Control Best Management Practices.

12.     The Settling Parties acknowledge that SSATA has or is in the process of making BMP changes to Pier A to improve the quality of storm water discharges from the portions of the Facility depicted in **Exhibit A** as having industrial activities ("Industrial Areas") or vehicle fueling activities ("Vehicle Fueling Areas"). In addition to implementing and maintaining BMPs, SSATA shall implement the BMPs specifically identified and described in this Consent Decree in paragraph 13, for Industrial Areas and

Vehicle Fueling Areas described in **Exhibit A**, as applicable.

13.     Within thirty (30) days of the Effective Date, SSATA shall incorporate the following structural and non-structural BMPs in the Industrial Areas and Fueling Areas described in **Exhibit A**, as applicable:

13.1.  Structural BMPs

13.1.1.  Installing Enpurion with ZnIX pillows, or equivalent, in storm drain inlets in Industrial Areas and Vehicle Fueling Areas as identified in **Exhibit A**. See attached manufacturer's cut sheets attached hereto as **Exhibit B**.

13.2.  Wattles/Filter Socks

13.2.1.  Deploy Metaloxx or equivalent absorbing wattles/filter socks in Industrial Areas as show in **Exhibit A**.

13.2.2.  Ensure wattles/filter socks are deployed to the extent feasible to prevent stormwater from flowing around or beneath the wattles/filter socks.

13.3.  Vehicle Fueling Areas

13.3.1.  Fully delineate all Vehicle Fueling Areas identified in **Exhibit A** with painted markings or signage.

13.4.  Sweeping

13.4.1.  Monthly inspection of Industrial Areas and Vehicle Fueling Areas described in **Exhibit A** and the removal of trash and other debris by on-site personnel.

13.4.2.  Based on the results of monthly inspections, SSATA will deploy personnel to conduct detailed sweeping with a regenerative sweeper, as well as hand sweeping of hard-to-reach areas of Industrial Areas and Vehicle Fueling Areas.

13.5.  Housekeeping in Industrial Areas and Vehicle Fueling Areas

13.5.1.  Close or cover all waste/trash/recycle bins when not in active

use.

      13.5.2.  To the extent feasible, move, or otherwise cover, stored and miscellaneous metal out of contact with rainfall and runoff.

13.6.  Storm Water Team personnel will conduct Pre-Rain Inspections of Industrial Areas and Vehicle Fueling Areas when the NOAA station at Long Beach Municipal Airport predicts a local rain in the next seventy-two (72) hours of greater than one half (0.5) inches with a probability of greater than fifty percent (50%).  The inspection will include the following elements:

      13.6.1.  Inspection of the Industrial Areas and Vehicle Fueling Areas for any areas of dirt and debris accumulation.

      13.6.2.  Removal of dirt and debris from areas identified in 13.6.1.

      13.6.3.  Inspection of catch basin inserts and wattles in Industrial Areas and Vehicle Fueling Areas. Replace as necessary, based upon observations and manufacturers' recommendations.

      13.6.4.  Inspect for any spills or leaks in Industrial Areas and Vehicle Fueling Areas and take appropriate actions.

      13.6.5.  Confirm all waste/trash/recycle bins in Industrial Areas and Vehicle Fueling Areas are closed or covered.

13.7.  Staff training as described in paragraphs 24-27 below.

14.  For the Priority Non-Industrial ("PNID") Areas of the Facility depicted in **Exhibit A**, SSATA will implement the following non-structural BMPs:[1]

14.1.  Sweeping

      14.1.1.  Monthly inspection and the removal of trash or debris by on-site personnel.

---

[1] It is SSATA's intention to implement the provisions of this section 14 to the balance of the Non-Industrial Areas at Pier A as time and resources allow in SSATA's sole and absolute discretion.

14.1.2.  Based on the results of monthly inspections, SSATA will deploy personnel to conduct quarterly detailed sweeping with a regenerative sweeper, as well as hand sweeping of hard-to-reach areas.

14.2.  Housekeeping

14.2.1.  Close or cover all waste/trash/recycle bins when not in active use.

14.2.2.  To the extent feasible, move, or otherwise cover, stored and miscellaneous metal out of contact with rainfall and runoff.

14.3.  Inspections

14.3.1.  Pre-rain inspections as described in paragraph 13.6 above.

14.4.  Staff training as described in paragraphs 24-27 below.

15.    In addition to the non-structural BMPs for PNID areas set forth in paragraph 14 above, SSATA will implement the following structural and non-structural BMPs for the chassis storage area depicted in **Exhibit A**:

15.1.  Chassis Storage Area

15.1.1.  Wattles/Filter Socks

15.1.2.  Deploy and secure Metaloxx or equivalent metal absorbing wattles/filter socks at the locations identified in **Exhibit A**.

15.1.3.  Ensure wattles/filter socks are deployed to the extent feasible to prevent stormwater from flowing around or beneath the wattles/filter socks.

**B.**    **Discharge Locations and Storm Water Sampling**

16.    <u>Discharge Locations</u>. **Exhibit A** attached hereto identifies storm water discharge locations and one (1) storm water sample location for Pier A ("Industrial Sample Locations"), referred to herein as the "Power Shop Sample Location," in conformity with provision XI.C.4 of the Storm Water Permit. In addition, **Exhibit A** attached hereto

identifies one (1) PNID sample location for informational purposes only, referred to herein as the "PNID Sample Location". PNID sample results will be shared with LA Waterkeeper on a confidential basis and are for informational purposes only.  Should Sample Locations change, SSATA will amend the Facility site map and notify LA Waterkeeper within thirty (30) days of such a change.

17.   <u>Sampling</u>. SSATA will implement the following industrial storm water monitoring procedures at Pier A:

17.1.   <u>Frequency</u>.

17.1.1.   <u>Industrial Sample Location</u>. During the life of this Consent Decree, weather permitting, SSATA shall collect samples from the Industrial Sample Location identified on **Exhibit A** at Pier A to the extent feasible from a minimum of four (4) "qualifying storm events" that occur in a reporting year such that SSATA collects two (2) samples during the first half of the reporting year and two (2) samples during the second half of the reporting year. A "qualifying storm event" or "QSE" is a storm event that produces a discharge from a drainage area covered by the Storm Water Permit and is preceded by forty-eight (48) hours with no discharge from any drainage area. If, prior to March 1, SSATA has collected samples from fewer that two (2) QSEs, SSATA shall, to the extent feasible, collect samples during as many QSEs as feasible until SSATA samples a minimum of four (4) storm events for the reporting year. No two (2) samples may be from the same Sample Location during the same storm event.

17.1.2.   <u>PNID Sample Location</u>. Except as provided below, during the life of this Consent Decree, weather permitting, SSATA shall collect samples from the PNID Sample Location as identified

on **Exhibit A** at Pier A from a minimum of four (4) QSEs that occur in a reporting year such that SSATA samples during each of the same QSEs as it samples for the Power Shop Sample Location to the extent feasible.

17.2. <u>Contained or Stored Storm Water</u>. To the extent that SSATA stores or contains storm water associated with areas of industrial activity, SSATA shall sample the stored or contained water at Pier A before it discharges the storm water from Pier A to a storm drain or Water of the United States even if not during operating hours in conformity with provision XI.B.4.b of the Storm Water Permit.

17.3. <u>Parameters</u>. SSATA shall analyze the Industrial Area and PNID Sample Location storm water samples collected for the contaminants set forth in Table 1.

17.4. <u>Laboratory</u>. A laboratory accredited by the State of California shall analyze all samples collected pursuant to this Consent Decree.

17.5. <u>Detection Limits</u>. The laboratory shall use analytical methods adequate to detect the individual contaminants at or below Table 1 Numeric Limits.

17.6. <u>Hold Time</u>. SSATA shall deliver all samples collected from Pier A to the laboratory as necessary to ensure no exceedance of the sample "hold time" for each contaminant sampled. For field measurements of pH, SSATA shall use portable instruments, and not pH paper. SSATA will calibrate and use the instruments according to manufacturers' instructions and approved industry methodology, as specified in 40 C.F.R., Part 136.

17.7. <u>Results</u>. SSATA shall request that the laboratory report sample analysis results to SSATA within ten (10) days of laboratory receipt of the sample, or as soon as possible without incurring "rush" charges.

17.8. <u>Reporting</u>. SSATA shall upload and certify on the California Stormwater Multiple Application and Report Tracking System ("SMARTS") the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report, for all Industrial storm water samples collected at Pier A described and taken in accordance with this paragraph 17 within ten (10) days of receiving the laboratory results, and shall notify LA Waterkeeper that the foregoing has been uploaded to SMARTS and certified within five (5) days of certification. At the same time as such notification, SSATA shall also provide LA Waterkeeper with the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report, for the PNID Sample Location storm water samples collected at Pier A in accordance with this paragraph 17 on a confidential basis.

18.   <u>Contaminant Reduction</u>. SSATA shall develop and implement additional BMPs to reduce pollutants in storm water discharges from Industrial Areas at Pier A, where specifically required herein, to levels below those in Table 1 under the terms of this Consent Decree set forth below ("Numeric Limits").

**Table 1. Numeric Limits**

| Analytes | Values | Source of Limit |
|---|---|---|
| Total Suspended Solids | 100 mg/L (annual); 400 mg/L (instantaneous) | Permit NAL |
| Zinc | 0.26 mg/L (annual) | Permit NAL |
| Iron | 1.0 mg/L (annual) | Permit NAL |
| Copper | 0.0332 mg/L (annual) | Permit NAL |
| Oil and Grease | 15 mg/L (annual); 25 mg/L (instantaneous) | Permit NAL |
| Aluminum | 0.75 mg/L (annual) | Permit NAL |
| pH | 6.5-8.5 s.u. (instantaneous) | Basin Plan |

19.   <u>Table 1 Exceedances</u>. An "Exceedance" of Table 1 is defined, with respect to

any Industrial Sample Location and the PNID Sample Location, as any of the following:

19.1. Where the sampling result is greater than or equal the sum of the concentrations of any pollutant in any storm water sample from any Sample Location and all prior storm water samples collected for the same pollutant from the same Sample Location in the same reporting year demonstrate that the annual average for that pollutant from that Sample Location will exceed the applicable annual Numeric Limit specified in Table 1 if that pollutant is sampled four (4) times from that Sample Location in that reporting year;[2]

19.2. If any pollutant is sampled fewer than four (4) times from any Sample Location in a reporting year, and there was otherwise no Exceedance for that pollutant at that Sample Location pursuant to paragraph 19.1 above, then where the average concentration of that pollutant from all storm water samples from that Sample Location during that reporting year exceeds the applicable annual Numeric Limit specified in Table 1;[3] or

19.3. Where the concentration of any pollutant in any two (2) storm water samples collected from that Sample Location in a Reporting Year exceed any instantaneous Numeric Limit specified in Table 1, for Total Suspended Solids and Oil & Grease, or are outside the range of any instantaneous Numeric Limit specified in Table 1, for pH.

20.   Analyte Reduction Strategy for Table 1 Exceedances with respect to Industrial

---

[2] E.g., There is an Exceedance (a) where a sample from Sample Location #1 during the first QSE has a concentration for iron of 5 mg/L, and also (b) where samples from Sample Location #1 during the first, second, and third QSEs have concentrations for iron of 2 mg/L, 0.5 mg/L, and 2.5 mg/L, respectively, because, in either scenario, the  annual average based on four QSEs at Sample Location #1 would be at minimum 1.25 mg/L regardless of the concentrations in further samples from that Sample Location.

[3] E.g., Where samples from Sample Location #1 during the first, second and third QSEs have concentrations for iron of 1.2 mg/L, 1.1 mg/L, and 1.2 mg/L, respectively, but only three samples were collected for iron from Sample Location #1 during that reporting year, because the average based on four QSEs would be less than 1 mg/L, but the average of the three samples taken is greater than 1 mg/L.

Sample Location. If Pier A monitoring, as required herein with respect to any Industrial Sample Location, reveals one (1) or more Exceedance, as defined in paragraph 19 above, SSATA shall submit a plan to LA Waterkeeper for reducing the level of the pollutant to the Numeric Limits specified in Table 1 ("Analyte Reduction Strategy" or "ARS") from the applicable drainage area.

20.1.  The ARS for industrial areas shall be prepared by a Qualified Industrial Storm Water Professional ("QISP") using the template attached hereto as **Exhibit C** and must be submitted to LA Waterkeeper within thirty (30) days of SSATA's receipt of sampling data from Pier A showing an Exceedance defined in paragraph 19 above.[4] In the event of exceedances for multiple analytes and/or for multiple Sample Locations at multiple Piers, the SSA Entities may submit a single ARS addressing multiple analytes and multiple Sample Locations at multiple Piers, provided however that the SSA Entities shall be required to submit no more than one (1) ARS for each half of the Reporting Year.

20.2.  Analyte Reduction Strategy Requirements. An ARS prepared in conformity with **Exhibit C** shall include at a minimum: (1) the identification of the contaminant(s) discharged in excess of the Numeric Limits in Table 1; (2) an assessment of the likely source of each contaminant discharged in excess of the numeric value(s); (3) the identification of additional BMPs, including either preventing the exposure of pollutant and pollutant sources to storm water and/or further treatment of storm water associated with the Sample Location for which the Exceedance was identified prior to discharge that are intended to reduce pollutant concentrations to those below Table 1

---

[4] The ARS discussed in this Consent Decree is a separate and distinct requirement from any "Action Plan" or Exceedance Response Actions discussed in the Storm Water Permit, though actions taken to comply with the ARS may be used by SSATA to demonstrate compliance with the Storm Water Permit.

Numeric Limits; and (4) time schedules for implementation of the
proposed BMPs (if any). The time schedule(s) for implementation of
additional BMPs shall ensure that the SSA Entities implement all
BMPs identified in the ARS as soon as reasonably practicable but no
later than the ensuing October 1 following the preparation of the ARS
for the preceding reporting year unless the Settling Parties mutually
agree on a later date.

20.3.   ARS Review. LA Waterkeeper shall have thirty (30) calendar days
upon receipt of the SSA Entities' ARS to provide the SSA Entities
with comments on the ARS, on the form attached hereto as **Exhibit
C**. Failure to provide written comments prepared by a QISP within
thirty (30) calendar days shall constitute irrefutable evidence that LA
Waterkeeper is satisfied with the content and conclusions set forth in
the ARS. Within thirty (30) calendar days of the SSA Entities' receipt
of LA Waterkeeper's comments on the ARS, the SSA Entities shall
consider LA Waterkeeper's comments and shall either incorporate
them into the ARS or, if the SSA Entities decline to accept one or
more of LA Waterkeeper's comments, the SSA Entities shall meet
with LA Waterkeeper to discuss the reasons for not incorporating any
of LA Waterkeeper's suggestions.

20.4.   The SSA Entities' decision not to adopt any of LA Waterkeeper's
suggestions regarding an ARS shall not impact the otherwise
applicable schedule for implementing any other revision to the
SWPPP or Monitoring Implementation Plan ("MIP") set forth in the
ARS. The Settling Parties shall resolve any disputes as to the
adequacy of the ARS in addressing the requirements of Paragraph
20.2 herein pursuant to the dispute resolution provisions of this
Consent Decree as set out in Section VI below.

20.5.  All communications described in Paragraph 20 herein shall be deemed confidential. The SSA Entities shall not be required to upload the ARS to SMARTS. LA Waterkeeper shall not use the ARS, or any other document described in Paragraph 20 herein for any purpose other than as a confidential and informational communication, or as necessary as evidence in any dispute resolution proceeding.

20.6.  ARS Plan Payments. SSATA shall pay LA Waterkeeper a onetime ARS Review Fee of Two Thousand Dollars ($2,000) for the costs and fees which may be incurred for reviewing and commenting on any ARS submittals associated with Pier A for the term of this Consent Decree. SSATA shall submit the payment within thirty (30) days of the effective date of this Consent Decree. SSATA shall make the payment payable to "Los Angeles Waterkeeper" and addressed to Los Angeles Waterkeeper, 360 E 2nd Street Suite 250, Los Angeles, CA  90012. Failure to submit a payment as required under this paragraph will constitute a breach of the Consent Decree.

21.  Analyte Reduction Strategy for Table 1 Exceedances with respect to PNID Sample Location. If Pier A monitoring, as required herein with respect to the PNID sample location reveals one (1) or more Exceedances, as defined in paragraph 19 above, SSATA shall review the good housekeeping measures set forth in paragraph 15 above and consider the implementation of additional BMPs in its sole and absolute discretion and provide a memorandum to LA Waterkeeper within thirty (30) days of SSATA's receipt of sampling data showing the Exceedance defined in paragraph 19 above using the template attached hereto as **Exhibit D** that includes the following elements: (1) the identification of the contaminant(s) discharged in excess of the Numeric Limits in Table 1; (2) an assessment of the sampling methodology and likely source of each contaminant discharged in excess of the numeric value(s); and

(3) if additional good housekeeping BMPs are feasible, an explanation of whether or not such BMPs would reasonably reduce pollutant concentrations, and if and when SSATA will implement such BMPs. In the event of exceedances in samples collected from a single QSE from PNID sample locations for multiple analytes and/or for multiple Sample Locations at multiple Piers, the SSA Entities may submit a single memorandum addressing multiple analytes and multiple PNID sample locations at multiple Piers, provided however that the SSA Entities shall be required to submit no more than one (1) memorandum for each half of the Reporting Year.

    21.1.  All communications described in Paragraph 21 herein shall be deemed confidential. The SSA Entities shall not be required to upload the memorandums to SMARTS. LA Waterkeeper shall not use the memorandums, or any other document described in Paragraph 21 herein for any purpose other than as a confidential and informational communication.

22.  <u>Visual Observations</u>. SSATA shall conduct all visual observations in accordance with the terms of the Storm Water Permit. Visual observations include the following:

    22.1.  <u>Storm Water Discharge Observations</u>. SSATA shall conduct visual observations at each discharge location where SSATA obtains a sample during a QSE pursuant to Section XI.A.2 of the Storm Water Permit.

    22.2.  <u>Non-Storm Water Discharge Observations</u>. SSATA shall conduct monthly non-storm water visual observations at each industrial discharge point pursuant to Section XI.A.1 of the Storm Water Permit.

23.  SSATA shall maintain logs of the visual observations consistent with Paragraph 22 herein. SSATA shall make these records available for LA Waterkeeper's review via email within five (5) business days of the request for said documents by LA Waterkeeper.

**C.    <u>Employee Training.</u>**

24. Within forty-five (45) days of the Effective Date, SSATA shall conduct additional employee training to familiarize the members of the Storm Water Team designated in the SWPPP with the requirements of the Storm Water Permit and this Consent Decree. The training program shall include use of written training materials needed for effective implementation of the training program. SSATA shall also ensure that there are Storm Water Team members to implement the BMPs and conduct other compliance activities required by the SWPPP and this Consent Decree.

25. The training program shall require at least the following:

    25.1. <u>Non-Storm Water Discharge Training</u>. SSATA shall train Storm Water Team members on the Storm Water Permit's prohibition of non-storm water discharges, so that employees know what non-storm water discharges are, which can result from improper practices that may produce non-storm water discharges at Pier A, and how to detect and prevent them.

    25.2. <u>BMP Training</u>. SSATA shall train Storm Water Team Members on BMP implementation and maintenance to ensure effective BMP implementation to prevent or minimize the exposure of industrial pollutants to storm water, to prevent or minimize the discharge of contaminated storm water, and to ensure the proper treatment of storm water, where required herein, at Pier A.

    25.3. <u>Sampling Training</u>. SSATA shall designate an adequate number of Storm Water Team members or consultants to ensure the collection of storm water samples required by this Consent Decree and/or the Storm Water Permit. The training shall include the proper sampling protocols, including chain of custody requirements, to ensure that individuals engaged in sampling activities properly collect, store, and submit the samples to a certified laboratory properly.

    25.4. <u>Visual Observation Training</u>. SSATA shall provide training to all

Storm Water Team members performing visual observations at Pier A pursuant to this Consent Decree and/or the Pier A SWPPP that includes required visual observations, the distinct types of visual observations required, and instruction on proper record keeping.

26.     SSATA shall provide training on an annual basis, or as otherwise required, to ensure compliance with the Storm Water Permit, by a private consultant or a representative of SSATA who is a registered QISP familiar with the requirements of this Consent Decree and the Storm Water Permit. SSATA shall repeat the training as necessary to ensure that Storm Water Team members identified in the SWPPP are familiar with the requirements of this Consent Decree and the Pier A SWPPP and/or MIP, as appropriate to the employee's job descriptions. Any new Storm Water Team member who is responsible for implementation of any portion of the SWPPP, the MIP, or compliance with other terms of the Storm Water Permit or Consent Decree shall receive training within thirty (30) business days after being identified in the SWPPP as a Storm Water Team member.

27.     SSATA shall maintain training records to document compliance with the Storm Water Permit and shall make these records available for LA Waterkeeper's review via email within ten (10) business days of the request by LA Waterkeeper.

**D.     Storm Water Pollution Prevention Plan and Monitoring Implementation Plan.**

28.     Within sixty (60) days of the Effective Date of this Consent Decree, SSATA shall revise the Pier A SWPPP and/or MIP as necessary to include:

28.1.   All BMPs utilized at Pier A for Industrial Areas and Vehicle Fueling Areas as identified on **Exhibit A**.

28.2.   All BMPs identified and developed pursuant to this Consent Decree and/or the Storm Water Permit for Industrial Areas and Vehicle Fueling Areas as identified on **Exhibit A.**

28.3.   The specific individual(s) or positions responsible for compliance with the Storm Water Permit.

28.4. A detailed site map that includes at a minimum all information required by the Storm Water Permit and this Consent Decree.

28.5. A description of each industrial activity, all potential pollutant sources, and each potential pollutant associated with each industrial activity and/or pollutant source.

28.6. Incorporation of the requirements of the Storm Water Permit and this Consent Decree as applicable.

29. <u>Additional and Ongoing Revisions to SWPPP and/or MIP</u>. SSATA shall revise the SWPPP and/or MIP as more fully described in the Permit Fact Sheet at II.I. SSATA shall notify LA Waterkeeper of any revised SWPPP and/or MIP uploaded and certified to SMARTS within ten (10) business days of certification on SMARTS.

29.1. For any SWPPP or MIP revisions that are not the result of an ARS, LA Waterkeeper shall provide comments, if any, to SSATA within thirty (30) days of notification of any certified revisions to the SWPPP or MIP. If no comments are received within thirty (30) days, the revisions shall be conclusively presumed to be acceptable to LA Waterkeeper. Within thirty (30) days of receiving comments from LA Waterkeeper, SSATA shall consider LA Waterkeeper's comments and shall either incorporate LA Waterkeeper's comments into any revised SWPPP and/or MIP or shall meet with LA Waterkeeper to discuss the reasons for not incorporating any of LA Waterkeeper's suggestions. The Parties shall resolve any disputes as to the completeness of the SWPPP and/or MIP as set forth in the Permit Fact Sheet at II.1 pursuant to the dispute resolution provisions of this Consent Decree, set out in Section VI below.

29.2. All communications described in Paragraph 29 herein shall be deemed confidential. The Parties shall not use communications or

documents described in Paragraphs 29 herein for any purpose other than as confidential and informational communications, or as necessary as evidence in any dispute resolution proceeding regarding the completeness of the SWPPP or MIP.

**E.   Alternative Means of Compliance**

30.   Notice of Termination/Notice of Non-Applicability/CII. The Settling Parties agree that if Pier A satisfies the requirements of and receives an approval for a "Notice of Termination, or Notice of Non-Applicability" or through compliance with the yet to be adopted Commercial, Institutional and Industrial ("CII") Permit as those terms are defined in the Storm Water Permit or the CII Permit, and all monetary obligations in this Consent Decree have been met, SSATA shall be considered to be in full compliance with the terms of this Consent Decree and the provisions of Section III of this Consent Decree shall not apply so long as the Notice of Termination/Notice of Non-Applicability or CII Permit coverage remains in effect.

**IV.   COMPLIANCE MONITORING AND REPORTING**

31.   The SSA Entities shall allow LA Waterkeeper one (1) virtual site inspection in the first calendar year following the Effective Date. After the first year, if the SSA Entities are required to prepare an ARS related to Industrial Sample Locations, LA Waterkeeper shall be permitted to conduct one (1) additional virtual site inspection to inspect any newly implemented BMPs described in the ARS. The SSA Entities shall allow only one (1) site inspection during each calendar year of this Consent Decree. All such site inspections shall be conducted virtually, unless agreed upon by the Settling Parties.

32.   Any virtual Site Inspection shall occur during normal business hours at a time mutually agreed upon by the Settling Parties. LA Waterkeeper will provide the SSA Entities with as much notice as possible of its request for a virtual site inspection, which shall not be unreasonably denied by the SSA Entities, and shall provide the SSA Entities with a list of those areas LA Waterkeeper wishes to inspect. LA

Waterkeeper shall make its request at least twenty-four (24) hours' notice prior to any proposed Virtual Site Inspection in anticipation of wet weather, and seventy-two (72) hours' notice during dry weather. For any Site Inspection requested to occur in wet weather, the Settling Parties shall meet and confer during normal business hours regarding any adjustment in the timing which shall not be unreasonably denied in the event the forecast changes and anticipated precipitation appears unlikely or the need to allocate storm water team personnel to take required QSE samples as more fully described in Paragraph 17 above, and thus frustrates the purpose of a virtual inspection in wet weather. If a Virtual Site Inspection is infeasible due to sampling constraints described above, the Settling Parties shall consider alternative options during the meet and confer including but not limited to: (1) photo documenting the sampling event; or (2) delaying the Virtual Site Inspection until after the sampling activities set forth in Paragraph 17 have been completed. Notice will be provided by telephone and electronic mail to the individual(s) designated below at paragraph 49.

33.     <u>Reporting and Documents</u>. During the life of this Consent Decree, SSATA shall copy LA Waterkeeper on all non-privileged documents related to industrial storm water quality at Pier A that SSATA submits to the Regional Board, the State Board, and/or any State or local agency or municipality, which are not uploaded to SMARTS.

34.     <u>Compliance Monitoring and Oversight</u>. SSATA shall pay a one-time fee of Six Thousand Dollars ($6,000) to compensate LA Waterkeeper for costs and fees to be incurred for monitoring compliance with this Consent Decree. SSATA shall make the payment within thirty (30) business days of the Effective Date to "Los Angeles Waterkeeper" and addressed to Los Angeles Waterkeeper, 360 E 2nd Street Suite 250 Los Angeles, CA 90012.

## V.   **Environmental Project and Reimbursement of Litigation Fees and Costs**

35.     <u>Environmental Project</u>. SSATA agrees to make a payment totaling Twenty Thousand Dollars ($20,000) to the City of Long Beach Municipal Urban Stormwater

Treatment ("MUST") Program[5] to allow the program to continue to plan and design for general expansions of the MUST Program. Payment shall be made within sixty (60) days of the Effective Date, payable to the City of Long Beach and sent via overnight mail to City of Long Beach c/o City Manager, 411 W. Ocean Blvd., 10th Floor, Long Beach, CA 90802.

36.     For all missed deadlines included in this Consent Decree not excused by Force Majeure, SSATA shall make a stipulated payment of Five Hundred Dollars ($500) ("Stipulated Payment") provided, however, that LA Waterkeeper shall provide SSATA with notice of any alleged missed deadline and SSATA shall have ten (10) business days to cure the missed deadline without penalty. Payments for a missed deadline shall fund environmental project activities. SSATA shall make the Stipulated Payment to the City of Long Beach MUST Program, payable to the City of Long Beach and sent via overnight mail to City of Long Beach c/o City Manager, 411 W. Ocean Blvd., 10th Floor, Long Beach, CA 90802, and such funds shall be used for the purposes described in Paragraph 35 above. SSATA shall provide LA Waterkeeper with a copy of such payment concurrently with the payment. SSATA shall make the Stipulated Payment within thirty (30) days of a missed deadline unless LA Waterkeeper agrees in writing to an extension of that deadline.

37.     <u>Reimbursement of LA Waterkeeper's Fees and Costs</u>. SSATA shall pay a total of Two Hundred Seven Thousand Dollars ($207,000) to LA Waterkeeper to reimburse LA Waterkeeper for its investigation fees and costs, expert/consultant fees and costs, and attorneys' fees incurred because of investigating and preparing the lawsuit and negotiating this Consent Decree. SSATA shall make the payments within thirty (30) business days of the Effective Date and payable to Environmental Advocates Attorney Client Trust Account and sent via overnight mail to Environmental Advocates c/o Christopher A. Sproul, 5135 Anza Street, San Fransisco, CA 94121.

///

---

[5] Funding for the Long Beach MUST Program or another alternative City Program intended to achieve the same or similar goals may be incorporated into the Permit Option 1 Program pending final adoption of the CII Permit.

## VI.   **DISPUTE RESOLUTION**

38.     This Court shall retain jurisdiction over this matter until the final termination date defined above for the purposes of implementing and enforcing the terms and conditions of this Consent Decree and adjudicating all disputes among the Settling Parties that may arise under the provisions of this Consent Decree, unless there is an ongoing dispute at the time of the final termination date, in which case this Consent Decree will terminate upon final resolution of the dispute. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

39.     If a dispute under this Consent Decree arises, or either Settling Party believes that a breach of this Consent Decree has occurred, the Settling Parties shall schedule a meet and confer within ten (10) business days of receiving written notification from the other party of a request for a meeting to determine whether a violation of this Consent Decree has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. If the Settling Parties are unable to resolve the dispute through this meet and confer process, the Settling Parties agree to request a settlement meeting before the Magistrate Judge assigned to this action. The Settling Parties agree to file any waivers necessary for the Magistrate Judge to preside over any settlement conference pursuant to this Paragraph. If the Settling Parties cannot resolve the dispute by the conclusion of the settlement meeting with the Magistrate Judge, the Settling Parties agree to submit the dispute via motion to the District Court. In resolving any dispute arising from this Consent Decree, the Court shall have discretion to award attorneys' fees and costs to either Settling Party. The relevant provisions of the then-applicable CWA and Rule 11 of the Federal Rules of Civil Procedure shall govern the allocation of fees and costs in connection with the resolution of any disputes before the Court.  The Court shall award relief limited to compliance orders and awards of attorneys' fees and costs, subject to proof.

40.     Force Majeure. No Settling Party shall be considered to be in default in the performance of any of its obligations under this Consent Decree when performance

becomes impossible due to circumstances beyond the Settling Party's control, including Force Majeure, which includes, but is not limited to, any act of god, pandemic/epidemic, war, fire, earthquake, windstorm, flood or natural catastrophe; civil disturbance, vandalism, sabotage, or terrorism; restraint by court order or public authority or agency; inability to proceed due to pending litigation under the California Environmental Quality Act; action or non-action by, or inability to obtain the necessary authorizations, approvals, or permits from, any governmental agency or private party except insofar as caused by any lack of reasonable diligence in applying for or otherwise procuring such permit; or inability to obtain equipment or materials from the marketplace if such materials or equipment are not reasonably available. Impossibility and/or Force Majeure shall not include normal inclement weather, economic hardship, or inability to pay. Any Settling Party seeking to rely upon this paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the impossibility or Force Majeure event and by exercise of due diligence has been unable to overcome the failure or performance. Delay in compliance with a specific obligation under this Consent Decree due to impossibility and/or Force Majeure as defined in this paragraph shall not excuse or delay compliance with any or all other obligations required under this Consent Decree.

40.1. If SSATA claims compliance was or is impossible, it shall notify LA Waterkeeper in writing as soon as possible, but in no event more than five (5) business days of the date that SSATA learns of the event or circumstance that caused or would cause a violation of this Consent Decree (hereinafter referred to as the "Notice of Nonperformance").

40.2. Within ten (10) business days of sending the Notice of Nonperformance, SSATA shall send LA Waterkeeper a detailed description of the reason for the nonperformance and the specific obligations under the Consent Decree that are or have been affected by the Force Majeure. It shall describe the anticipated length of time the

delay may persist, the cause or causes of the delay, the measures SSATA took or will take to prevent or minimize the delay, the schedule by which the measures shall be implemented, and the anticipated date of compliance. In no event shall the deadline be extended beyond the length of the delay caused by the Force Majeure event. SSATA shall adopt all reasonable measures to avoid and minimize such delays and shall provide LA Waterkeeper with notice of a reasonable date certain of completion of the prior nonperformance of a specific obligation under the terms of this Consent Decree within fifteen (15) days of discovery of the date certain for completion.

40.3.   The Settling Parties shall meet and confer in good faith concerning the non-performance and, where the Settling Parties concur that performance was or is impossible due to an event or matter covered under the Force Majeure provisions of this Consent Decree, despite the timely good faith efforts of SSATA, the establishment of new deadlines.

40.4.   If LA Waterkeeper disagrees with SSATA's Notice of Nonperformance, or if the Settling Parties cannot timely agree on the terms of new performance deadlines or requirements, either party shall have the right to invoke the dispute resolution procedure pursuant to Section VI.

41.   <u>Administrative Delay</u>. SSATA shall diligently pursue any approvals required for compliance with this Consent Decree. Should such diligent pursuit of approvals required for compliance be unavailing due to actions of or inaction on the part of the any governmental or regulatory entity with jurisdiction over SSATA, and SSATA reasonably demonstrates that these delays are not attributable to any action or inaction on the part of the SSATA, any relevant compliance deadlines set forth in this Consent

Decree shall be tolled until such time as Parties agree to an alternative means of compliance with the Consent Decree pursuant to the Force Majeure clause herein.

## VII.  MUTUAL RELEASE OF LIABILITY

42.  LA Waterkeeper's Release. Upon the Effective Date of this Consent Decree, LA Waterkeeper, on its own behalf and on behalf of its current and former officers, directors, employees, and each of their successors and assigns, and their agents, attorneys, and other representatives, release all persons including, without limitation, SSATA (and each of its direct and indirect parent and subsidiary companies and affiliates, and their respective current and former officers, directors, members, employees, shareholders, and each of their predecessors, successors, and assigns, and each of their agents, attorneys, consultants, and other representatives) from and waives all claims alleged in the Notice Letter and/or Complaint, FAC, and SAC up to the termination of this Consent Decree.

43.  SSATA's Release. Upon the Effective Date of this Consent Decree, SSATA, on its own behalf and on behalf of its current and former officers, directors, employees, members, and each of their successors and assigns, and their agents, attorneys, and other representatives releases LA Waterkeeper (and its current and former officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and their agents, attorneys, and other representatives) from and waives all claims which arise from or pertain to this action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed for matters related to LA Waterkeeper's Notice Letter, Complaint, FAC, and SAC up to the termination of this Consent Decree by the Court.

44.  Covenant Not to Sue.  As of the Effective Date of this Agreement, and for a period up to and including the Termination Date of this Agreement, LA Waterkeeper agrees that LA Waterkeeper, its officers, directors, executive staff, members, and any individuals or organization under the control of LA Waterkeeper, its officers, executive staff, and members of its governing board, will not serve any 60-day Notice of Violations

and Intent to Sue or file any lawsuit against SSATA, the City of Long Beach, or their respective affiliates, current or former officers, directors, members, employees, shareholders, or any of their predecessors, successors, or assigns, or any of their agents, attorneys, consultants, or any other of their representatives for alleged violations related to Pier A that were or could have been raised in its Notice Letter, Complaint, FAC, and/or SAC.

## VIII.  MISCELLANEOUS PROVISIONS

45.  <u>No Admission of Liability</u>. Neither this Consent Decree, the implementation of additional BMPs, nor any payment pursuant to the Consent Decree, shall constitute or be construed as a finding, adjudication, admission, or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. SSATA maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

46.  <u>Construction</u>. The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Storm Water Permit, the Clean Water Act, or specifically herein.

47.  <u>Choice of Law</u>. The laws of the United States and the State of California shall govern this Consent Decree.

48.  <u>Severability</u>. If the Court holds any provision, paragraph, section, or sentence of this Consent Decree to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

49.  <u>Correspondence</u>. Unless specifically provided for in this Consent Decree, all notices required herein or any other correspondence pertaining to this Consent Decree shall be sent by U.S. mail or electronic mail as follows:

<u>If to LA Waterkeeper:</u>

Los Angeles Waterkeeper
Attn: Benjamin Harris, Barak Kamelgard, Madeleine Siegel
360 E 2nd Street Suite 250
Los Angeles, CA  90012

ben@lawaterkeeper.org
barak@lawaterkeeper.org
madeleine@lawaterkeeper.org

With a copy to

Environmental Advocates
Attn: Christopher Sproul, Brian Orion, Marla Fox
5135 Anza Street
San Francisco, CA 94121
csproul@enviroadvocates.com
borion@enviroadvocates.com
mfox@enviroadvocates.com

If to SSATA:

SSA Terminals (Pier A), LLC
Attn: Candice M. Woods
SSA Marine, Inc.
Deputy General Counsel
1131 SW Klickitat Way
Seattle, WA 98134
206.654.3587 phone
206.515.4192 fax
Candice.Woods@SSAMarine.com
Legal@Carrix.com

With a copy to:

Environmental Law Group LLP
Attn: S. Wayne Rosenbaum
225 Broadway, Suite 1900
San Diego, CA 92101
swr@envirolawyer.com

50.    Notifications of communications shall be deemed submitted three (3) business days after having been sent via U.S. mail or the day of sending notification or communication by electronic mail. Any change of address or addressees shall be communicated in the manner described above for giving notices.

51.    Counterparts. The Settling Parties may execute this Consent Decree in any number of counterparts, all of which together shall constitute one original document.

Telecopy, email of a .pdf signature, and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

52.   <u>Modification of the Consent Decree</u>. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Settling Parties. If any Settling Party wishes to modify any provision of this Consent Decree, the Settling Party must notify the other Settling Party in writing at least twenty-one (21) days prior to taking any step to implement the proposed change.

53.   <u>Full Settlement</u>. This Consent Decree constitutes a full and final settlement of this matter.

54.   <u>Integration Clause</u>. This is an integrated Consent Decree. The Settling Parties intend this Consent Decree to be a full and complete statement of the terms of the agreement between the Settling Parties and expressly supersedes all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

55.   <u>Authority</u>. The undersigned representatives for LA Waterkeeper and SSATA each certify that they are authorized by the Settling Party whom they represent to enter the terms and conditions of this Consent Decree.

56.   The Settling Parties certify that their undersigned representatives are fully authorized to enter this Consent Decree, to execute it on behalf of the Settling Parties, and to legally bind the Settling Parties to its terms.

57.   The Settling Parties, including any successors or assigns, agree to be bound by this Consent Decree and not to contest its validity in any subsequent proceeding to implement             or             enforce             its             terms.

**IN WITNESS WHEREOF**, the undersigned have executed this Consent Decree as of the date first set forth below.

1

**APPROVED AS TO CONTENT**

2

3

4   Dated:    April 3, 2024          By: _____

5                                    Bruce Reznik
                                     Executive Director
6                                    Los Angeles Waterkeeper

7

8   Dated:    APRIL 3, 2024          By: _____

9                                    Jon Kozachenko
                                     General Manager
10                                   SSA Terminals (Pier A), LLC

11

12

**APPROVED AS TO FORM**

13

14

15  Dated:    April 1, 2024          By: _____

16                                   Christopher Sproul
                                     Environmental Advocates
17                                   Attorney for LA Waterkeeper

18

19  Dated:    April 3, 2024          By: _____

20                                   Barak Kamelgard
                                     LA Waterkeeper
21                                   Attorney for LA Waterkeeper

22

23  Dated:    April 8, 2024          By: _____

24                                   S. Wayne Rosenbaum
                                     Environmental Law Group
25                                   Attorney for SSA Terminals (Pier A), LLC

26  **IT IS SO ORDERED.**

27
    Dated: May 7, 2024               _____
28
                                     Hon. Fred. W. Slaughter

Consent Decree                 34            Civil Case No. 2:22-cv-01198-FWS-MRW

# EXHIBIT A



**Legend**

- Facility Boundary
- Sample Locations
- PNID Sampling Location
- Industrial Areas
- Vehicle Fueling Area
- Chassis Storage Area
- Priority Non Industrial Area

**BMP TYPE**
- Drop Inlets
- Metalvox wattles

Crane Shop

Gearman Storage

CERRITOS CHANNEL

Sitemap Prepared as Exhibit A to the Consent Decree to which it is attached and is not intended for any other purpose.

**STORMWATER SITE MAP WITH ADDITIONAL INFORMATION**
**SSA PIER A TERMINAL | 700 PIER A PLAZA | LONG BEACH**

© 2023 Microsoft Corporation © 2023 Maxar ©CNES (2023) Distribution Airbus DS © 2023 TomTom, Port of
Los Angeles, City of Long Beach, County of Los Angeles, California State Parks, Esri, HERE, Garmin,
SafeGraph, FAO, METI, NASA, USGS, Bureau of Land Management, EPA, NPS

Coordinate System: NAD 1983 StatePlane California V FIPS 0405 Feet

**DATE REVISED:** 01/30/2024

**Drainage Areas and BMPs**

Client:
SSAMarine

Site:
Pier A Terminal

**EXHIBIT A**

3771 Long Beach Blvd. Annex Bldg
Long Beach, CA 90807
P: 562.495.5777 www.nv5.com

**N|V5**

Torrance

Long Beach

Palos

# EXHIBIT B

# Enpurion FlexBasin™

 NEW!

## Stormwater pillows offer low-cost, versatile and effective treatment

**Combine engineered media pillow materials to fit your site's needs**

### Proven Results

- Select engineered media for specific pollutants
- Pick textiles for influent characteristics
- Reduce heavy metals
- Capture turbidity and suspended solids
- Eliminate emulsified oils and hydrocarbons
- Change pillows to adapt to site conditions instantly
- Manage your own maintenance quickly, easily and cost-effectively

### Advantages

- Flexible and effective stormwater treatment
- Low-cost, easy to use and maintain
- Scalable and modular
- Can be configured for any combination or pollutant

### Applications

- Parking lots
- High traffic areas
- Production and material storage areas

- Enpurion MT media for metals and oils
- Enpurion MX media for phosphorus, pH
- Enpurion BioBlend for organics
- ZnIX ion exchange for zinc, and copper
- Enpurion CLR for turbidity and TSS



Engineered media for site-specific pollutants

High capacity design

Up to 5 different sorption media

Optional sample port

Liner captures oils and debris

Mesh base prevents clogging

**Target pollutants:**

- ✓ Zinc & copper
- ✓ Turbidity & pH
- ✓ Pb, Al and Fe
- ✓ Phosphorus
- ✓ Emulsified oils
- ✓ Suspended solids

info@enpurion.com
253-922-8823

www.enpurion.com
©2022 Lean Environment Inc

# enpurion

# EXHIBIT C

CONFIDENTIAL – NOT FOR DISTRIBUTION

# Analyte Reduction Strategy Report

Qualifying Storm Event Sample Date(s):_____

Date(s) Sample Analyses Received:_____

| Sample Results (only enter if applicable Numeric Limit exceeded) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Constituent | TSS (mg/L) | O&G (mg/L) | Aluminum (mg/L) | Copper (mg/L) | Iron (mg/L) | Lead (mg/L) | Zinc (mg/L) | pH (s.u.) |
| Numeric Limit | 100 (annual); 400 (instant) | 15 (annual); 25 (instant) | 0.75 | 0.0332 | 1.0 | 0.262 | 0.26 | 6.5-9.5 |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |

| Additional BMPs Planned | Estimated Date of Implementation | Los Angeles Waterkeeper Comments if any (attach additional pages if necessary) | Response to Comments if any (attach additional pages if necessary) |
|---|---|---|---|
| | | | |
| | | | |

CONFIDENTIAL – NOT FOR DISTRIBUTION

| | | | |
|---|---|---|---|
| | | | |

Date Sent to Los Angeles Waterkeeper:_____

Preparer: _____

QISP ID Number: _____

Date Comments Received (no later than 30 days from LAW receipt of report): _____

Los Angeles Waterkeeper comments received by: _____

Date Response to comments sent to Waterkeeper: _____.

Preparer: _____

QISP ID Number: _____

# EXHIBIT D

CONFIDENTIAL – NOT FOR DISTRIBUTION

# PNID Reduction Strategy Report

Qualifying Storm Event Sample Date(s):_____

Date(s) Sample Analyses Received:_____

| Sample Results (only enter if applicable Numeric Limit exceeded) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Constituent | TSS (mg/L) | O&G (mg/L) | Aluminum (mg/L) | Copper (mg/L) | Iron (mg/L) | Lead (mg/L) | Zinc (mg/L) | pH (s.u.) |
| Numeric Limit | 100 (annual); 400 (instant) | 15 (annual); 25 (instant) | 0.75 | 0.0332 | 1.0 | 0.262 | 0.26 | 6.5-9.5 |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |

| Additional BMPs Planned | Estimated Date of Implementation |
|---|---|
| | |
| | |
| | |
| | |

Date Sent to Los Angeles Waterkeeper:_____

Preparer: _____

# Exhibit 2

Christopher Sproul (State Bar No. 126398)
csproul@enviroadvocates.com
Brian Orion (State Bar No. 239460)
borion@enviroadvocates.com
Marla Fox (State Bar No. 349813)
mfox@enviroadvocates.com
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695

Barak Kamelgard (State Bar No. 298822)
barak@lawaterkeeper.org
Benjamin Avi Harris (State Bar No. 313193)
ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E. 2nd Street, Suite 250 Los Angeles, California 90012
Telephone: (310) 394-6162

*Attorneys for Plaintiff*
Los Angeles Waterkeeper

S. Wayne Rosenbaum (SBN 182456)
Grant R. Olsson (SBN: 317583)
**ENVIRONMENTAL LAW GROUP LLP VARCO & ROSENBAUM**
225 Broadway, Suite 1900 San Diego, California 92101
Tel: (619) 231-5858
swr@envirolawyer.com
golsson@envirolawyer.com

*Attorneys for Defendants*
*SSA TERMINALS, LLC; SSA PACIFIC, INC.;*
*PACIFIC MARITIME SERVICES, LLC; and*
*SSA Terminals (Pier A), LLC.*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, A California non-profit corporation, | Civil Case No: 2:22-cv-01198-FWS-MRW |
| Plaintiff,<br>vs. | **CONSENT DECREE PIER C** |
| SSA Terminals, LLC; SSA Pacific, Inc.; Pacific Maritime Services, LLC; SSA Terminals (Pier A), LLC; City of Long Beach, | **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)** |
| Defendants. | |

# CONSENT DECREE

The following Consent Decree is entered into by and between Los Angeles Waterkeeper ("LA Waterkeeper"), and SSA Terminals, LLC ("SSA Terminals" or "SSAT"). The entities entering this Consent Decree are each an individual "Settling Party" and collectively the "Settling Parties."

**WHEREAS,** LA Waterkeeper is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its primary office in Santa Monica, California;

**WHEREAS,** LA Waterkeeper is dedicated to the preservation, protection, and defense of the rivers, creeks, and coastal waters of Los Angeles County from all sources of pollution and degradation;

**WHEREAS,** SSA Terminals (Pier A), LLC is the lessee and operator of Pier A located at 700 Pier A Plaza, Long Beach, California 90813 ("Pier A");

**WHEREAS,** SSA Terminals, LLC is the lessee and operator of Pier C60 located at 1521 Pier C Street, Long Beach, California 90813 ("Pier C");

**WHEREAS,** SSA Pacific, Inc. is the operator of Pier F Berths 204 to 207 at Pier F Berth 206, Long Beach, California 90802 ("Pier F");

**WHEREAS,** Pacific Maritime Services, LLC is the lessee and operator of Pier J located at 1521 Pier J Avenue E., Long Beach, California 90802 ("Pier J");

**WHEREAS,** SSA Terminals (Pier A), LLC, SSA Terminals, LLC, SSA Pacific, Inc., and Pacific Maritime Services, LLC are collectively referred to herein as the "SSA Entities";

**WHEREAS,** Piers A, C, F, and J are each owned by the City of Long Beach ("City of Long Beach" or "City");

**WHEREAS,** Pier C is an establishment primarily engaged in activities directly related to marine cargo handling for or from a vessel, that arrives at shipside, dock, pier, terminal, staging area, or in-transit area until cargo loading or unloading operations are completed (SIC Code 4491);

**WHEREAS,** SSA Terminals contends that neither the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as superseded by Order No. 2014-0057-DWQ, and amended by Order No. 2015-0122 –DWQ and Order 2018-0028-DWQ ("Storm Water Permit"), nor the federal NPDES program for storm water discharges associated with industrial activities apply to drainages at transportation facilities that are not associated with specified industrial activities, and LA Waterkeeper disputes this contention, but the Settling Parties have compromised to allow for settlement of this matter notwithstanding said disagreement, with the parties' legal obligations to each other defined by this Agreement, and each party reserving all rights unless expressly stated to the contrary herein;

**WHEREAS,** LA Waterkeeper alleges its members live, work, travel, recreate, own property and homes, and reside in Los Angeles County. LA Waterkeeper's members use and enjoy the waters of Long Beach Harbor into which Pier C directly discharges storm water. LA Waterkeeper alleges that its members use and enjoy these waterways for recreational, educational, aesthetic, and spiritual purposes. Additionally, LA Waterkeeper alleges that it, and its members, use Long Beach Harbor, the Pacific Ocean, and the beaches into which these waters flow to engage in scientific study;

**WHEREAS,** subject to the Settling Parties' disagreement discussed above, storm water associated with vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication) and equipment cleaning as defined in 40 C.F.R. § 122.26(b)(14)(viii) from Pier C are regulated by the Storm Water Permit and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"), Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342 ("Regulated Industrial Activities");

**WHEREAS,** Pier C operates under SIC code 4491—Marine Cargo Handling; Pier C's Waste Discharger Identification Number ("WDID") is 4 19I025337;

///

///

---

**WHEREAS,** the Regulated Industrial Activities occurring at Pier C include vehicle maintenance and equipment washing as depicted on the Site Plan attached hereto as **Exhibit A**;

**WHEREAS,** the Storm Water Permit includes the following requirements for those regulated activities occurring at Pier C: (1) develop and implement a Stormwater Pollution Prevention Plan ("SWPPP"); (2) control pollutant discharges associated with industrial activities using, as appropriate, best available technology economically achievable ("BAT") or best conventional pollutant control technology ("BCT") to prevent or reduce pollutants; (3) implement BAT and BCT through the development and application of Best Management Practices ("BMPs"), which must be included and updated in the SWPPP; and (4) when necessary, implement additional BMPs to prevent or reduce any pollutants associated with industrial activities that are causing or contributing to any exceedance of water quality standards;

**WHEREAS**, this Consent Decree imposes requirements on Pier C that go beyond those set forth in the Storm Water Permit through the implementation of BMPs and informational sampling of storm water related to non-industrial areas of Pier C;

**WHEREAS,** on December 8, 2021, LA Waterkeeper sent the SSA Entities, the United States Environmental Protection Agency ("EPA"), EPA Region IX, the State Water Resources Control Board ("State Board"), and the Los Angeles Regional Water Quality Control Board ("Regional Board") a notice of intent to file suit ("Notice Letter") under Sections 505(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1365(a) and (b). The Notice Letter alleged violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at Pier C;

**WHEREAS,** on February 22, 2022, LA Waterkeeper filed a complaint against the SSA Entities in the United States District Court, Central District of California alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at Piers A, C, F, and J ("Complaint");

///

1    **WHEREAS,** on March 10, 2022, LA Waterkeeper sent via letter its First

2    Supplemental Notice of Clean Water Act Violations and Intent to File Suit ("Supplemental

3    CWA Notice Letter");

4    **WHEREAS**, on May 9, 2022, the SSA Entities, including SSA Terminals, filed

5    their first motion to dismiss five of LA Waterkeeper's six claims in the Complaint for

6    failure to state a claim and lack of subject matter jurisdiction, and a motion to strike

7    portions of the sixth claim;

8    **WHEREAS,** on September 16, 2022, LA Waterkeeper sent a notice letter alleging

9    violations of the Resource Conservation and Recovery Act ("RCRA Notice Letter");

10   **WHEREAS,** on January 10, 2023, LA Waterkeeper filed its first amended

11   complaint ("FAC") against the SSA Entities and the City in the United States District

12   Court, Central District of California alleging violations of Section 301(a) of the Clean

13   Water Act, 33 U.S.C. § 1311(a), RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B),

14   28 U.S.C. § 1331, and violations of the Storm Water Permit at Piers A, C, F, and J;

15   **WHEREAS,** on March 13, 2023, the City filed a motion to dismiss LA

16   Waterkeeper's FAC for failure to state a claim and lack of subject matter jurisdiction;

17   **WHEREAS,** on March 13, 2023, the SSA Entities, including Pier C, filed their

18   second motion to dismiss five of LA Waterkeeper's six claims in the FAC for failure to

19   state a claim and lack of subject matter jurisdiction, and a motion to strike portions of the

20   sixth, on essentially the same bases as its prior motion to dismiss;

21   **WHEREAS,** on August 14, 2023, LA Waterkeeper filed a motion for leave to

22   amend and supplement the FAC;

23   **WHEREAS,** on August 24, 2023, the SSA Entities and the City filed an opposition

24   to LA Waterkeeper's motion for leave to amend.

25   **WHEREAS,** on October 14, 2023, Judge Fred W. Slaughter ruled on the motions

26   to dismiss and the motion to amend and ordered:

27   1.    The SSA Defendants' Motion to Dismiss (Dkt. 58) is GRANTED IN PART

28   AND DENIED IN PART. The Motion is DENIED as to Plaintiff's first, second, third, and

fourth claims and pre-suit notice under RCRA. The Motion is GRANTED as to Plaintiff's sixth claim. The sixth claim under RCRA is DISMISSED WITH LEAVE TO AMEND.

2.      Defendant City of Long Beach's Motion to Dismiss (Dkt. 59) is GRANTED IN PART AND DENIED IN PART. The Motion is DENIED as to Plaintiff's pre-suit notice and GRANTED as to Plaintiff's CWA and RCRA claims against Defendant City of Long Beach. Plaintiff's claims against Defendant City of Long Beach are DISMISSED WITH LEAVE TO AMEND.

3.      Plaintiff's Motion to Amend the Complaint (Dkt. 73) is DENIED AS MOOT.

4.      Plaintiff is ORDERED to file a Second Amended Complaint, consistent with the Court's Order, by December 15, 2023;

**WHEREAS,** on December 15, 2023, LA Waterkeeper filed a Second Amended Compliant ("SAC");

**WHEREAS,** LA Waterkeeper alleges SSA Terminals to be in violation of the substantive and procedural requirements of the Storm Water Permit, the Clean Water Act, and RCRA with respect to Pier C;

**WHEREAS,** SSA Terminals denies all allegations in the Notice Letters, Complaint, FAC, and SAC relating to Pier C;

**WHEREAS,** LA Waterkeeper and SSA Terminals have agreed that it is in the Settling Parties' mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the SAC with respect to Pier C without further proceedings; and

**WHEREAS,** all actions taken by the Settling Parties pursuant to this Consent Decree shall comply with all applicable federal and state laws and local rules and regulations.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1.      The Court has jurisdiction over the subject matter of this action pursuant to

Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a).

2.    Venue is appropriate in the Central District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because Pier C is located within this District.

3.    The SAC alleges claims upon which relief may be granted pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), and the Summons and Complaint shall be deemed served pursuant to Fed. R. Civ. P. 4.

4.    LA Waterkeeper has standing to bring this action.

5.    The Court shall retain jurisdiction over this matter for purposes of interpreting, modifying, or enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce this Consent Decree.

6.    The Court shall dismiss with prejudice all claims against the City of Long Beach with respect to the Federal Water Pollution Control Act (the "CWA"), 33 U.S.C. §§ 1251, *et seq*., including, and without limitation, all claims arising out of 33 U.S.C. §§ 1311(a), 1331, and 1342.

7.    The Court shall dismiss with prejudice all claims against the City of Long Beach and SSA Terminals with respect to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, *et seq*., including, and without limitation, RCRA section 7002(a)(1), 42 U.S.C. § 6972.

## I.    **OBJECTIVES**

8.    It is the express purpose of the Settling Parties entering this Consent Decree to further the objectives set forth in the Clean Water Act and to resolve those issues alleged by LA Waterkeeper in its SAC. Considering these objectives and as set forth fully below, the Settling Parties agree to comply with the provisions of this Consent Decree and SSA Terminals agrees to comply with the applicable requirements of the Storm Water Permit and all applicable provisions of the Clean Water Act at Pier C.

///

**II.   AGENCY REVIEW AND TERM OF CONSENT DECREE**

9.   LA Waterkeeper shall submit this Consent Decree to the United States Department of Justice and the EPA (collectively, "Federal Agencies") within three (3) days of the final signature of the Settling Parties for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) days after receipt by both agencies, as evidenced by written acknowledgement of receipt by the agencies or the certified return receipts, copies of which LA Waterkeeper shall provide to SSA Terminals. If the Federal Agencies object to entry of this Consent Decree, the Settling Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies within a reasonable amount of time. Following the Federal Agencies' review, the Settling Parties shall submit the Consent Decree to the Court for entry.

10.   The term "Effective Date" as used herein shall mean the day that the Court enters the last of the Consent Decrees for Piers A, C, F, and J, or the next business day if such day is not a business day.

11.   This Consent Decree will terminate three (3) years from the Effective Date, unless prior to the termination date either Party has invoked the dispute resolution provisions of this Consent Decree and there is an ongoing, unresolved dispute regarding either Settling Party's compliance with this Consent Decree, in which case the Consent Decree will terminate upon final resolution of the dispute pursuant to the dispute resolution provisions contained herein.

**III.   COMMITMENTS OF THE SETTLING PARTIES**

**A.   Storm Water Pollution Control Best Management Practices.**

12.   The Settling Parties acknowledge that SSA Terminals has or is in the process of making BMP changes to Pier C to improve the quality of storm water discharges from the portions of the Facility depicted in **Exhibit A** as having industrial activities ("Industrial Areas") or vehicle fueling activities ("Vehicle Fueling Areas"). In addition to implementing and maintaining BMPs, SSA Terminals shall implement the BMPs specifically identified and described in this Consent Decree in paragraph 13, for Industrial

Areas and Vehicle Fueling Areas described in **Exhibit A**, as applicable.

13.     Within thirty (30) days of the Effective Date, SSA Terminals shall incorporate the following structural and non-structural BMPs in the Industrial Areas and Fueling Areas described in **Exhibit A**, as applicable:

    13.1.   Structural BMPs

        13.1.1.   Installing Enpurion with ZnIX pillows, or equivalent, in storm drain inlets in Industrial Areas and Vehicle Fueling Areas as identified in **Exhibit A**.  See attached manufacturer's cut sheets attached hereto as **Exhibit B**.

        13.1.2.   Construct curbs or equivalent measures sufficient to prevent storm water discharges from any point other than discharge points designated in the Facility's SWPPP as it pertains to Industrial Areas and Vehicle Fueling Areas abutting Channel Three and as more fully described in Exhibit A.

    13.2.   Wattles/Filter Socks

        13.2.1.   Deploy Metaloxx or equivalent absorbing wattles/filter socks inside the berms or curbs referenced in paragraph 13.1.2 at the discharge points designated in the Facility's SWPPP.

        13.2.2.   Ensure wattles/filter socks are deployed to the extent feasible to prevent stormwater from flowing around or beneath the wattles/filter socks.

    13.3.   Vehicle Fueling Areas

        13.3.1.   Fully delineate all Vehicle Fueling Areas identified in **Exhibit A** with painted markings or signage.

    13.4.   Sweeping

        13.4.1.   Monthly inspection of Industrial Areas and Vehicle Fueling Areas described in **Exhibit A** and the removal of trash and

other debris by on-site personnel.

    13.4.2.  Based on the results of monthly inspections, SSA Terminals will deploy personnel to conduct detailed sweeping with a regenerative sweeper, as well as hand sweeping of hard-to-reach areas of Industrial Areas and Vehicle Fueling Areas.

13.5.  Housekeeping in Industrial Areas and Vehicle Fueling Areas

    13.5.1.  Close or cover all waste/trash/recycle bins when not in active use.

    13.5.2.  To the extent feasible, move, or otherwise cover, stored and miscellaneous metal out of contact with rainfall and runoff.

13.6.  Storm Water Team personnel will conduct Pre-Rain Inspections of Industrial Areas and Vehicle Fueling Areas when the NOAA station at Long Beach Municipal Airport predicts a local rain in the next seventy-two (72) hours of greater than one half (0.5) inches with a probability of greater than fifty percent (50%).  The inspection will include the following elements:

    13.6.1.  Inspection of the Industrial Areas and Vehicle Fueling Areas for any areas of dirt and debris accumulation.

    13.6.2.  Removal of dirt and debris from areas identified in 13.6.1.

    13.6.3.  Inspection of catch basin inserts and insert media in Industrial Areas and Vehicle Fueling Areas. Replace as necessary, based upon observations and manufacturers' recommendations.

    13.6.4.  Inspect for any spills or leaks in Industrial Areas and Vehicle Fueling Areas and take appropriate actions.

    13.6.5.  Confirm all waste/trash/recycle bins in Industrial Areas and Vehicle Fueling Areas are closed or covered.

13.7.  Staff training as described in paragraphs 24-27 below.

14.     For the Priority Non-Industrial Drainage ("PNID") Areas of the Facility depicted in **Exhibit A**, SSA Terminals will implement the following non-structural BMPs:[1]

    14.1.  Sweeping

        14.1.1.  Monthly inspection and the removal of trash or debris by on-site personnel.

        14.1.2.  Based on the results of monthly inspections, SSA Terminals will deploy personnel to conduct quarterly detailed sweeping with a regenerative sweeper, as well as hand sweeping of hard-to-reach areas.

    14.2.  Housekeeping

        14.2.1.  Close or cover all waste/trash/recycle bins when not in active use.

        14.2.2.  To the extent feasible, move, or otherwise cover, stored and miscellaneous metal out of contact with rainfall and runoff.

    14.3.  Inspections

        14.3.1.  Pre-rain inspections as described in paragraph 13.6 above.

    14.4.  Staff training as described in paragraphs 24-27 below.

15.     In addition to the non-structural BMPs for PNID areas set forth in paragraph 14 above, SSA Terminals will implement the following structural and non-structural BMPs for the chassis storage areas depicted in **Exhibit A**:

    15.1.  Chassis Storage Area 1

        15.1.1.  Structural BMPs

            15.1.1.1.  Enclose the northern perimeter of the Chassis Storage area with concrete berms or curbs sufficient to prevent storm water discharges from any point other than discharge points identified in

---

[1] It is SSA Terminals' intention to implement the provisions of this section 14 to the balance of the Non-Industrial Areas at Pier C as time and resources allow in SSA Terminals' sole and absolute discretion.

**Exhibit A**.

15.1.2. Wattles/Filter Socks

        15.1.3.    Employ and secure Metaloxx or equivalent metal absorbing wattles/filter socks inside the berms or curbs referenced in paragraph 15.1.1.1 at the discharge points identified in **Exhibit A**.

        15.1.4.    Ensure wattles/filter socks are deployed to the extent feasible to prevent stormwater from flowing around or beneath the wattles/filter socks.

15.2.  Chassis Storage Area 2

    15.2.1.  Deploy Metaloxx or equivalent wattles/filter socks as described in **Exhibit A**.

    15.2.2.  Ensure wattles/filter socks are deployed to the extent feasible to prevent stormwater from flowing around or beneath the wattles/filter socks.

**B.**    **Discharge Locations and Storm Water Sampling**

16.    <u>Discharge Locations</u>. **Exhibit A** attached hereto identifies storm water discharge locations and one (1) storm water sample location for Pier C ("Industrial Sample Locations"), referred to herein as the "Power Shop Sample Location," in conformity with provision XI.C.4 of the Storm Water Permit. In addition, **Exhibit A** attached hereto identifies one (1) PNID sample location for informational purposes only, referred to herein as the "Chassis Storage Area 2" Sample Location. PNID sample results will be shared with LA Waterkeeper on a confidential basis and are for informational purposes only. Should Sample Locations change, SSA Terminals will amend the Facility site map and notify LA Waterkeeper within thirty (30) days of such a change.

17.    <u>Sampling</u>. SSA Terminals will implement the following industrial storm water monitoring procedures at Pier C:

17.1.    Frequency.

17.1.1.   Industrial Sample Location. During the life of this Consent Decree, weather permitting, SSA Terminals shall collect samples from the Industrial Sample Location identified on **Exhibit A** at Pier C to the extent feasible from a minimum of four (4) "qualifying storm events" that occur in a reporting year such that SSA Terminals collects two (2) samples during the first half of the reporting year and two (2) samples during the second half of the reporting year. A "qualifying storm event" or "QSE" is a storm event that produces a discharge from a drainage area covered by the Storm Water Permit and is preceded by forty-eight (48) hours with no discharge from any drainage area. If, prior to March 1, SSA Terminals has collected samples from fewer that two (2) QSEs, SSA Terminals shall, to the extent feasible, collect samples during as many QSEs as feasible until SSA Terminals samples a minimum of four (4) storm events for the reporting year, if feasible. No two (2) samples may be from the same Sample Location during the same storm event.

17.1.2.   Chassis Storage Area 2 Location. Except as provided below, during the life of this Consent Decree, weather permitting, SSA Terminals shall collect samples from the Chassis Storage Area 2 Sample Location as identified on **Exhibit A** at Pier C from a minimum of four (4) QSEs that occur in a reporting year such that SSA Terminals samples during each of the same QSEs as it samples for the Power Shop Sample Location to the extent feasible.

17.2.    Contained or Stored Storm Water. To the extent that SSA Terminals

stores or contains storm water associated with areas of industrial activity, SSA Terminals shall sample the stored or contained water at Pier C before it discharges the storm water from Pier C to a storm drain or Water of the United States even if not during operating hours in conformity with provision XI.B.4.b of the Storm Water Permit.

17.3. <u>Parameters</u>. SSA Terminals shall analyze the Industrial Area and Chassis Storage Area 2 storm water samples collected for the contaminants set forth in Table 1.

17.4. <u>Laboratory</u>. A laboratory accredited by the State of California shall analyze all samples collected pursuant to this Consent Decree.

17.5. <u>Detection Limits</u>. The laboratory shall use analytical methods adequate to detect the individual contaminants at or below Table 1 Numeric Limits.

17.6. <u>Hold Time</u>. SSA Terminals shall deliver all samples collected from Pier C to the laboratory as necessary to ensure no exceedance of the sample "hold time" for each contaminant sampled. For field measurements, such as pH, SSA Terminals shall use portable instruments, and not pH paper. SSA Terminals will calibrate and use the instruments according to manufacturers' instructions and approved industry methodology, as specified in 40 C.F.R., Part 136.

17.7. <u>Results</u>. SSA Terminals shall request that the laboratory report sample analysis results to SSA Terminals within ten (10) days of laboratory receipt of the sample, or as soon as possible without incurring "rush" charges.

17.8. <u>Reporting</u>. SSA Terminals shall upload and certify on the California Stormwater Multiple Application and Report Tracking System ("SMARTS") the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report, for all

Industrial storm water samples collected at Pier C described and taken in accordance with this paragraph 17 within ten (10) days of receiving the laboratory results, and shall notify LA Waterkeeper that the foregoing has been uploaded to SMARTS and certified within five (5) days of certification. At the same time as such notification, SSA Terminals shall also provide LA Waterkeeper with the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report, for the Chassis Storage Area 2 Sample Location storm water samples collected at Pier C in accordance with this paragraph 17 on a confidential basis.

18.   <u>Contaminant Reduction</u>. SSA Terminals shall develop and implement additional BMPs to reduce pollutants in storm water discharges from Industrial Areas at Pier C, where specifically required herein, to levels below those in Table 1 under the terms of this Consent Decree set forth below ("Numeric Limits").

**Table 1. Numeric Limits**

| Analytes | Values | Source of Limit |
|---|---|---|
| Total Suspended Solids | 100 mg/L (annual); 400 mg/L (instantaneous) | Permit NAL |
| Zinc | 0.26 mg/L (annual) | Permit NAL |
| Iron | 1.0 mg/L (annual) | Permit NAL |
| Copper | 0.0332 mg/L (annual) | Permit NAL |
| Oil and Grease | 15 mg/L (annual); 25 mg/L (instantaneous) | Permit NAL |
| Aluminum | 0.75 mg/L (annual) | Permit NAL |
| pH | 6.5-8.5 s.u. (instantaneous) | Basin Plan |

19.   <u>Table 1 Exceedances</u>. An "Exceedance" of Table 1 is defined, with respect to any Industrial Sample Location and the Chassis Storage Area 2 Sample Location, as any of the following:

19.1.   Where the sampling result is greater than or equal the sum of the concentrations of any pollutant in any storm water sample from any

Sample Location and all prior storm water samples collected for the same pollutant from the same Sample Location in the same reporting year demonstrate that the annual average for that pollutant from that Sample Location will exceed the applicable annual Numeric Limit specified in Table 1 if that pollutant is sampled four (4) times from that Sample Location in that reporting year;[2]

19.2. If any pollutant is sampled fewer than four (4) times from any Sample Location in a reporting year, and there was otherwise no Exceedance for that pollutant at that Sample Location pursuant to paragraph 19.1 above, then where the average concentration of that pollutant from all storm water samples from that Sample Location during that reporting year exceeds the applicable annual Numeric Limit specified in Table 1;[3] or

19.3. Where the concentration of any pollutant in any two (2) storm water samples collected from that Sample Location in a Reporting Year exceed any instantaneous Numeric Limit specified in Table 1, for Total Suspended Solids and Oil & Grease, or are outside the range of any instantaneous Numeric Limit specified in Table 1, for pH.

20. <u>Analyte Reduction Strategy for Table 1 Exceedances with respect to Industrial Sample Location</u>.   If Pier C monitoring, as required herein with respect to any Industrial Sample Location, reveals one (1) or more Exceedance, as defined in paragraph 19 above, SSA Terminals shall submit a plan to LA Waterkeeper for

---

[2] E.g., There is an Exceedance (a) where a sample from Sample Location #1 during the first QSE has a concentration for iron of 5 mg/L, and also (b) where samples from Sample Location #1 during the first, second, and third QSEs have concentrations for iron of 2 mg/L, 0.5 mg/L, and 2.5 mg/L, respectively, because, in either scenario, the  annual average based on four QSEs at Sample Location #1 would be at minimum 1.25 mg/L regardless of the concentrations in further samples from that Sample Location.

[3] E.g., Where samples from Sample Location #1 during the first, second, and third QSEs have concentrations for iron of 1.2 mg/L, 1.1 mg/L, and 1.2 mg/L, respectively, but only three samples were collected for iron from Sample Location #1 during that reporting year, because the average based on four QSEs would be less than 1 mg/L, but the average of the three samples taken is greater than 1 mg/L.

reducing the level of the pollutant to the Numeric Limits specified in Table 1 ("Analyte Reduction Strategy" or "ARS") from the applicable drainage area.

20.1.   The ARS for industrial areas shall be prepared by a Qualified Industrial Storm Water Professional ("QISP") using the template attached hereto as **Exhibit C** and must be submitted to LA Waterkeeper within thirty (30) days of SSA Terminals' receipt of sampling data from Pier C showing an Exceedance defined in paragraph 19 above.[4] In the event of exceedances for multiple analytes and/or for multiple Sample Locations at multiple Piers, the SSA Entities may submit a single ARS addressing multiple analytes and multiple Sample Locations at multiple Piers, provided however that the SSA Entities shall be required to submit no more than one (1) ARS for each half of the Reporting Year.

20.2.   Analyte Reduction Strategy Requirements. An ARS prepared in conformity with **Exhibit C** shall include at a minimum: (1) the identification of the contaminant(s) discharged in excess of the Numeric Limits in Table 1; (2) an assessment of the likely source of each contaminant discharged in excess of the numeric value(s); (3) the identification of additional BMPs, including either preventing the exposure of pollutant and pollutant sources to storm water and/or further treatment of storm water associated with the Sample Location for which the Exceedance was identified prior to discharge that are intended to reduce pollutant concentrations to those below Table 1 Numeric Limits; and (4) time schedules for implementation of the proposed BMPs (if any). The time schedule(s) for implementation of

---

[4] The ARS discussed in this Consent Decree is a separate and distinct requirement from any "Action Plan" or Exceedance Response Actions discussed in the Storm Water Permit, though actions taken to comply with the ARS may be used by SSA Terminals to demonstrate compliance with the Storm Water Permit.

additional BMPs shall ensure that the SSA Entities implement all BMPs identified in the ARS as soon as reasonably practicable but no later than the ensuing October 1 following the preparation of the ARS for the preceding reporting year unless the Settling Parties mutually agree on a later date.

20.3. ARS Review. LA Waterkeeper shall have thirty (30) calendar days upon receipt of the SSA Entities' ARS to provide the SSA Entities with comments on the ARS, on the form attached hereto as **Exhibit C**. Failure to provide written comments prepared by a QISP within thirty (30) calendar days shall constitute irrefutable evidence that LA Waterkeeper is satisfied with the content and conclusions set forth in the ARS. Within thirty (30) calendar days of the SSA Entities' receipt of LA Waterkeeper's comments on the ARS, the SSA Entities shall consider LA Waterkeeper's comments and shall either incorporate them into the ARS or, if the SSA Entities decline to accept one or more of LA Waterkeeper's comments, the SSA Entities shall meet with LA Waterkeeper to discuss the reasons for not incorporating any of LA Waterkeeper's suggestions.

20.4. The SSA Entities' decision not to adopt any of LA Waterkeeper's suggestions regarding an ARS shall not impact the otherwise applicable schedule for implementing any other revision to the SWPPP or Monitoring Implementation Plan ("MIP") set forth in the ARS. The Settling Parties shall resolve any disputes as to the adequacy of the ARS in addressing the requirements of Paragraph 20.2 herein pursuant to the dispute resolution provisions of this Consent Decree as set out in Section VI below.

20.5. All communications described in Paragraph 20 herein shall be deemed confidential. The SSA Entities shall not be required to

upload the ARS to SMARTS. LA Waterkeeper shall not use the ARS, or any other document described in Paragraph 20 herein for any purpose other than as a confidential and informational communication, or as necessary as evidence in any dispute resolution proceeding.

20.6. ARS Plan Payments. SSA Terminals shall pay LA Waterkeeper a onetime ARS Review Fee of Two Thousand Dollars ($2,000) for the costs and fees which may be incurred for reviewing and commenting on any ARS submittals associated with Pier C for the term of this Consent Decree. SSA Terminals shall submit the payment within thirty (30) days of the effective date of this Consent Decree. SSA Terminals shall make the payment payable to "Los Angeles Waterkeeper" and addressed to Los Angeles Waterkeeper, 360 E 2nd Street Suite 250, Los Angeles, CA  90012. Failure to submit a payment as required under this paragraph will constitute a breach of the Consent Decree.

21. Analyte Reduction Strategy for Table 1 Exceedances with respect to PNID Sample Location.[5] If Pier C monitoring, as required herein with respect to Chassis Storage Area 2 reveals one (1) or more Exceedances, as defined in paragraph 19 above, SSA Terminals shall review the good housekeeping measures set forth in paragraph 15 above and consider the implementation of additional BMPs in its sole and absolute discretion and provide a memorandum to LA Waterkeeper within thirty (30) days of SSA Terminals' receipt of sampling data showing the Exceedance defined in paragraph 19 above using the template attached hereto as **Exhibit D** that includes the following elements: (1) the identification of the contaminant(s) discharged in excess of the Numeric Limits in Table 1; (2) an assessment of the sampling

---

[5] For the purposes of this Paragraph 21, the Chassis Storage Area 2 Sample Location is deemed to be synonymous with the term PNID sample locations.

methodology and likely source of each contaminant discharged in excess of the numeric value(s); and (3) if additional good housekeeping BMPs are feasible, an explanation of whether or not such BMPs would reasonably reduce pollutant concentrations, and if and when SSA Terminals will implement such BMPs. In the event of exceedances in samples collected from a single QSE from PNID sample locations for multiple analytes and/or for multiple Sample Locations at multiple Piers, the SSA Entities may submit a single memorandum addressing multiple analytes and multiple PNID sample locations at multiple Piers, provided however that the SSA Entities shall be required to submit no more than one (1) memorandum for each half of the Reporting Year.

    21.1.  All communications described in Paragraph 21 herein shall be deemed confidential. The SSA Entities shall not be required to upload the memorandum to SMARTS. LA Waterkeeper shall not use the memorandum, or any other document described in Paragraph 21 herein for any purpose other than as a confidential and informational communication.

22.  <u>Visual Observations</u>. SSA Terminals shall conduct all visual observations in accordance with the terms of the Storm Water Permit. Visual observations include the following:

    22.1.  <u>Storm Water Discharge Observations</u>. SSA Terminals shall conduct visual observations at each point where Pier C discharges storm water from Industrial Areas and Vehicle Fueling Areas during each QSE pursuant to Section XI.A.1 of the Storm Water Permit.

    22.2.  <u>Non-Storm Water Discharge Observations</u>. SSA Terminals shall conduct monthly non-storm water visual observations at each industrial discharge point pursuant to Section XI.A.1 of the Storm Water Permit.

23.  SSA Terminals shall maintain logs of the visual observations consistent with Paragraph 22 herein. SSA Terminals shall make these records available for LA

Waterkeeper's review via email within five (5) business days of the request for said documents by LA Waterkeeper.

C. **Employee Training.**

24. Within forty-five (45) days of the Effective Date, SSA Terminals shall conduct additional employee training to familiarize the members of the Storm Water Team designated in the SWPPP with the requirements of the Storm Water Permit and this Consent Decree. The training program shall include use of written training materials needed for effective implementation of the training program. SSA Terminals shall also ensure that there are Storm Water Team members to implement the BMPs and conduct other compliance activities required by the SWPPP and this Consent Decree.

25. The training program shall require at least the following:

    25.1. <u>Non-Storm Water Discharge Training</u>. SSA Terminals shall train Storm Water Team members on the Storm Water Permit's prohibition of non-storm water discharges, so that employees know what non-storm water discharges are, which can result from improper practices that may produce non-storm water discharges at Pier C, and how to detect and prevent them.

    25.2. <u>BMP Training</u>. SSA Terminals shall train Storm Water Team Members on BMP implementation and maintenance to ensure effective BMP implementation to prevent or minimize the exposure of industrial pollutants to storm water, to prevent or minimize the discharge of contaminated storm water, and to ensure the proper treatment of storm water, where required herein, at Pier C.

    25.3. <u>Sampling Training</u>. SSA Terminals shall designate an adequate number of Storm Water Team members or consultants to ensure the collection of storm water samples required by this Consent Decree and/or the Storm Water Permit. The training shall include the proper sampling protocols, including chain of custody requirements, to ensure that

1        individuals engaged in sampling activities properly collect, store, and

2        submit the samples to a certified laboratory properly.

3        25.4.  <u>Visual Observation Training</u>. SSA Terminals shall provide training to

4        all Storm Water Team members performing visual observations at Pier

5        C pursuant to this Consent Decree and/or the Pier C SWPPP that

6        includes required visual observations, the distinct types of visual

7        observations required, and instruction on proper record keeping.

8    26.    SSA Terminals shall provide training on an annual basis, or as otherwise

9 required, to ensure compliance the Storm Water Permit, by a private consultant or a

10 representative of SSA Terminals who is a registered QISP familiar with the requirements

11 of this Consent Decree and the Storm Water Permit. SSA Terminals shall repeat the

12 training as necessary to ensure that Storm Water Team members identified in the SWPPP

13 are familiar with the requirements of this Consent Decree and Pier C SWPPP and/or MIP,

14 as appropriate to the employee's job descriptions. Any new Storm Water Team member

15 who is responsible for implementation of any portion of the SWPPP, the MIP, or

16 compliance with other terms of the Storm Water Permit or Consent Decree shall receive

17 training within thirty (30) business days after being identified in the SWPPP as a Storm

18 Water Team member.

19    27.    SSA Terminals shall maintain training records to document compliance with

20 the Storm Water Permit and shall make these records available for LA Waterkeeper's

21 review via email within ten (10) business days of the request by LA Waterkeeper.

22    **D.**    **Storm Water Pollution Prevention Plan and Monitoring Implementation**

23 **Plan.**

24    28.    Within sixty (60) days of the Effective Date of this Consent Decree,

25 SSA Terminals shall revise the Pier C SWPPP and/or MIP as necessary to include:

26        28.1.  All BMPs utilized at Pier C for Industrial Areas and Vehicle Fueling

27        Areas as identified on **Exhibit A**.

28        28.2.  All BMPs identified and developed pursuant to this Consent Decree

and/or the Storm Water Permit for Industrial Areas and Vehicle Fueling Areas as identified on **Exhibit A.**

28.3.  The specific individual(s) or positions responsible for compliance with the Storm Water Permit.

28.4.  A detailed site map that includes at a minimum all information required by the Storm Water Permit and this Consent Decree.

28.5.  A description of each industrial activity, all potential pollutant sources, and each potential pollutant associated with each industrial activity and/or pollutant source.

28.6.  Incorporation of the requirements of the Storm Water Permit and this Consent Decree as applicable.

29.  <u>Additional and Ongoing Revisions to SWPPP and/or MIP</u>. SSA Terminals shall revise the SWPPP and/or MIP as more fully described in the Permit Fact Sheet at II.I. SSA Terminals shall notify LA Waterkeeper of any revised SWPPP and/or MIP uploaded and certified to SMARTS within ten (10) business days of submittal to SMARTS.

29.1.  For any SWPPP or MIP revisions that are not the result of an ARS, LA Waterkeeper shall provide comments, if any, to SSA Terminals within thirty (30) days of notification of any revisions to the SWPPP or MIP. If no comments are received within thirty (30) days, the revisions shall be conclusively presumed to be acceptable to LA Waterkeeper. Within thirty (30) days of receiving comments from LA Waterkeeper, SSA Terminals shall consider LA Waterkeeper's comments and shall either incorporate LA Waterkeeper's comments into any revised SWPPP and/or MIP or shall meet with LA Waterkeeper to discuss the reasons for not incorporating any of LA Waterkeeper's suggestions. The Parties shall resolve any disputes as to the completeness of the SWPPP and/or MIP as set forth in the Permit

Fact Sheet at II.1 pursuant to the dispute resolution provisions of this Consent Decree, set out in Section VI below.

29.2.   All communications described in Paragraph 29 herein shall be deemed confidential.  The Parties shall not use communications or documents described in Paragraphs 29 herein for any purpose other than as a confidential and informational communications, or as necessary as evidence in any dispute resolution proceeding regarding the completeness of the SWPPP or MIP.

### E.   Alternative Means of Compliance

30.   Notice of Termination/Notice of Non-Applicability/CII. The Settling Parties agree that if Pier C satisfies the requirements of and receives an approval for a "Notice of Termination/Notice of Non-Applicability" or through compliance with the yet to be adopted Commercial, Institutional and Industrial ("CII") Permit as those terms are defined in the Storm Water Permit or the CII Permit, and all monetary obligations in this Consent Decree have been met, SSA Terminals shall be considered to be in full compliance with the terms of this Consent Decree and the provisions of Section III of this Consent Decree shall not apply so long as the Notice of Termination/Notice of Non-Applicability or CII Permit coverage remains in effect.

### IV.   COMPLIANCE MONITORING AND REPORTING

31.   The SSA Entities shall allow LA Waterkeeper one (1) virtual site inspection in the first calendar year following the Effective Date. After the first year, if the SSA Entities are required to prepare an ARS related to Industrial Sample Locations, LA Waterkeeper shall be permitted to conduct one (1) additional virtual site inspection to inspect any newly implemented BMPs described in the ARS. The SSA Entities shall allow only one (1) site inspection during each calendar year of this Consent Decree. All such site inspections shall be conducted virtually, unless agreed upon by the Settling Parties.

32.   Any virtual Site Inspection shall occur during normal business hours at a

time mutually agreed upon by the Settling Parties. LA Waterkeeper will provide the SSA Entities with as much notice as possible of its request for a virtual site inspection, which shall not be unreasonably denied by the SSA Entities, and shall provide the SSA Entities with a list of those areas LA Waterkeeper wishes to inspect. LA Waterkeeper shall make its request at least twenty-four (24) hours' notice prior to any proposed Virtual Site Inspection in anticipation of wet weather, and seventy-two (72) hours' notice during dry weather. For any Site Inspection requested to occur in wet weather, the Settling Parties shall meet and confer during normal business hours regarding any adjustment in the timing which shall not be unreasonably denied in the event the forecast changes and anticipated precipitation appears unlikely or the need to allocate storm water team personnel to take required QSE samples as more fully described in Paragraph 17 above, and thus frustrates the purpose of a virtual inspection in wet weather. If a Virtual Site Inspection is infeasible due to sampling constraints described above, the Settling Parties shall consider alternative options during the meet and confer including but not limited to: (1) photo documenting the sampling event; or (2) delaying the Virtual Site Inspection until after the sampling activities set forth in Paragraph 17 have been completed. Notice will be provided by telephone and electronic mail to the individual(s) designated below at paragraph 49.

33. <u>Reporting and Documents</u>. During the life of this Consent Decree, SSA Terminals shall copy LA Waterkeeper on all non-privileged documents related to storm water quality at Pier C that SSA Terminals submits to the Regional Board, the State Board, and/or any State or local agency or municipality, which are not uploaded to SMARTS.

34. <u>Compliance Monitoring and Oversight</u>. SSA Terminals shall pay a one-time fee of Six Thousand Dollars ($6,000) to compensate LA Waterkeeper for costs and fees to be incurred for monitoring compliance with this Consent Decree. SSA Terminals shall make the payment within thirty (30) business days of the Effective Date to "Los Angeles Waterkeeper" and addressed to Los Angeles Waterkeeper, 360 E 2nd Street Suite 250 Los

1    Angeles, CA 90012.

2    **V.**    **Environmental Project and Reimbursement of Litigation Fees and Costs**

3       35.    <u>Environmental Project</u>. SSA Terminals agrees to make a payment totaling

4 Twenty Thousand Dollars ($20,000) to the City of Long Beach Municipal Urban

5 Stormwater Treatment ("MUST") Program[6] to allow the program to continue to plan and

6 design for general expansions of the MUST Program. Payment shall be made within sixty

7 (60) days of the Effective Date, payable to the City of Long Beach and sent via overnight

8 mail to City of Long Beach, c/o City Manager, 411 W. Ocean Blvd., 10th Floor, Long

9 Beach, CA 90802.

10       36.    For all missed deadlines included in this Consent Decree not excused by Force

11 Majure, SSA Terminals shall make a stipulated payment of Five Hundred Dollars ($500)

12 ("Stipulated Payment") provided, however, that LA Waterkeeper shall provide SSA

13 Terminals with notice of any alleged missed deadline and SSA Terminals shall have ten

14 (10) business days to cure the missed deadline. Payments for a missed deadline shall fund

15 environmental project activities. SSA Terminals shall make the Stipulated Payment to the

16 City of Long Beach MUST Program, payable to the City of Long Beach and sent via

17 overnight mail to City of Long Beach c/o City Manager, 411 W. Ocean Blvd., 10th Floor,

18 Long Beach, CA 90802, and such funds shall be used for the purposes described in

19 Paragraph 35 above. SSA Terminals shall provide LA Waterkeeper with a copy of such

20 payment concurrently with the payment. SSA Terminals shall make the Stipulated

21 Payment within thirty (30) days of a missed deadline unless LA Waterkeeper agrees in

22 writing to an extension of that deadline.

23       37.    <u>Reimbursement of LA Waterkeeper's Fees and Costs</u>. SSA Terminals shall

24 pay a total of Two Hundred Seven Thousand Dollars ($207,000) to LA Waterkeeper for its

25 investigation fees and costs, expert/consultant fees and costs, and attorneys' fees incurred

26 because of investigating and preparing the lawsuit and negotiating this Consent Decree.

27

28

---

[6] Funding for the Long Beach MUST Program or another alternative City Program intended to achieve the same or similar goals may be incorporated into the Permit Option 1 Program pending final adoption of the CII Permit.

SSA Terminals shall make the payments within thirty (30) business days of the Effective Date and payable to Environmental Advocates Attorney Client Trust Account and sent via overnight mail to Environmental Advocates c/o Christopher A. Sproul, 5135 Anza Street, San Fransisco, CA 94121.

## VI.    DISPUTE RESOLUTION

38.    This Court shall retain jurisdiction over this matter until the final termination date defined above for the purposes of implementing and enforcing the terms and conditions of this Consent Decree and adjudicating all disputes among the Settling Parties that may arise under the provisions of this Consent Decree, unless there is an ongoing dispute at the time of the final termination date, in which case this Consent Decree will terminate upon final resolution of the dispute. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

39.    If a dispute under this Consent Decree arises, or either Settling Party believes that a breach of this Consent Decree has occurred, the Settling Parties shall schedule a meet and confer within ten (10) business days of receiving written notification from the other party of a request for a meeting to determine whether a violation of this Consent Decree has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. If the Settling Parties are unable to resolve the dispute through this meet and confer process, the parties agree to request a settlement meeting before the Magistrate Judge assigned to this action. The Settling Parties agree to file any waivers necessary for the Magistrate Judge to preside over any settlement conference pursuant to this Paragraph.  If the Settling Parties cannot resolve the dispute by the conclusion of the settlement meeting with the Magistrate Judge, the Settling Parties agree to submit the dispute via motion to the District Court. In resolving any dispute arising from this Consent Decree, the Court shall have discretion to award attorneys' fees and costs to either party. The relevant provisions of the then-applicable CWA and Rule 11 of the Federal Rules of Civil Procedure shall govern the allocation of fees and costs in connection with the

resolution of any disputes before the Court.  The Court shall award relief limited to compliance orders and awards of attorneys' fees and costs, subject to proof.

40.   <u>Force Majeure.</u> No Settling Party shall be considered to be in default in the performance of any of its obligations under this Consent Decree when performance becomes impossible due to circumstances beyond the Settling Party's control, including Force Majeure, which includes, but is not limited to, any act of god, pandemic/epidemic, war, fire, earthquake, windstorm, flood or natural catastrophe; civil disturbance, vandalism, sabotage, or terrorism; restraint by court order or public authority or agency; inability to proceed due to pending litigation under the California Environmental Quality Act; action or non-action by, or inability to obtain the necessary authorizations, approvals, or permits from, any governmental agency or private party except insofar as caused by any lack of reasonable diligence in applying for or otherwise procuring such permit; or inability to obtain equipment or materials from the marketplace if such materials or equipment are not reasonably available. Impossibility and/or Force Majeure shall not include normal inclement weather, economic hardship, or inability to pay. Any Settling Party seeking to rely upon this paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the impossibility or Force Majeure event and by exercise of due diligence has been unable to overcome the failure or performance. Delay in compliance with a specific obligation under this Consent Decree due to impossibility and/or Force Majeure as defined in this paragraph shall not excuse or delay compliance with any or all other obligations required under this Consent Decree.

40.1.   If SSA Terminals claims compliance was or is impossible, it shall notify LA Waterkeeper in writing as soon as possible, but in no event more than five (5) business days of the date that SSA Terminals learns of the event or circumstance that caused or would cause a violation of this Consent Decree (hereinafter referred to as the "Notice of Nonperformance").

40.2.   Within ten (10) business days of sending the Notice of Nonperformance, SSA Terminals shall send LA Waterkeeper a detailed description of the reason for the nonperformance and the specific obligations under the Consent Decree that are or have been affected by the Force Majeure. It shall describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures SSA Terminals took or will take to prevent or minimize the delay, the schedule by which the measures shall be implemented, and the anticipated date of compliance. In no event shall the deadline be extended beyond the length of the delay caused by the Force Majeure event. SSA Terminals shall adopt all reasonable measures to avoid and minimize such delays and shall provide LA Waterkeeper with notice of a reasonable date certain of completion of the prior nonperformance of a specific obligation under the terms of this Consent Decree within fifteen (15) days of discovery of the date certain for completion.

40.3.   The Settling Parties shall meet and confer in good faith concerning the non-performance and, where the Settling Parties concur that performance was or is impossible due to an event or matter covered under the Force Majeure provisions of this Consent Decree, despite the timely good faith efforts of SSA Terminals, the establishment of new deadlines.

40.4.   If LA Waterkeeper disagrees with SSA Terminals' Notice of Nonperformance, or if the Settling Parties cannot timely agree on the terms of new performance deadlines or requirements, either party shall have the right to invoke the dispute resolution procedure pursuant to Section VI.

41.   <u>Administrative Delay</u>. SSA Terminals shall diligently pursue any approvals required for compliance with this Consent Decree. Should such diligent pursuit of

approvals required for compliance be unavailing due to actions of or inaction on the part of the any governmental or regulatory entity with jurisdiction over SSA Terminals, and SSA Terminals reasonably demonstrates that these delays are not attributable to any action or inaction on the part of the SSA Terminals, any relevant compliance deadlines set forth in this Consent Decree shall be tolled until such time as Parties agree to an alternative means of compliance with the Consent Decree pursuant to the Force Majeure clause herein.

## VII.   MUTUAL RELEASE OF LIABILITY

42.    <u>LA Waterkeeper's Release</u>. Upon the Effective Date of this Consent Decree, LA Waterkeeper, on its own behalf and on behalf of its current and former officers, directors, employees, and each of their successors and assigns, and their agents, attorneys, and other representatives, release all persons including, without limitation, SSA Terminals (and each of its direct and indirect parent and subsidiary companies and affiliates, and their respective current and former officers, directors, members, employees, shareholders, and each of their predecessors, successors, and assigns, and each of their agents, attorneys, consultants, and other representatives) from and waives all claims alleged in the Notice Letter and/or Complaint, FAC and SAC up to the termination of this Consent Decree.

43.    <u>SSA Terminals' Release</u>. Upon the Effective Date of this Consent Decree, SSA Terminals, on its own behalf and on behalf of its current and former officers, directors, employees, members, and each of their successors and assigns, and their agents, attorneys, and other representatives releases LA Waterkeeper (and its current and former officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and their agents, attorneys, and other representatives) from and waives all claims which arise from or pertain to this action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed for matters related to LA Waterkeeper's

Notice Letter, Complaint, FAC and SAC up to the termination of this Consent Decree by the Court.

44.    Covenant Not to Sue.  As of the Effective Date of this Agreement, and for a period up to and including the Termination Date of this Agreement, LA Waterkeeper agrees that LA Waterkeeper, its officers, directors, executive staff, members, and any individuals or organization under the control of LA Waterkeeper, its officers, executive staff, and members of its governing board, will not serve any 60-day Notice of Violations and Intent to Sue or file any lawsuit against SSA Terminals, the City of Long Beach, or their respective affiliates, current or former officers, directors, members, employees, shareholders, or any of their predecessors, successors, or assigns, or any of their agents, attorneys, consultants, or any other of their representatives for alleged violations related to Pier C that were or could have been raised in its Notice Letter, Complaint, FAC, and/or SAC.

## VIII.  **MISCELLANEOUS PROVISIONS**

45.    No Admission of Liability.  Neither this Consent Decree, the implementation of additional BMPs, nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, admission, or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. SSA Terminals maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

46.    Construction.  The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Storm Water Permit, the Clean Water Act, or specifically herein.

47.    Choice of Law.  The laws of the United States and the State of California shall govern this Consent Decree.

48.    Severability.  If the Court holds any provision, paragraph, section, or sentence of this Consent Decree to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

49.   <u>Correspondence</u>. Unless specifically provided for in this Consent Decree, all notices required herein or any other correspondence pertaining to this Consent Decree shall be sent by U.S. mail or electronic mail as follows:

<u>If to LA Waterkeeper:</u>

Los Angeles Waterkeeper
Attn: Benjamin Harris, Barak Kamelgard, Madeleine Siegel
360 E 2nd Street Suite 250
Los Angeles, CA  90012
ben@lawaterkeeper.org
barak@lawaterkeeper.org
madeleine@lawaterkeeper.org

<u>With a copy to</u>

Environmental Advocates
Attn: Christopher Sproul, Brian Orion, Marla Fox
5135 Anza Street
San Francisco, CA 94121
csproul@enviroadvocates.com
borion@enviroadvocates.com
mfox@enviroadvocates.com

<u>If to SSA Terminals:</u>

SSA Terminals, LLC
Attn: Candice M. Woods
SSA Marine, Inc.
Deputy General Counsel
1131 SW Klickitat Way
Seattle, WA 98134
206.654.3587 phone
206.515.4192 fax
Candice.Woods@SSAMarine.com
Legal@Carrix.com

<u>With a copy to:</u>

Environmental Law Group LLP
Attn: S. Wayne Rosenbaum
225 Broadway, Suite 1900
San Diego, CA 92101
swr@envirolawyer.com

50.     Notifications of communications shall be deemed submitted three (3) business days after having been sent via U.S. mail or the day of sending notification or communication by electronic mail. Any change of address or addressees shall be communicated in the manner described above for giving notices.

51.     Counterparts. The Settling Parties may execute this Consent Decree in any number of counterparts, all of which together shall constitute one original document. Telecopy, email of a .pdf signature, and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

52.     Modification of the Consent Decree. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Settling Parties. If any Settling Party wishes to modify any provision of this Consent Decree, the Settling Party must notify the other Settling Party in writing at least twenty-one (21) days prior to taking any step to implement the proposed change.

53.     Full Settlement. This Consent Decree constitutes a full and final settlement of this matter.

54.     Integration Clause. This is an integrated Consent Decree. The Settling Parties intend this Consent Decree to be a full and complete statement of the terms of the agreement between the Settling Parties and expressly supersedes all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

55.     Authority. The undersigned representatives for LA Waterkeeper and SSA Terminals each certify that they are authorized by the Settling Party whom they represent to enter the terms and conditions of this Consent Decree.

56.     The Settling Parties certify that their undersigned representatives are fully authorized to enter this Consent Decree, to execute it on behalf of the Settling Parties, and to legally bind the Settling Parties to its terms.

57.     The Settling Parties, including any successors or assigns, agree to be bound by this Consent Decree and not to contest its validity in any subsequent proceeding to implement              or                enforce              its              terms.

IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date first set forth below.

**APPROVED AS TO CONTENT**

Dated:     April 3, 2024                    By: _____
                                           Bruce Reznik
                                           Executive Director
                                           Los Angeles Waterkeeper

Dated:     4/3/2024                         By: _____
                                           Ryan Baird
                                           C-60 General Manager
                                           SSA Terminals, LLC

**APPROVED AS TO FORM**

Dated:     April 1, 2024                    By: _____
                                           Christopher Sproul
                                           Environmental Advocates
                                           Attorney for LA Waterkeeper

Dated:     April 3, 2024                    By: _____
                                           Barak Kamelgard
                                           LA Waterkeeper
                                           Attorney for LA Waterkeeper

Dated:     April 8, 2024                    By: _____
                                           S. Wayne Rosenbaum
                                           Environmental Law Group
                                           Attorney for SSA Terminals, LLC

**IT IS SO ORDERED.**
Dated: May 7, 2024
                                           _____
                                           Hon. Fred. W. Slaughter

# EXHIBIT A



# EXHIBIT B

# Enpurion FlexBasin™



**NEW!**

## Stormwater pillows offer low-cost, versatile and effective treatment

### Proven Results

- Select engineered media for specific pollutants
- Pick textiles for influent characteristics
- Reduce heavy metals
- Capture turbidity and suspended solids
- Eliminate emulsified oils and hydrocarbons
- Change pillows to adapt to site conditions instantly
- Manage your own maintenance quickly, easily and cost-effectively

### Advantages

- Flexible and effective stormwater treatment
- Low-cost, easy to use and maintain
- Scalable and modular
- Can be configured for any combination or pollutant

### Applications

- Parking lots
- High traffic areas
- Production and material storage areas

### Combine engineered media pillow materials to fit your site's needs

- Enpurion MT media for metals and oils
- Enpurion MX media for phosphorus, pH
- Enpurion BioBlend for organics
- ZnIX ion exchange for zinc, and copper
- Enpurion CLR for turbidity and TSS



Engineered media for site-specific pollutants

High capacity design

Up to 5 different sorption media

Optional sample port

Liner captures oils and debris

Mesh base prevents clogging

### Target pollutants:

- ✔ Zinc & copper
- ✔ Turbidity & pH
- ✔ Pb, Al and Fe
- ✔ Phosphorus
- ✔ Emulsified oils
- ✔ Suspended solids

info@enpurion.com
253-922-8823

www.enpurion.com
©2022 Lean Environment Inc

# enpurion

# EXHIBIT C

CONFIDENTIAL – NOT FOR DISTRIBUTION

# Analyte Reduction Strategy Report

Qualifying Storm Event Sample Date(s):_____

Date(s) Sample Analyses Received:_____

| Sample Results (only enter if applicable Numeric Limit exceeded) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Constituent | TSS (mg/L) | O&G (mg/L) | Aluminum (mg/L) | Copper (mg/L) | Iron (mg/L) | Lead (mg/L) | Zinc (mg/L) | pH (s.u.) |
| Numeric Limit | 100 (annual); 400 (instant) | 15 (annual); 25 (instant) | 0.75 | 0.0332 | 1.0 | 0.262 | 0.26 | 6.5-9.5 |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |

| Additional BMPs Planned | Estimated Date of Implementation | Los Angeles Waterkeeper Comments if any (attach additional pages if necessary) | Response to Comments if any (attach additional pages if necessary) |
|---|---|---|---|
| | | | |
| | | | |

CONFIDENTIAL – NOT FOR DISTRIBUTION

| | | | |
|---|---|---|---|
| | | | |

Date Sent to Los Angeles Waterkeeper:_____

Preparer: _____

QISP ID Number: _____

Date Comments Received (no later than 30 days from LAW receipt of report): _____

Los Angeles Waterkeeper comments received by: _____

Date Response to comments sent to Waterkeeper: _____.

Preparer: _____

QISP ID Number: _____

# EXHIBIT D

CONFIDENTIAL – NOT FOR DISTRIBUTION

# PNID Reduction Strategy Report

Qualifying Storm Event Sample Date(s):_____

Date(s) Sample Analyses Received:_____

| Sample Results (only enter if applicable Numeric Limit exceeded) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Constituent | TSS (mg/L) | O&G (mg/L) | Aluminum (mg/L) | Copper (mg/L) | Iron (mg/L) | Lead (mg/L) | Zinc (mg/L) | pH (s.u.) |
| Numeric Limit | 100 (annual); 400 (instant) | 15 (annual); 25 (instant) | 0.75 | 0.0332 | 1.0 | 0.262 | 0.26 | 6.5-9.5 |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |

| Additional BMPs Planned | Estimated Date of Implementation |
|---|---|
| | |
| | |
| | |
| | |

Date Sent to Los Angeles Waterkeeper:_____

Preparer: _____

# Exhibit 3

Christopher Sproul (State Bar No. 126398)
csproul@enviroadvocates.com
Brian Orion (State Bar No. 239460)
borion@enviroadvocates.com
Marla Fox (State Bar No. 349813)
mfox@enviroadvocates.com
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695

Barak Kamelgard (State Bar No. 298822)
barak@lawaterkeeper.org
Benjamin Avi Harris (State Bar No. 313193)
ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E. 2nd Street, Suite 250 Los Angeles, California 90012
Telephone: (310) 394-6162

*Attorneys for Plaintiff*
Los Angeles Waterkeeper

S. Wayne Rosenbaum (SBN 182456)
Grant R. Olsson (SBN: 317583)
**ENVIRONMENTAL LAW GROUP LLP VARCO & ROSENBAUM**
225 Broadway, Suite 1900 San Diego, California 92101
Tel: (619) 231-5858
swr@envirolawyer.com
golsson@envirolawyer.com

*Attorneys for Defendants*
*SSA TERMINALS, LLC; SSA PACIFIC, INC.;*
*PACIFIC MARITIME SERVICES, LLC; and*
*SSA Terminals (Pier A), LLC.*

---

Consent Decree                                          Civil Case No. 2:22-cv-01198-FWS-MRW

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, A California non-profit corporation, | Civil Case No: 2:22-cv-01198-FWS-MRW |
| Plaintiff, | |
| vs. | **CONSENT DECREE PIER F** |
| SSA Terminals, LLC; SSA Pacific, Inc.; Pacific Maritime Services, LLC; SSA Terminals (Pier A), LLC; City of Long Beach, | |
| Defendants. | **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)** |

# CONSENT DECREE

The following Consent Decree is entered into by and between Los Angeles Waterkeeper ("LA Waterkeeper"), and SSA Pacific, Inc. ("SSA Pacific"). The entities entering this Consent Decree are each an individual "Settling Party" and collectively the "Settling Parties."

**WHEREAS,** LA Waterkeeper is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its primary office in Santa Monica, California;

**WHEREAS,** LA Waterkeeper is dedicated to the preservation, protection, and defense of the rivers, creeks, and coastal waters of Los Angeles County from all sources of pollution and degradation;

**WHEREAS,** SSA Terminals (Pier A), LLC is the lessee and operator of Pier A located at 700 Pier A Plaza, Long Beach, California 90813 ("Pier A");

**WHEREAS,** SSA Terminals, LLC is the lessee and operator of Pier C60 located at 1521 Pier C Street, Long Beach, California 90813 ("Pier C");

**WHEREAS,** SSA Pacific, Inc. is the operator of Pier F Berths 204 to 207 at Pier F Berth 206, Long Beach, California 90802 ("Pier F");

**WHEREAS,** Pacific Maritime Services, LLC is the lessee and operator of Pier J located at 1521 Pier J Avenue E, Long Beach, California 90802 ("Pier J");

**WHEREAS,** SSA Terminals (Pier A), LLC, SSA Terminals, LLC, SSA Pacific, Inc., and Pacific Maritime Services, LLC are collectively referred to herein as the "SSA Entities";

**WHEREAS,** Piers A, C, F, and J are each owned by the City of Long Beach ("City of Long Beach" or "City");

**WHEREAS,** Pier F is an establishment primarily engaged in activities directly related to marine cargo handling for or from a vessel, that arrives at shipside, dock, pier, terminal, staging area, or in-transit area until cargo loading or unloading operations are completed (SIC Code 4491);

**WHEREAS,** SSA Pacific contends that neither the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ and Order 2018-0028-DWQ ("Storm Water Permit"), nor the federal NPDES program for storm water discharges associated with industrial activities, apply to drainages at transportation facilities that are not associated with specified industrial activities, and LA Waterkeeper disputes this contention, but the Settling Parties have compromised to allow for settlement of this matter notwithstanding said disagreement, with the parties' legal obligations to each other defined by this Agreement, and each party reserving all rights unless expressly stated to the contrary herein;

**WHEREAS,** LA Waterkeeper alleges its members live, work, travel, recreate, own property and homes and reside in Los Angeles County. LA Waterkeeper's members use and enjoy the waters of Long Beach Harbor into which Pier F directly discharges storm water. LA Waterkeeper alleges that its members use and enjoy these waterways for recreational, educational, aesthetic, and spiritual purposes. Additionally, LA Waterkeeper alleges that it, and its members, use Long Beach Harbor, the Pacific Ocean, and the beaches into which these waters flow to engage in scientific study;

**WHEREAS,** subject to the Settling Parties' disagreement discussed above, storm water associated with vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication) and equipment cleaning as defined in 40 C.F.R. § 122.26(b)(14)(viii) from Pier F are regulated by the Storm Water Permit and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"), Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342 ("Regulated Industrial Activities");

**WHEREAS,** Pier F operates under SIC code 4491—Marine Cargo Handling; Pier F's Waste Discharger Identification Number ("WDID") is 4 19I025370;

///

///

**WHEREAS,** the Regulated Industrial Activities occurring at Pier F include vehicle maintenance and equipment washing as depicted on the Site Plan attached hereto as **Exhibit A**;

**WHEREAS,** the Storm Water Permit includes the following requirements for those regulated activities occurring at Pier F: (1) develop and implement a stormwater pollution prevention plan ("SWPPP"); (2) control pollutant discharges associated with industrial activities using, as appropriate, best available technology economically achievable ("BAT") or best conventional pollutant control technology ("BCT") to prevent or reduce pollutants; (3) implement BAT and BCT through the development and application of Best Management Practices ("BMPs"), which must be included and updated in the SWPPP; and (4) when necessary, implement additional BMPs to prevent or reduce any pollutants associated with industrial activities that are causing or contributing to any exceedance of water quality standards;

**WHEREAS**, this Consent Decree imposes requirements on SSA Pacific that go beyond those set forth in the Storm Water Permit through the implementation of BMPs and informational sampling of storm water related to non-industrial areas of Pier F;

**WHEREAS,** on December 8, 2021, LA Waterkeeper sent the SSA Entities, the United States Environmental Protection Agency ("EPA"), EPA Region IX, the State Water Resources Control Board ("State Board"), and the Los Angeles Regional Water Quality Control Board ("Regional Board") a notice of intent to file suit ("Notice Letter") under Sections 505(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1365(a) and (b). The Notice Letter alleged violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at Pier F;

**WHEREAS,** on February 22, 2022, LA Waterkeeper filed a complaint against the SSA Entities in the United States District Court, Central District of California alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at Piers A, C, F, and J ("Complaint");

**WHEREAS,** on March 10, 2022, LA Waterkeeper sent via letter its First Supplemental Notice of Clean Water Act Violations and Intent to File Suit ("Supplemental CWA Notice Letter");

**WHEREAS,** on May 9, 2022, the SSA Entities filed their first motion to dismiss five of LA Waterkeeper's six claims in the Complaint for failure to state a claim and lack of subject matter jurisdiction, and a motion to strike portions of the sixth;

**WHEREAS,** on September 16, 2022, LA Waterkeeper sent a notice letter alleging violations of the Resource Conservation and Recovery Act ("RCRA Notice Letter");

**WHEREAS,** on January 10, 2023, LA Waterkeeper filed its first amended complaint ("FAC") against the SSA Entities and the City of Long Beach in the United States District Court, Central District of California alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), 28 U.S.C. § 1331 and violations of the Storm Water Permit at Piers A, C, F, and J;

**WHEREAS,** on March 13, 2023, the City filed a motion to dismiss LA Waterkeeper's FAC for failure to state a claim and lack of subject matter jurisdiction;

**WHEREAS,** on March 13, 2023, the SSA Entities, including SSA Pacific, filed their second motion to dismiss five of LA Waterkeeper's six claims in the FAC for failure to state a claim and lack of subject matter jurisdiction, and a motion to strike portions of the sixth, on essentially the same bases as its prior motion to dismiss;

**WHEREAS,** on August 14, 2023, LA Waterkeeper filed a motion for leave to amend and supplement the FAC;

**WHEREAS,** on August 24, 2023, the SSA Entities and the City filed an opposition to LA Waterkeeper's motion for leave to amend.

**WHEREAS,** on October 14, 2023, Judge Fred W. Slaughter ruled on the motions to dismiss and the motion to amend and ordered:

1.     The SSA Defendants' Motion to Dismiss (Dkt. 58) is GRANTED IN PART AND DENIED IN PART. The Motion is DENIED as to Plaintiff's first, second, third, and

fourth claims and pre-suit notice under RCRA. The Motion is GRANTED as to Plaintiff's sixth claim. The sixth claim under RCRA is DISMISSED WITH LEAVE TO AMEND.

2.      Defendant City of Long Beach's Motion to Dismiss (Dkt. 59) is GRANTED IN PART AND DENIED IN PART. The Motion is DENIED as to Plaintiff's pre-suit notice and GRANTED as to Plaintiff's and CWA and RCRA claims against Defendant City of Long Beach. Plaintiff's claims against Defendant City of Long Beach are DISMISSED WITH LEAVE TO AMEND.

3.      Plaintiff's Motion to Amend the Complaint (Dkt. 73) is DENIED AS MOOT.

4.      Plaintiff is ORDERED to file a Second Amended Complaint, consistent with the Court's Order, by December 15, 2023;

**WHEREAS,** on December 15, 2023, LA Waterkeeper filed a Second Amended Compliant ("SAC");

**WHEREAS,** LA Waterkeeper alleges SSA Pacific to be in violation of the substantive and procedural requirements of the Storm Water Permit, the Clean Water Act, and RCRA with respect to Pier F;

**WHEREAS,** SSA Pacific denies all allegations in the Notice Letters, the Compliant, the FAC, and the SAC relating to Pier F;

**WHEREAS,** LA Waterkeeper and SSA Pacific have agreed that it is in the Settling Parties' mutual interest to enter a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the SAC with respect to Pier F without further proceedings; and

**WHEREAS,** all actions taken by the Settling Parties pursuant to this Consent Decree shall comply with all applicable federal and state laws and local rules and regulations.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1.      The Court has jurisdiction over the subject matter of this action pursuant to

Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a).

2.     Venue is appropriate in the Central District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because Pier F is located within this District.

3.     The SAC alleges claims upon which relief may be granted pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1) and the Summons and Complaint shall be deemed served pursuant to Fed. R. Civ. P. 4.

4.     LA Waterkeeper has standing to bring this action.

5.     The Court shall retain jurisdiction over this matter for purposes of interpreting, modifying, or enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce this Consent Decree.

6.     The Court shall dismiss with prejudice all claims against the City of Long Beach with respect to the Federal Water Pollution Control Act (the "CWA"), 33 U.S.C. §§ 1251, *et seq*., including, and without limitation, all claims arising out of 33 U.S.C. §§ 1311(a), 1331, and 1342.

7.     The Court shall dismiss with prejudice all claims against the City of Long Beach and SSA Pacific with respect to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, *et seq*., including, and without limitation, RCRA section 7002(a)(1), 42 U.S.C. § 6972.

## I.  **OBJECTIVES**

8.     It is the express purpose of the Settling Parties entering this Consent Decree to further the objectives set forth in the Clean Water Act and to resolve those issues alleged by LA Waterkeeper in its SAC. Considering these objectives and as set forth fully below, the Settling Parties agree to comply with the provisions of this Consent Decree and SSA Pacific agrees to comply with the applicable requirements of the Storm Water Permit and all applicable provisions of the Clean Water Act at Pier F.

///

## II.   AGENCY REVIEW AND TERM OF CONSENT DECREE

9.    LA Waterkeeper shall submit this Consent Decree to the United States Department of Justice and the EPA (collectively "Federal Agencies") within three (3) days of the final signature of the Settling Parties for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) days after receipt by both agencies, as evidenced by written acknowledgement of receipt by the agencies or the certified return receipts, copies of which LA Waterkeeper shall provide to SSA Pacific. If the Federal Agencies object to entry of this Consent Decree, the Settling Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies within a reasonable amount of time. Following the Federal Agencies' review, the Settling Parties shall submit the Consent Decree to the Court for entry.

10.    The term "Effective Date" as used herein shall mean the day that the Court enters the last of the Consent Decrees for Piers A, C, F, and J, or the next business day if such day is not a business day.

11.    This Consent Decree will terminate three (3) years from the Effective Date, unless prior to the termination date either Party has invoked the dispute resolution provisions of this Consent Decree and there is an ongoing, unresolved dispute regarding either Settling Party's compliance with this Consent Decree, in which case the Consent Decree will terminate upon final resolution of the dispute pursuant to the dispute resolution provisions contained herein.

## III.   COMMITMENTS OF THE SETTLING PARTIES

### A.   Storm Water Pollution Control Best Management Practices.

12.    The Settling Parties acknowledge that SSA Pacific is in the process of making BMP changes to Pier F to improve the quality of storm water discharges from the portions of the Facility depicted in **Exhibit A** as having industrial activities ("Industrial Areas") or vehicle fueling activities ("Vehicle Fueling Areas"). In addition to implementing and maintaining BMPs, SSA Pacific shall implement the BMPs specifically identified and described in this Consent Decree in paragraph 13, for Industrial Areas and Vehicle Fueling

Areas described in **Exhibit A**, as applicable.

13.    Within thirty (30) days of the Effective Date, SSA Pacific shall incorporate the following structural and non-structural BMPs in the Industrial Areas and Fueling Areas described in **Exhibit A**, as applicable:

13.1.  Structural BMPs

13.1.1. Installing Enpurion with ZnIX pillows, or equivalent, in storm drain inlets in Industrial Areas and Vehicle Fueling Areas as identified in **Exhibit A**. See attached manufacturer's cut sheets attached hereto as **Exhibit B**.

13.2.  Wattles/Filter Socks

13.2.1. Deploy Metaloxx or equivalent absorbing wattles/filter socks in Industrial Areas as show in **Exhibit A**.

13.2.2. Ensure wattles/filter socks are deployed to the extent feasible to prevent stormwater from flowing around or beneath the wattles/filter socks.

13.3.  Vehicle Fueling Areas

13.3.1. Fully delineate all Vehicle Fueling Areas identified in **Exhibit A** with painted markings or signage.

13.4.  Sweeping

13.4.1. Monthly inspection of Industrial Areas and Vehicle Fueling Areas described in **Exhibit A** and the removal of trash and other debris by on-site personnel.

13.4.2. Based on the results of monthly inspections, SSA Pacific will deploy personnel to conduct detailed sweeping with a regenerative sweeper, as well as hand sweeping of hard-to-reach areas of Industrial Areas and Vehicle Fueling Areas.

13.5.  Housekeeping in Industrial Areas and Vehicle Fueling Areas

13.5.1. Close or cover all waste/trash/recycle bins when not in active

use.

    13.5.2.  To the extent feasible, move, or otherwise cover, stored and miscellaneous metal out of contact with rainfall and runoff.

13.6.  Storm Water Team personnel will conduct Pre-Rain Inspections of Industrial Areas and Vehicle Fueling Areas when the NOAA station at Long Beach Municipal Airport predicts a local rain in the next seventy-two (72) hours of greater than one half (0.5) inches with a probability of greater than fifty percent (50%).  The inspection will include the following elements:

    13.6.1.  Inspection of the Industrial Areas and Vehicle Fueling Areas for any areas of dirt and debris accumulation.

    13.6.2.  Removal of dirt and debris from areas identified in 13.6.1.

    13.6.3.  Inspection of catch basin inserts and wattles in Industrial Areas and Vehicle Fueling Areas. Replace as necessary, based upon observations and manufacturers' recommendations.

    13.6.4.  Inspect for any spills or leaks in Industrial Areas and Vehicle Fueling Areas and take appropriate actions.

    13.6.5.  Confirm all waste/trash/recycle bins in Industrial Areas and Vehicle Fueling Areas are closed or covered.

13.7.  Staff training as described in paragraphs 24-27 below.

14.  For the Priority Non-Industrial ("PNID") Areas of the Facility depicted in **Exhibit A**, SSA Pacific will implement the following non-structural BMPs:[1]

14.1.  Sweeping

    14.1.1.  Monthly inspection and the removal of trash or debris by on-site personnel.

---

[1] It is SSA Pacific's intention to implement the provisions of this section 14 to the balance of the Non-Industrial Areas at Pier F as time and resources allow in SSA Pacific's sole and absolute discretion.

14.1.2. Based on the results of monthly inspections, SSA Pacific will deploy personnel to conduct quarterly detailed sweeping with a regenerative sweeper, as well as hand sweeping of hard-to-reach areas.

14.2. Housekeeping

14.2.1. Close or cover all waste/trash/recycle bins when not in active use.

14.2.2. To the extent feasible, move, or otherwise cover, stored and miscellaneous metal out of contact with rainfall and runoff.

14.3. Inspections

14.3.1. Pre-rain inspections as described in paragraph 13.6 above.

14.4. Staff training as described in paragraphs 24-27 below.

15. INTENTIONALLY LEFT BLANK.

**B.** **Discharge Locations and Storm Water Sampling**

16. Discharge Locations. **Exhibit A** attached hereto identifies storm water discharge locations and one (1) storm water sample locations for Pier F ("Industrial Sample Locations"), referred to herein as the "Power Shop Sample Location," in conformity with provision XI.C.4 of the Storm Water Permit. In addition, **Exhibit A** attached hereto identifies one (1) PNID sample locations for informational purposes only, referred to herein as the "PNID Sample Location." PNID sample results will be shared with LA Waterkeeper on a confidential basis and are for informational purposes only. Should Sample Locations change, SSA Pacific will amend the Facility site map and notify LA Waterkeeper within thirty (30) days of such a change.

17. Sampling. SSA Pacific will implement the following industrial storm water monitoring procedures at Pier F:

17.1. Frequency.

17.1.1. Industrial Sample Location. During the life of this Consent Decree, weather permitting, SSA Pacific shall collect samples

from the Industrial Sample Location identified on **Exhibit A** at Pier F to the extent feasible from a minimum of four (4) "qualifying storm events" that occur in a reporting year such that SSA Pacific collects two (2) samples during the first half of the reporting year and two (2) samples during the second half of the reporting year. A "qualifying storm event" or "QSE" is a storm event that produces a discharge from a drainage area covered by the Storm Water Permit and is preceded by forty-eight (48) hours with no discharge from any drainage area. If, prior to March 1, SSA Pacific has collected samples from fewer than two (2) qualifying storm events, SSA Pacific shall, to the extent feasible, collect samples during as many QSEs as feasible until SSA Pacific samples a minimum of four (4) storm events for the reporting year, if feasible. No two (2) samples may be from the same Sample Location during the same storm event.

      17.1.2.  <u>PNID Sample Location</u>. Except as provided below, during the life of this Consent Decree, weather permitting, SSA Pacific shall collect samples from the PNID Sample Location as identified on Exhibit A at Pier F to from a minimum of four (4) QSEs that occur in a reporting year such that SSA Pacific samples during each of the same QSEs as it samples for the Power Shop Sample Location to the extent feasible.

    17.2.  <u>Contained or Stored Storm Water</u>. To the extent that SSA Pacific stores or contains storm water associated with areas of industrial activity, SSA Pacific shall sample the stored or contained water at Pier F before it discharges the storm water from Pier F to a storm drain or Water of the United States even if not during operating hours in conformity with

provision XI.B.4.b of the Storm Water Permit.

17.3. <u>Parameters</u>. SSA Pacific shall analyze the Industrial Area and PNID Sample Location storm water samples collected for the contaminants set forth in Table 1.

17.4. <u>Laboratory</u>. A laboratory accredited by the State of California shall analyze all samples collected pursuant to this Consent Decree.

17.5. <u>Detection Limits</u>. The laboratory shall use analytical methods adequate to detect the individual contaminants at or below Table 1 Numeric Limits.

17.6. <u>Hold Time</u>. SSA Pacific shall deliver all samples collected from Pier F to the laboratory as necessary to ensure no exceedance of the sample "hold time" for each contaminant sampled. For field measurements of pH, SSA Pacific shall use portable instruments, and not pH paper.  SSA Pacific will calibrate and use the instruments according to manufacturers' instructions and approved industry methodology, as specified in 40 C.F.R., Part 136.

17.7. <u>Results</u>. SSA Pacific shall request that the laboratory report sample analysis results to SSA Pacific within ten (10) days of laboratory receipt of the sample, or as soon as possible without incurring "rush" charges.

17.8. <u>Reporting</u>. SSA Pacific shall upload and certify on the California Stormwater Multiple Application and Report Tracking System ("SMARTS") the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report, for all Industrial storm water samples collected at Pier F described and taken in accordance with the samples identified in paragraph 17 within ten (10) days of receiving the laboratory results, and shall notify LA Waterkeeper that the foregoing has been uploaded to SMARTS and certified within five (5) days of certification. At the same time as such

notification, SSA Pacific shall also provide LA Waterkeeper with the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report, for the PNID Sample Location storm water samples collected at Pier F described and taken in accordance with the samples identified in paragraph 17 on a confidential basis.

18.    <u>Contaminant Reduction</u>. SSA Pacific shall develop and implement additional BMPs to reduce pollutants in storm water discharges from Industrial Areas at Pier F, where specifically required herein, to levels below those in Table 1 under the terms of this Consent Decree set forth below ("Numeric Limits").

**Table 1. Numeric Limits**

| Analytes | Values | Source of Limit |
|---|---|---|
| Total Suspended Solids | 100 mg/L (annual); 400 mg/L (instantaneous) | Permit NAL |
| Zinc | 0.26 mg/L (annual) | Permit NAL |
| Iron | 1.0 mg/L (annual) | Permit NAL |
| Copper | 0.0332 mg/L (annual) | Permit NAL |
| Oil and Grease | 15 mg/L (annual); 25 mg/L (instantaneous) | Permit NAL |
| Aluminum | 0.75 mg/L (annual) | Permit NAL |
| pH | 6.5-8.5 s.u. (instantaneous) | Basin Plan |

19.    <u>Table 1 Exceedances</u>. An "Exceedance" of Table 1 is defined, with respect to any Industrial Sample Location and the PNID Area Sample Location, as any of the following:

19.1.   Where the sampling result is greater than or equal to the sum of the concentrations of any pollutant in any storm water sample from any Sample Location and all prior storm water samples collected for the same pollutant from the same Sample Location in the same reporting year demonstrate that the annual average for that pollutant from that Sample Location will exceed the applicable annual Numeric Limit

specified in Table 1 if that pollutant is sampled four (4) times from that Sample Location in that reporting year;[2]

19.2.  If any pollutant is sampled fewer than four (4) times from any Sample Location in a reporting year, and there was otherwise no Exceedance for that pollutant at that Sample Location pursuant to paragraph 19.1 above, then where the average concentration of that pollutant from all storm water samples from that Sample Location during that reporting year exceeds the applicable annual Numeric Limit specified in Table 1;[3] or

19.3.  Where the concentration of any pollutant in any two (2) storm water samples collected from that Sample Location in a Reporting Year exceed any instantaneous Numeric Limit specified in Table 1, for Total Suspended Solids and Oil & Grease, or are outside the range of any instantaneous Numeric Limit specified in Table 1, for pH.

20.  <u>Analyte Reduction Strategy for Table 1 Exceedances with respect to Industrial Sample Location</u>. If Pier F monitoring, as required herein with respect to any Industrial Sample Location, reveals one (1) or more Exceedance, as defined in paragraph 19 above, SSA Pacific shall submit a plan to LA Waterkeeper for reducing the level of the pollutant to the Numeric Limits specified in Table 1 ("Analyte Reduction Strategy" or "ARS") from the applicable drainage area.

20.1.  The ARS for Industrial Areas shall be prepared by a Qualified Industrial Storm Water Professional ("QISP") using the template

---

[2] E.g., There is an Exceedance (a) where a sample from Sample Location #1 during the first QSE has a concentration for iron of 5 mg/L, and also (b) where samples from Sample Location #1 during the first, second, and third QSEs have concentrations for iron of 2 mg/L, 0.5 mg/L, and 2.5 mg/L, respectively, because, in either scenario, the  annual average based on four QSEs at Sample Location #1 would be at minimum 1.25 mg/L regardless of the concentrations in further samples from that Sample Location.

[3] E.g., Where samples from Sample Location #1 during the first, second and third QSEs have concentrations for iron of 1.2 mg/L, 1.1 mg/L, and 1.2 mg/L, respectively, but only three samples were collected for iron from Sample Location #1 during that reporting year, because the average based on four QSEs would be less than 1 mg/L, but the average of the three samples taken is greater than 1 mg/L.

1   attached hereto as Exhibit C and must be submitted to LA

2   Waterkeeper within thirty (30) days of SSA Pacific's receipt of

3   sampling data from Pier F showing an Exceedance defined in

4   paragraph 19 above.[4] In the event of exceedances for multiple

5   analytes and/or for multiple Sample Locations at multiple Piers, the

6   SSA Entities may submit a single ARS addressing multiple analytes

7   and multiple Sample Locations at multiple Piers, provided however

8   that the SSA Entities shall be required to submit no more than one

9   (1) ARS for each half of the Reporting Year.

10  20.2.   Analyte Reduction Strategy Requirements. An ARS shall be

11  prepared on the form provided in **Exhibit C** and shall include at a

12  minimum:  (1) the identification of the contaminant(s) discharged in

13  excess of the Numeric Limits in Table 1; (2) an assessment of the

14  likely source of each contaminant discharged in excess of the

15  numeric value(s); (3) the identification of additional BMPs,

16  including either preventing the exposure of pollutant and pollutant

17  sources to storm water and/or further treatment of storm water

18  associated with the Sample Location for which the Exceedance was

19  identified prior to discharge that are intended to reduce pollutant

20  concentrations to those below Table 1 Numeric Limits; and (4) time

21  schedules for implementation of the proposed BMPs (if any). The

22  time schedule(s) for implementation of additional BMPs shall ensure

23  that the SSA Entities implement all BMPs as soon as reasonably

24  practicable but no later than the ensuing October 1 following the

25  preparation of the ARS for the preceding reporting year unless the

26

27  [4] The ARS discussed in this Consent Decree is a separate and distinct requirement from any "Action Plan" or Exceedance Response Actions discussed in the Storm Water Permit, though actions taken to

28  comply with the ARS may be used by SSA Pacific to demonstrate compliance with the Storm Water Permit.

Settling Parties mutually agree on a later date.

20.3.  ARS Review. LA Waterkeeper shall have thirty (30) calendar days upon receipt of the SSA Entities' ARS to provide the SSA Entities with comments on the ARS, on the form attached hereto as **Exhibit C.** Failure to provide written comments prepared by a QISP within thirty (30) calendar days shall constitute irrefutable evidence that LA Waterkeeper is satisfied with the content and conclusions set forth in the ARS. Within thirty (30) calendar days of the SSA Entities' receipt of LA Waterkeeper's comments on the ARS, the SSA Entities shall consider LA Waterkeeper's comments and shall either incorporate them into the ARS or, if the SSA Entities declines to accept one or more of LA Waterkeeper's comments, the SSA Entities shall meet with LA Waterkeeper to discuss the reasons for not incorporating any of LA Waterkeeper's suggestions.

20.4.  The SSA Entities' decision not to adopt any of LA Waterkeeper's suggestions regarding an ARS shall not impact the otherwise applicable schedule for implementing any other revision to the SWPPP or Monitoring Implementation Plan ("MIP") set forth in the ARS. The Parties shall resolve any disputes as to the adequacy of the ARS in addressing the requirements of Paragraph 20.2 herein pursuant to the dispute resolution provisions of this Consent Decree as set out in Section VI below.

20.5.  All communications described in Paragraph 20 herein shall be deemed confidential. The SSA Entities shall not be required to upload the ARS to SMARTS.  LA Waterkeeper shall not use the ARS, or any other document described in Paragraph 20 herein for any purpose other than as a confidential and informational communication, or as necessary as evidence in any dispute resolution

1    proceeding.

2        20.6.  ARS Plan Payments. SSA Pacific shall pay LA Waterkeeper a

3    onetime ARS Review Fee of Two Thousand Dollars ($2,000) for the

4    costs and fees which may be incurred for reviewing and commenting

5    on any ARS submittals associated with Pier F for the term of this

6    Consent Judgement. SSA Pacific shall submit the payment within

7    thirty (30) days of the effective date of the Consent Judgement. SSA

8    Pacific shall make the payment payable to "Los Angeles

9    Waterkeeper" and addressed to Los Angeles Waterkeeper, 360 E 2nd

10   Street Suite 250, Los Angeles, CA 90012. Failure to submit a

11   payment as required under this paragraph will constitute a breach of

12   the Consent Decree.

13   21.  <u>Analyte Reduction Strategy for Table 1 Exceedances with respect to PNID Sample</u>

14   <u>Location</u>. If Pier F monitoring, as required herein with respect to the PNID sample

15   location reveals one (1) or more Exceedances, as defined in paragraph 19 above,

16   SSA Pacific shall review the good housekeeping measures set forth in paragraph 15

17   above and consider the implementation of additional BMPs in its sole and absolute

18   discretion and provide a memorandum to LA Waterkeeper within thirty (30) days of

19   SSA Pacific's receipt of sampling data showing the Exceedance defined in

20   paragraph 19 above using the template attached hereto as **Exhibit D** that includes

21   the following elements: (1) the identification of the contaminant(s) discharged in

22   excess of the Numeric Limits in Table 1; (2) an assessment of the sampling

23   methodology and likely source of each contaminant discharged in excess of the

24   numeric value(s); and (3) if additional good housekeeping BMPs are feasible, an

25   explanation of whether or not such BMPs would reasonably reduce pollutant

26   concentrations, and if and when SSA Pacific will implement such BMPs. In the

27   event of exceedances in samples collected from a single QSE from PNID sample

28   locations for multiple analytes and/or for multiple Sample Locations at multiple

Piers, the SSA Entities may submit a single memorandum addressing multiple analytes and multiple PNID sample locations at multiple Piers, provided however that the SSA Entities shall be required to submit no more than one (1) memorandum for each half of the Reporting Year.

21.1.   All communications described in Paragraph 21 herein shall be deemed confidential. The SSA Entities shall not be required to upload the memorandum to SMARTS.   LA Waterkeeper shall not use the memorandum, or any other document described in Paragraph 21 herein for any purpose other than as a confidential and informational communication.

22.   Visual Observations. SSA Pacific shall conduct all visual observations in accordance with the terms of the Storm Water Permit. Visual observations include the following:

21.1.   Storm Water Discharge Observations. SSA Pacific shall conduct visual observations at each point where Pier F discharges storm water from Industrial Drainage Areas and Vehicle Fueling Areas during each QSE pursuant to Section XI.A.1 of the Storm Water Permit.

22.2.   Non-Storm Water Discharge Observations. SSA Pacific shall conduct monthly non-storm water visual observations at each industrial discharge point pursuant to Section XI.A.1 of the Storm Water Permit.

23.   SSA Pacific shall maintain logs of the visual observations consistent with the Storm Water Permit and SSA Pacific shall make all visual observation logs available for review during the life of this Consent Decree in conformance with the Storm Water Permit and shall make these records available for LA Waterkeeper's review via email within five (5) business days of the request.

**C.   Employee Training.**

24.   Within forty-five (45) days of the Effective Date, SSA Pacific shall conduct additional employee training to familiarize the members of the Storm Water Team

designated in the SWPPP with the requirements of the Storm Water Permit and this Consent Decree. The training program shall include use of written training materials needed for effective implementation of the training program. SSA Pacific shall also ensure that there are Storm Water Team members to implement the BMPs and conduct other compliance activities required by the SWPPP and this Consent Decree.

25.     The training program shall require at least the following:

25.1.   Non-Storm Water Discharge Training. SSA Pacific shall train Storm Water Team members on the Storm Water Permit's prohibition of non-storm water discharges, so that employees know what non-storm water discharges are, which can result from improper practices that may produce non-storm water discharges at Pier F, and how to detect and prevent them.

25.2.   BMP Training. SSA Pacific shall train Storm Water Team Members on BMP implementation and maintenance to ensure effective BMP implementation to prevent or minimize the exposure of industrial pollutants to storm water, to prevent or minimize the discharge of contaminated storm water, and to ensure the proper treatment of storm water, where required herein, at Pier F.

25.3.   Sampling Training. SSA Pacific shall designate an adequate number of Storm Water Team members or consultants to ensure the collection of storm water samples required by this Consent Decree and/or the Storm Water Permit. The training shall include the proper sampling protocols, including chain of custody requirements, to ensure that individuals engaged in sampling activities properly collect, store, and submit the samples to a certified laboratory properly.

25.4.   Visual Observation Training. SSA Pacific shall provide training to all Storm Water Team members performing visual observations at Pier F pursuant to this Consent Decree and/or the Pier F SWPPP that includes

required visual observations, the distinct types of visual observations required, and instruction on proper record keeping.

26. SSA Pacific shall provide training on an annual basis, or as otherwise required, to ensure compliance the Storm Water Permit, by a private consultant or a representative of SSA Pacific who is a registered QISP familiar with the requirements of this Consent Decree and the Storm Water Permit. SSA Pacific shall repeat the training as necessary to ensure that Storm Water Team members identified in the Pier F SWPPP are familiar with the requirements of this Consent Decree and Pier F SWPPP and/or MIP, as appropriate to the employee's job descriptions. Any new Storm Water Team member who is responsible for implementation of any portion of the Pier F SWPPP, the MIP, or compliance with other terms of the Storm Water Permit or Consent Decree shall receive training within thirty (30) business days after being identified in the SWPPP as a Storm Water Team member.

27. SSA Pacific shall maintain training records to document compliance with the Storm Water Permit and shall make these records available for LA Waterkeeper's review via email within ten (10) business days of the request by LA Waterkeeper.

**D.** **Storm Water Pollution Prevention Plan and Monitoring Implementation Plan.**

28. Within sixty (60) days of the Effective Date of this Consent Decree, SSA Pacific shall revise the Pier F SWPPP and/or MIP as necessary to include:

28.1. All BMPs utilized at Pier F for Industrial Drainage Areas and Vehicle Fueling Areas as identified on **Exhibit A**.

28.2. All BMPs identified and developed pursuant to this Consent Decree and/or the Storm Water Permit for Industrial Drainage Areas and Vehicle Fueling Areas as identified on **Exhibit A.**

28.3. The specific individual(s) or positions responsible for compliance with the Storm Water Permit.

28.4. A detailed site map that includes at a minimum all information required

by the Storm Water Permit and this Consent Decree.

28.5. A description of each industrial activity, all potential pollutant sources, and each potential pollutant associated with each industrial activity and/or pollutant source.

28.6. Incorporation of the requirements of the Storm Water Permit and this Consent Decree as applicable.

29. Additional and Ongoing Revisions to SWPPP and/or MIP. SSA Pacific shall revise the SWPPP and/or MIP as more fully described in the Permit Fact Sheet at II.I. SSA Pacific shall notify LA Waterkeeper of any revised SWPPP and/or MIP uploaded and certified to SMARTS within ten (10) business days of submittal to SMARTS.

29.1. For any SWPPP or MIP revisions that are not the result of an ARS, LA Waterkeeper shall provide comments, if any, to SSA Pacific within thirty (30) days of notification of any revisions to the SWPPP or MIP. If no comments are received within thirty (30) days, the revisions shall be conclusively presumed to be acceptable to LA Waterkeeper. Within thirty (30) days of receiving comments from LA Waterkeeper, SSA Pacific shall consider LA Waterkeeper's comments and shall either incorporate LA Waterkeeper's comments into any revised SWPPP and/or MIP or shall meet with LA Waterkeeper to discuss the reasons for not incorporating any of LA Waterkeeper's suggestions. The Parties shall resolve any disputes as to the completeness of the SWPPP and/or MIP as set forth in the Permit Fact Sheet at II.1 pursuant to the dispute resolution provisions of this Consent Decree, set out in Section VI below.

29.2. All communications described in Paragraph 29 and 30 herein shall be deemed confidential. The Parties shall not use communications or documents described in Paragraphs 29 or 30 herein for any

purpose other than as a confidential and informational communications, or as necessary as evidence in any dispute resolution proceeding regarding the completeness of the SWPPP or MIP.

**E.   Alternative Means of Compliance**

30.   Notice of Termination/Notice of Non-Applicability/CII. The Settling Parties agree that if Pier F satisfies the requirements of and receives an approval for a "Notice of Termination/Notice of Non-Applicability" or through compliance with the yet to be adopted Commercial, Institutional and Industrial ("CII") permit as those terms are defined in the Storm Water Permit or the Commercial, Institutional or Industrial Permit, and all monetary obligations in this Consent Decree have been met, SSA Pacific shall be considered to be in full compliance with the terms of this Consent Decree and the provisions of Section III of this Consent Decree shall not apply so long as the Notice of Termination/Notice of Non-Applicability or CII Permit coverage remains in effect.

**IV.   COMPLIANCE MONITORING AND REPORTING**

31.   The SSA Entities shall allow LA Waterkeeper one (1) virtual site inspection in the first calendar year following the Effective Date. After the first year, if the SSA Entities are required to prepare an ARS related to Industrial Sample Locations, LA Waterkeeper shall be permitted to conduct one (1) additional virtual site inspection to inspect any newly implemented BMPs described in the ARS. The SSA Entities shall allow only one (1) site inspection during each calendar year of this Consent Decree. All such site inspections shall be conducted virtually, unless agreed upon by the Settling Parties.

32.   Any virtual Site Inspection shall occur during normal business hours at a time mutually agreed upon by the Settling Parties. LA Waterkeeper will provide the SSA Entities with as much notice as possible of its request for a virtual site inspection, which shall not be unreasonably denied by the SSA Entities, and shall provide the SSA Entities with a list of those areas LA Waterkeeper wishes to inspect. LA

Waterkeeper shall make its request at least twenty-four (24) hours' notice prior to any proposed Virtual Site Inspection in anticipation of wet weather, and seventy-two (72) hours' notice during dry weather. For any Site Inspection requested to occur in wet weather, the Settling Parties shall meet and confer during normal business hours regarding any adjustment in the timing which shall not be unreasonably denied in the event the forecast changes and anticipated precipitation appears unlikely or the need to allocate storm water team personnel to take required QSE samples as more fully described in Paragraph 17 above, and thus frustrates the purpose of a virtual inspection in wet weather. If a Virtual Site Inspection is infeasible due to sampling constraints described above, the Settling Parties shall consider alternative options during the meet and confer including but not limited to: (1) photo documenting the sampling event; or (2) delaying the Virtual Site Inspection until after the sampling activities set forth in Paragraph 17 have been completed.  Notice will be provided by telephone and electronic mail to the individual(s) designated below at paragraph 49.

33.   <u>Reporting and Documents</u>. During the life of this Consent Decree, SSA Pacific shall copy LA Waterkeeper on all non-privileged documents related to storm water quality at Pier F that SSA Pacific submits to the Regional Board, the State Board, and/or any State or local agency or municipality, which are not uploaded to SMARTS.

34.   <u>Compliance Monitoring and Oversight</u>. SSA Pacific shall pay a one-time fee of Six Thousand Dollars ($6,000) to compensate LA Waterkeeper for costs and fees to be incurred for monitoring compliance with this Consent Decree. SSA Pacific shall make the payment within thirty (30) business days of the Effective Date to "Los Angeles Waterkeeper" and addressed to Los Angeles Waterkeeper, 360 E 2nd Street Suite 250 Los Angeles, CA  90012.

## V.   <u>Environmental Project and Reimbursement of Litigation Fees and Costs</u>

35.   <u>Environmental Project</u>. SSA Pacific agrees to make a payment totaling Twenty Thousand Dollars ($20,000) to the City of Long Beach Municipal Urban

Stormwater Treatment ("MUST") Program[5] to allow the program to continue to plan and design for general expansions of the MUST Program. Payment shall be made within sixty (60) days of the Effective Date, payable to the City of Long Beach and sent via overnight mail to City of Long Beach, c/o City Manager, 411 W. Ocean Blvd., 10th Floor, Long Beach, CA 90802.

36.     For all missed deadlines included in this Consent Decree not excused by Force Majure, SSA Pacific shall make a stipulated payment of Five Hundred Dollars ($500) ("Stipulated Payment") provided, however, that LA Waterkeeper shall provide SSA Pacific with notice of any alleged missed deadline and SSA Pacific shall have ten (10) business days to cure the missed deadline without penalty. Payments for a missed deadline shall fund environmental project activities. SSA Pacific shall make the Stipulated Payment to the City of Long Beach MUST Program, payable to the City of Long Beach and sent via overnight mail to City of Long Beach c/o City Manager, 411 W. Ocean Blvd., 10th Floor, Long Beach, CA 90802, and such funds shall be used for the purposes described in Paragraph 35 above. SSA Pacific shall provide LA Waterkeeper with a copy of such payment concurrently with the payment.  SSA Pacific shall make the Stipulated Payment within thirty (30) days of a missed deadline unless LA Waterkeeper agrees in writing to an extension of that deadline.

37.     <u>Reimbursement of LA Waterkeeper's Fees and Costs</u>. SSA Pacific shall pay a total of Two Hundred Seven Thousand Dollars ($207,000) to LA Waterkeeper to reimburse LA Waterkeeper for its investigation fees and costs, expert/consultant fees and costs, and attorneys' fees incurred because of investigating and preparing the lawsuit and negotiating this Consent Decree. SSA Pacific shall make the payments within thirty (30) business days of the Effective Date and payable to Environmental Advocates Attorney Client Trust Account and sent via overnight mail to Environmental Advocates c/o Christopher A. Sproul, 5135 Anza Street, San Fransisco, CA 94121.

---

[5]  Funding for the Long Beach MUST Program or another alternative City Program intended to achieve the same or similar goals may be incorporated into the Permit Option 1 Program pending final adoption of the CII Permit.

## VI.   DISPUTE RESOLUTION

38.     This Court shall retain jurisdiction over this matter until the final termination date defined above for the purposes of implementing and enforcing the terms and conditions of this Consent Decree and adjudicating all disputes among the Settling Parties that may arise under the provisions of this Consent Decree, unless there is an ongoing dispute at the time of the final termination date, in which case this Consent Decree will terminate upon final resolution of the dispute. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

39.     If a dispute under this Consent Decree arises, or either Settling Party believes that a breach of this Consent Decree has occurred, the Settling Parties shall schedule a meet and confer within ten (10) business days of receiving written notification from the other party of a request for a meeting to determine whether a violation of this Consent Decree has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. If the Settling Parties are unable to resolve the dispute through this meet and confer process, the Settling Parties agree to request a settlement meeting before the Magistrate Judge assigned to this action. The Settling Parties agree to file any waivers necessary for the Magistrate Judge to preside over any settlement conference pursuant to this Paragraph. If the Settling Parties cannot resolve the dispute by the conclusion of the settlement meeting with the Magistrate Judge, the Settling Parties agree to submit the dispute via motion to the District Court. In resolving any dispute arising from this Consent Decree, the Court shall have discretion to award attorneys' fees and costs to either Settling Party. The relevant provisions of the then-applicable CWA and Rule 11 of the Federal Rules of Civil Procedure shall govern the allocation of fees and costs in connection with the resolution of any disputes before the Court.  The Court shall award relief limited to compliance orders and awards of attorneys' fees and costs, subject to proof.

40.     Force Majeure. No Settling Party shall be considered to be in default in the performance of any of its obligations under this Consent Decree when performance

becomes impossible due to circumstances beyond the Settling Party's control, including Force Majeure, which includes, but is not limited to, any act of god, pandemic/epidemic, war, fire, earthquake, windstorm, flood or natural catastrophe; civil disturbance, vandalism, sabotage, or terrorism; restraint by court order or public authority or agency; inability to proceed due to pending litigation under the California Environmental Quality Act; action or non-action by, or inability to obtain the necessary authorizations, approvals, or permits from, any governmental agency or private party except insofar as caused by any lack of reasonable diligence in applying for or otherwise procuring such permit; or inability to obtain equipment or materials from the marketplace if such materials or equipment are not reasonably available. Impossibility and/or Force Majeure shall not include normal inclement weather, economic hardship, or inability to pay. Any Settling Party seeking to rely upon this paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the impossibility or Force Majeure event and by exercise of due diligence has been unable to overcome the failure or performance. Delay in compliance with a specific obligation under this Consent Decree due to impossibility and/or Force Majeure as defined in this paragraph shall not excuse or delay compliance with any or all other obligations required under this Consent Decree.

      40.1.  If SSA Pacific claims compliance was or is impossible, it shall notify LA Waterkeeper in writing as soon as possible, but in no event more than five (5) business days of the date that SSA Pacific learns of the event or circumstance that caused or would cause a violation of this Consent Decree (hereinafter referred to as the "Notice of Nonperformance").

      40.2.  Within ten (10) business days of sending the Notice of Nonperformance, SSA Pacific shall send LA Waterkeeper a detailed description of the reason for the nonperformance and the specific obligations under the Consent Decree that are or have been affected by

the Force Majeure. It shall describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures SSA Pacific took or will take to prevent or minimize the delay, the schedule by which the measures shall be implemented, and the anticipated date of compliance. In no event shall the deadline be extended beyond the length of the delay caused by the Force Majeure event. SSA Pacific shall adopt all reasonable measures to avoid and minimize such delays and shall provide LA Waterkeeper with notice of a reasonable date certain of completion of the prior nonperformance of a specific obligation under the terms of this Consent Decree within fifteen (15) days of discovery of the date certain for completion.

40.3. The Settling Parties shall meet and confer in good faith concerning the non-performance and, where the Settling Parties concur that performance was or is impossible due to an event or matter covered under the Force Majeure provisions of this Consent Decree, despite the timely good faith efforts of SSA Pacific, the establishment of new deadlines.

40.4. If LA Waterkeeper disagrees with SSA Pacific's Notice of Nonperformance, or if the Settling Parties cannot timely agree on the terms of new performance deadlines or requirements, either party shall have the right to invoke the dispute resolution procedure pursuant to Section VI.

41.   Administrative Delay. SSA Pacific shall diligently pursue any approvals required for compliance with this Consent Decree. Should such diligent pursuit of approvals required for compliance be unavailing due to actions of or inaction on the part of the any governmental or regulatory entity with jurisdiction over SSA Pacific, and SSA Pacific reasonably demonstrates that these delays are not attributable to any action or inaction on the part of the SSA Pacific, any relevant compliance deadlines set forth in

1 this Consent Decree shall be tolled until such time as Parties agree to an alternative
2 means of compliance with the Consent Decree pursuant to the Force Majeure clause
3 herein.

4 **VII. <u>MUTUAL RELEASE OF LIABILITY</u>**

5 42. <u>LA Waterkeeper's Release</u>. Upon the Effective Date of this Consent
6 Decree, LA Waterkeeper, on its own behalf and on behalf of its current and former
7 officers, directors, employees, and each of their successors and assigns, and their agents,
8 attorneys, and other representatives, release all persons including, without limitation,
9 SSA Pacific (and each of its direct and indirect parent and subsidiary companies and
10 affiliates, and their respective current and former officers, directors, members,
11 employees, shareholders, and each of their predecessors, successors, and assigns, and
12 each of their agents, attorneys, consultants, and other representatives) from and waives
13 all claims alleged in the Notice Letter and/or Complaint, FAC, and SAC up to the
14 termination of this Consent Decree.

15 43. <u>SSA Pacific's Release</u>. Upon the Effective Date of this Consent Decree,
16 SSA Pacific, on its own behalf and on behalf of its current and former officers, directors,
17 employees, members, and each of their successors and assigns, and their agents,
18 attorneys, and other representatives releases LA Waterkeeper (and its current and former
19 officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of
20 their successors and assigns, and their agents, attorneys, and other representatives) from
21 and waives all claims which arise from or pertain to this action, including all claims for
22 fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum
23 incurred or claimed for matters related to LA Waterkeeper's Notice Letter, Complaint,
24 FAC, and or SAC up to the termination of this Consent Decree by the Court.

25 44. <u>Covenant Not to Sue</u>. As of the Effective Date of this Agreement, and for
26 a period up to and including the Termination Date of this Agreement, LA Waterkeeper
27 agrees that LA Waterkeeper, its officers, directors, executive staff, members, and any
28 individuals or organization under the control of LA Waterkeeper, its officers, executive

staff, and members of its governing board, will not serve any 60-day Notice of Violations and Intent to Sue or file any lawsuit against SSA Pacific, the City of Long Beach, or their respective affiliates, current or former officers, directors, members, employees, shareholders, or any of their predecessors, successors, or assigns, or any of their agents, attorneys, consultants, or any other of their representatives for alleged violations related to Pier F that were or could have been raised in its Notice Letter, Complaint, FAC, and/or SAC.

## VIII.  **MISCELLANEOUS PROVISIONS**

45.  <u>No Admission of Liability</u>. Neither this Consent Decree, the implementation of additional BMPs, nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, admission, or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. SSA Pacific maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

46.  <u>Construction</u>. The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Storm Water Permit, the Clean Water Act, or specifically herein.

47.  <u>Choice of Law</u>. The laws of the United States and the State of California shall govern this Consent Decree.

48.  <u>Severability</u>. If the Court holds any provision, paragraph, section, or sentence of this Consent Decree to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

49.  <u>Correspondence</u>. Unless specifically provided for in this Consent Decree, all notices required herein or any other correspondence pertaining to this Consent Decree shall be sent by U.S. mail or electronic mail as follows:

If to LA Waterkeeper:

Los Angeles Waterkeeper
Attn: Benjamin Harris, Barak Kamelgard, Madeleine Siegel
360 E 2nd Street Suite 250
Los Angeles, CA  90012
ben@lawaterkeeper.org
barak@lawaterkeeper.org
madeleine@lawaterkeeper.org

With a copy to

Environmental Advocates
Attn: Christopher Sproul, Brian Orion, Marla Fox
5135 Anza Street
San Francisco, CA 94121
csproul@enviroadvocates.com
borion@enviroadvocates.com
mfox@enviroadvocates.com

If to SSA Pacific:

SSA Pacific, Inc.
Attn: Candice M. Woods
SSA Marine, Inc.
Deputy General Counsel
1131 SW Klickitat Way
Seattle, WA 98134
206.654.3587 phone
206.515.4192 fax
Candice.Woods@SSAMarine.com
Legal@Carrix.com

With a copy to:

Environmental Law Group LLP
Attn: S. Wayne Rosenbaum
225 Broadway, Suite 1900
San Diego, CA 92101
swr@envirolawyer.com

50.    Notifications of communications shall be deemed submitted three (3) business days after having been sent via U.S. mail or the day of sending notification or

communication by electronic mail. Any change of address or addressees shall be communicated in the manner described above for giving notices.

51.     Counterparts. The Settling Parties may execute this Consent Decree in any number of counterparts, all of which together shall constitute one original document. Telecopy, email of a .pdf signature, and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

52.     Modification of the Consent Decree. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Settling Parties. If any Settling Party wishes to modify any provision of this Consent Decree, the Settling Party must notify the other Settling Party in writing at least twenty-one (21) days prior to taking any step to implement the proposed change.

53.     Full Settlement. This Consent Decree constitutes a full and final settlement of this matter.

54.     Integration Clause. This is an integrated Consent Decree. The Settling Parties intend this Consent Decree to be a full and complete statement of the terms of the agreement between the Settling Parties and expressly supersedes all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

55.     Authority. The undersigned representatives for LA Waterkeeper and SSA Pacific each certify that they are authorized by the Settling Party whom they represent to enter the terms and conditions of this Consent Decree.

56.     The Settling Parties certify that their undersigned representatives are fully authorized to enter this Consent Decree, to execute it on behalf of the Settling Parties, and to legally bind the Settling Parties to its terms.

57.     The Settling Parties, including any successors or assigns, agree to be bound by this Consent Decree and not to contest its validity in any subsequent proceeding to implement or enforce its terms.

1   **IN WITNESS WHEREOF**, the undersigned have executed this Consent

2   Decree as of the date first set forth below.

3

4   **APPROVED AS TO CONTENT**

5

6   Dated: _____April 3, 2024_____        By: _____

7                                         Bruce Reznik

8                                         Executive Director

9                                         Los Angeles Waterkeeper

10  Dated: _____April 8, 2024_____        By: _____

11                                        Klaudio Biazevich

12                                        Vice President of Operations, Southern

                                          California

13                                        SSA Pacific, Inc.

14  **APPROVED AS TO FORM**

15

16  Dated: _____April 1, 2024_____        By: _____

17                                        Christopher Sproul

18                                        Environmental Advocates

                                          Attorney for LA Waterkeeper

19

20  Dated: _____April 3, 2024_____        By: _____

21                                        Barak Kamelgard

22                                        LA Waterkeeper

                                          Attorney for LA Waterkeeper

23

24  Dated: _____April 8, 2024_____        By: _____

25                                        S. Wayne Rosenbaum

26                                        Environmental Law Group

                                          Attorney for SSA Pacific, Inc.

27  **IT IS SO ORDERED.**

28  Dated: May 7, 2024                    _____

                                          Hon. Fred. W. Slaughter

---

Consent Decree                34                Civil Case No. 2:22-cv-01198-FWS-MRW

# EXHIBIT A



Legend

- Facility Boundary
- Sample Locations
- PNID Sampling Location
- Industrial Areas
- Vehicle Fueling Areas
- Priority Non Industrial Areas

BMP TYPE
- Drop Inlets
- Metalox wattles
- Flow Direction

SOUTH EAST BASIN

MAIN CHANNEL

Sampling Location A1

Power_Shop

Sitemap Prepared as Exhibit A to the Consent Decree to which it is attached and is not intended for any other purpose.

STORMWATER SITE MAP WITH ADDITIONAL INFORMATION
SSA PIER F TERMINAL | BERTH 206 | LONG BEACH
DATE REVISED: 01/30/2024

© 2023 Microsoft Corporation © 2023 Maxar ©CNES (2023), Distribution Airbus DS © 2023 TomTom, Port of
Los Angeles, City of Long Beach, County of Los Angeles, California State Parks, Esri, HERE, Garmin,
SafeGraph, FAO, METI/NASA, USGS, Bureau of Land Management, EPA, NPS

Coordinate System: NAD 1983 StatePlane California V FIPS 0405 Feet

Drainage Areas and BMPs

Client: SSAMarine
A Carrix Enterprise

Site: Pier F Terminal

EXHIBIT A

N|V|5

3777 Long Beach Blvd. Annex Bldg.
Long Beach, CA 90807
P: 562.495.5777 www.nv5.com

# EXHIBIT B

# Enpurion FlexBasin™

 **NEW!**

## Stormwater pillows offer low-cost, versatile and effective treatment

**Combine engineered media pillow materials to fit your site's needs**

### Proven Results

- Select engineered media for specific pollutants
- Pick textiles for influent characteristics
- Reduce heavy metals
- Capture turbidity and suspended solids
- Eliminate emulsified oils and hydrocarbons
- Change pillows to adapt to site conditions instantly
- Manage your own maintenance quickly, easily and cost-effectively

### Advantages

- Flexible and effective stormwater treatment
- Low-cost, easy to use and maintain
- Scalable and modular
- Can be configured for any combination or pollutant

### Applications

- Parking lots
- High traffic areas
- Production and material storage areas

> **Enpurion MT media for metals and oils**

> **Enpurion MX media for phosphorus, pH**

> **Enpurion BioBlend for organics**

> **ZnIX ion exchange for zinc, and copper**

> **Enpurion CLR for turbidity and TSS**



Engineered media for site-specific pollutants

High capacity design

Up to 5 different sorption media

Optional sample port

Liner captures oils and debris

Mesh base prevents clogging

### Target pollutants:

- ✔ **Zinc & copper**
- ✔ **Turbidity & pH**
- ✔ **Pb, Al and Fe**
- ✔ **Phosphorus**
- ✔ **Emulsified oils**
- ✔ **Suspended solids**

info@enpurion.com
253-922-8823

www.enpurion.com
©2022 Lean Environment Inc

## enpurion

# EXHIBIT C

CONFIDENTIAL – NOT FOR DISTRIBUTION

# Analyte Reduction Strategy Report

Qualifying Storm Event Sample Date(s):_____

Date(s) Sample Analyses Received:_____

| Sample Results (only enter if applicable Numeric Limit exceeded) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Constituent | TSS (mg/L) | O&G (mg/L) | Aluminum (mg/L) | Copper (mg/L) | Iron (mg/L) | Lead (mg/L) | Zinc (mg/L) | pH (s.u.) |
| Numeric Limit | 100 (annual); 400 (instant) | 15 (annual); 25 (instant) | 0.75 | 0.0332 | 1.0 | 0.262 | 0.26 | 6.5-9.5 |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |

| Additional BMPs Planned | Estimated Date of Implementation | Los Angeles Waterkeeper Comments if any (attach additional pages if necessary) | Response to Comments if any (attach additional pages if necessary) |
|---|---|---|---|
| | | | |
| | | | |

CONFIDENTIAL – NOT FOR DISTRIBUTION

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |

Date Sent to Los Angeles Waterkeeper:_____

Preparer: _____

QISP ID Number: _____

Date Comments Received (no later than 30 days from LAW receipt of report):
_____

Los Angeles Waterkeeper comments received by: _____

Date Response to comments sent to Waterkeeper: _____.

Preparer: _____

QISP ID Number: _____

# EXHIBIT D

CONFIDENTIAL – NOT FOR DISTRIBUTION

# PNID Reduction Strategy Report

Qualifying Storm Event Sample Date(s):_____

Date(s) Sample Analyses Received:_____

| Sample Results (only enter if applicable Numeric Limit exceeded) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Constituent | TSS (mg/L) | O&G (mg/L) | Aluminum (mg/L) | Copper (mg/L) | Iron (mg/L) | Lead (mg/L) | Zinc (mg/L) | pH (s.u.) |
| Numeric Limit | 100 (annual); 400 (instant) | 15 (annual); 25 (instant) | 0.75 | 0.0332 | 1.0 | 0.262 | 0.26 | 6.5-9.5 |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |

| Additional BMPs Planned | Estimated Date of Implementation |
|---|---|
| | |
| | |
| | |
| | |

Date Sent to Los Angeles Waterkeeper:_____

Preparer: _____

# Exhibit 4

Christopher Sproul (State Bar No. 126398)
csproul@enviroadvocates.com
Brian Orion (State Bar No. 239460)
borion@enviroadvocates.com
Marla Fox (State Bar No. 349813)
mfox@enviroadvocates.com
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695

Barak Kamelgard (State Bar No. 298822)
barak@lawaterkeeper.org
Benjamin Avi Harris (State Bar No. 313193)
ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E. 2nd Street, Suite 250 Los Angeles, California 90012
Telephone: (310) 394-6162

*Attorneys for Plaintiff*
Los Angeles Waterkeeper

S. Wayne Rosenbaum (SBN 182456)
Grant R. Olsson (SBN: 317583)
**ENVIRONMENTAL LAW GROUP LLP VARCO & ROSENBAUM**
225 Broadway, Suite 1900 San Diego, California 92101
Tel: (619) 231-5858
swr@envirolawyer.com
golsson@envirolawyer.com

*Attorneys for Defendants*
*SSA TERMINALS, LLC; SSA PACIFIC, INC.;*
*PACIFIC MARITIME SERVICES, LLC; and*
*SSA Terminals (Pier A), LLC.*

| | |
|---|---|
| Consent Decree | Civil Case No. 2:22-cv-01198-FWS-MRW |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES WATERKEEPER, A
California non-profit corporation,

Plaintiff,

vs.

SSA Terminals, LLC; SSA Pacific, Inc.;
Pacific Maritime Services, LLC; SSA
Terminals (Pier A), LLC; City of Long
Beach,

Defendants.

Civil Case No: 2:22-cv-01198-FWS-MRW

**CONSENT DECREE PIER J**

**(Federal Water Pollution Control Act,
33 U.S.C. §§ 1251 *et seq*.)**

# CONSENT DECREE

The following Consent Decree is entered into by and between Los Angeles Waterkeeper ("LA Waterkeeper"), and Pacific Maritime Services, LLC ("Pacific Maritime" or "PMS"). The entities entering this Consent Decree are each an individual "Settling Party" and collectively the "Settling Parties."

**WHEREAS,** LA Waterkeeper is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its primary office in Santa Monica, California;

**WHEREAS,** LA Waterkeeper is dedicated to the preservation, protection, and defense of the rivers, creeks, and coastal waters of Los Angeles County from all sources of pollution and degradation;

**WHEREAS,** SSA Terminals (Pier A), LLC is the lessee and operator of Pier A located at 700 Pier A Plaza, Long Beach, California 90813 ("Pier A");

**WHEREAS,** SSA Terminals, LLC is the lessee and operator of Pier C60 located at 1521 Pier C Street, Long Beach, California 90813 ("Pier C");

**WHEREAS,** SSA Pacific, Inc. is the operator of Pier F Berths 204 to 207 at Pier F Berth 206, Long Beach, California 90802 ("Pier F");

**WHEREAS,** Pacific Maritime Services, LLC is the lessee and operator of Pier J located at 1521 Pier J Avenue E., Long Beach, California 90802 ("Pier J");

**WHEREAS,** SSA Terminals (Pier A), LLC, SSA Terminals, LLC, SSA Pacific, Inc., and Pacific Maritime Services, LLC are collectively referred to herein as the "SSA Entities";

**WHEREAS**, Piers A, C, F, and J are each owned by the City of Long Beach ("City of Long Beach" or "City");

**WHEREAS,** Pier J is an establishment primarily engaged in activities directly related to marine cargo handling for or from a vessel, that arrives at shipside, dock, pier, terminal, staging area, or in-transit area until cargo loading or unloading operations are completed (SIC Code 4491);

**WHEREAS,** Pacific Maritime contends that neither the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as superseded  by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ and Order 2018-0028-DWQ ("Storm Water Permit") nor the federal NPDES program for storm water discharges associated with industrial activities apply to drainages at transportation facilities that are not associated with specified industrial activities, and LA Waterkeeper disputes this contention, but the Settling Parties have compromised to allow for settlement of this matter notwithstanding said disagreement, with the parties' legal obligations to each other defined by this Agreement, and each party reserving all rights unless expressly stated to the contrary herein;

**WHEREAS,** LA Waterkeeper alleges its members live, work, travel, recreate, own property and homes and reside in Los Angeles County. LA Waterkeeper's members use and enjoy the waters of Long Beach Harbor into which Pier J directly discharges storm water. LA Waterkeeper alleges that its members use and enjoy these waterways for recreational, educational, aesthetic, and spiritual purposes. Additionally, LA Waterkeeper alleges that it, and its members, use Long Beach Harbor, the Pacific Ocean, and the beaches into which these waters flow to engage in scientific study;

**WHEREAS,** subject to the Settling Parties' disagreement discussed above, storm water associated with vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication) and equipment cleaning as defined in 40 C.F.R. § 122.26(b)(14)(viii) from Pier J are regulated by the Storm Water Permit and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"), Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342 ("Regulated Industrial Activities");

**WHEREAS,** Pier J operates under SIC code 4491—Marine Cargo Handling; Pier J's Waste Discharger Identification Number ("WDID") is 4 19I025359;

///

///

**WHEREAS,** the Regulated Industrial Activities occurring at Pier J include vehicle maintenance and equipment washing as depicted on the Site Plan attached hereto as **Exhibit A**;

**WHEREAS,** the Storm Water Permit includes the following requirements for those regulated activities occurring at Pier J: (1) develop and implement a stormwater pollution prevention plan ("SWPPP"); (2) control pollutant discharges associated with industrial activities using, as appropriate, best available technology economically achievable ("BAT") or best conventional pollutant control technology ("BCT") to prevent or reduce pollutants; (3) implement BAT and BCT through the development and application of Best Management Practices ("BMPs"), which must be included and updated in the SWPPP; and (4) when necessary, implement additional BMPs to prevent or reduce any pollutants associated with industrial activities that are causing or contributing to any exceedance of water quality standards;

**WHEREAS**, this Consent Decree imposes requirements on Pacific Maritime that go beyond those set forth in the Storm Water Permit through the implementation of BMPs and informational sampling of storm water related to non-industrial areas of Pier J;

**WHEREAS,** on December 8, 2021, LA Waterkeeper sent the SSA Entities, the United States Environmental Protection Agency ("EPA"), EPA Region IX, the State Water Resources Control Board ("State Board"), and the Los Angeles Regional Water Quality Control Board ("Regional Board") a notice of intent to file suit ("Notice Letter") under Sections 505(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1365(a) and (b). The Notice Letter alleged violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at Pier J;

**WHEREAS,** on February 22, 2022, LA Waterkeeper filed a complaint against the SSA Entities in the United States District Court, Central District of California alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at Piers A, C, F, and J ("Complaint");

///

**WHEREAS**, on March 10, 2022, LA Waterkeeper sent the SSA Entities via letter its First Supplemental Notice of Clean Water Act Violations and Intent to File Suit ("Supplemental CWA Notice Letter");

**WHEREAS**, on May 9, 2022, the SSA Entities, including Pacific Maritime, filed their first motion to dismiss five of LA Waterkeeper's six claims in the Complaint for failure to state a claim and lack of subject matter jurisdiction, and a motion to strike portions of the sixth claim;

**WHEREAS,** on September 16, 2022, Los Angeles Waterkeeper sent the SSA Entities a notice letter alleging violations of the Resource Conservation and Recovery Act ("RCRA Notice Letter");

**WHEREAS,** on January 10, 2023, LA Waterkeeper filed its first amended complaint ("FAC") against the SSA Entities and the City in the United States District Court, Central District of California alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), 28 U.S.C. § 1331, and violations of the Storm Water Permit at the Piers A, C, F, and J;

**WHEREAS,** on March 13, 2023, the City filed a motion to dismiss LA Waterkeeper's FAC for failure to state a claim and lack of subject matter jurisdiction;

**WHEREAS,** on March 13, 2023, the SSA Entities, including Pacific Maritime, filed their second motion to dismiss five of LA Waterkeeper's six claims in the FAC for failure to state a claim and lack of subject matter jurisdiction, and a motion to strike portions of the sixth, on essentially the same bases as its prior motion to dismiss;

**WHEREAS,** On August 14, 2023, LA Waterkeeper filed a motion for leave to amend and supplement the FAC;

**WHEREAS,** On August 24, 2023, the SSA Entities and the City filed an opposition to LA Waterkeeper's motion for leave to amend.

**WHEREAS,** On October 14, 2023, Judge Fred W. Slaughter ruled on the motions to dismiss and the motion to amend and ordered:

    1.    The SSA Defendants' Motion to Dismiss (Dkt. 58) is GRANTED IN PART

AND DENIED IN PART. The Motion is DENIED as to Plaintiff's first, second, third, and fourth claims and pre-suit notice under RCRA. The Motion is GRANTED as to Plaintiff's sixth claim. The sixth claim under RCRA is DISMISSED WITH LEAVE TO AMEND.

2. Defendant City of Long Beach's Motion to Dismiss (Dkt. 59) is GRANTED IN PART AND DENIED IN PART. The Motion is DENIED as to Plaintiff's pre-suit notice and GRANTED as to Plaintiff's and CWA and RCRA claims against Defendant City of Long Beach. Plaintiff's claims against Defendant City of Long Beach are DISMISSED WITH LEAVE TO AMEND.

3. Plaintiff's Motion to Amend the Complaint (Dkt. 73) is DENIED AS MOOT.

4. Plaintiff is ORDERED to file a Second Amended Complaint, consistent with the court's Order, by December 15, 2023;

**WHEREAS,** on December 15, 2023, LA Waterkeeper filed a Second Amended Compliant ("SAC");

**WHEREAS,** LA Waterkeeper alleges Pacific Maritime to be in violation of the substantive and procedural requirements of the Storm Water Permit, the Clean Water Act, and RCRA with respect to Pier J;

**WHEREAS,** Pacific Maritime denies all allegations in the Notice Letters and the SAC relating to Pier J;

**WHEREAS,** LA Waterkeeper and Pacific Maritime have agreed that it is in the Settling Parties' mutual interest to enter a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the Notice Letter, Complaint, FAC, and SAC with respect to Pier J without further proceedings; and

**WHEREAS,** all actions taken by the Settling Parties pursuant to this Consent Decree shall comply with all applicable federal and state laws and local rules and regulations.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1.    The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a).

2.    Venue is appropriate in the Central District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because Pier J is located within this District.

3.    The SAC alleges claims upon which relief may be granted pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1) and the Summons and Complaint shall be deemed served pursuant to Fed. R. Civ. P. 4.

4.    LA Waterkeeper has standing to bring this action.

5.    The Court shall retain jurisdiction over this matter for purposes of interpreting, modifying, or enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce this Consent Decree.

6.    The Court shall dismiss with prejudice all claims against the City of Long Beach with respect to the Federal Water Pollution Control Act (the "CWA"), 33 U.S.C. §§ 1251, *et seq*., including, and without limitation, all claims arising out of 33 U.S.C. §§ 1311(a), 1331, and 1342.

7.    The Court shall dismiss with prejudice all claims against the City of Long Beach and Pacific Maritime with respect to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq*., including, and without limitation, RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972.

## I.    **OBJECTIVES**

8.    It is the express purpose of the Settling Parties entering this Consent Decree to further the objectives set forth in the Clean Water Act and to resolve those issues alleged by LA Waterkeeper in its SAC. Considering these objectives and as set forth fully below, the Settling Parties agree to comply with the provisions of this Consent Decree and Pacific Maritime agrees to comply with the applicable requirements of the Storm Water Permit and all applicable provisions of the Clean Water Act at Pier J.

## II.   AGENCY REVIEW AND TERM OF CONSENT DECREE

9.      LA Waterkeeper shall submit this Consent Decree to the United States Department of Justice and the EPA (collectively "Federal Agencies") within three (3) days of the final signature of the Settling Parties for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) days after receipt by both agencies, as evidenced by written acknowledgement of receipt by the agencies or the certified return receipts, copies of which LA Waterkeeper shall provide to Pacific Maritime. If the Federal Agencies object to entry of this Consent Decree, the Settling Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies within a reasonable amount of time. Following the Federal Agencies' review, the Settling Parties shall submit the Consent Decree to the Court for entry.

10.     The term "Effective Date" as used herein shall mean the day that the Court enters the last of the Consent Decrees for Piers A, C, F, and J, or the next business day if such day is not a business day.

11.     This Consent Decree will terminate three (3) years from the Effective Date, unless prior to the termination date either Settling Party has invoked the dispute resolution provisions of this Consent Decree and there is an ongoing, unresolved dispute regarding either Settling Party's compliance with this Consent Decree, in which case the Consent Decree will terminate upon final resolution of the dispute pursuant to the dispute resolution provisions contained herein.

## III.   COMMITMENTS OF THE SETTLING PARTIES

### A.      Storm Water Pollution Control Best Management Practices.

12.     The Settling Parties acknowledge that Pacific Maritime is in the process of making BMP changes to Pier J to improve the quality of storm water discharges from the portions of the Facility depicted in **Exhibit A** as having industrial activities ("Industrial Areas") or vehicle fueling activities ("Vehicle Fueling Areas"). In addition to implementing and maintaining BMPs, Pacific Maritime shall implement the BMPs specifically identified and described in this Consent Decree in paragraph 13, for Industrial

Areas and Vehicle Fueling Areas described in **Exhibit A**, as applicable.

13.     Within thirty (30) days of the Effective Date, Pacific Maritime shall incorporate the following structural and non-structural BMPs in the Industrial Areas and Fueling Areas described in **Exhibit A**, as applicable:

    13.1.  Structural BMPs

        13.1.1.  Installing Enpurion with ZnIX pillows and wattles or equivalent, in storm drain inlets in Industrial Areas and Vehicle Fueling Areas as identified in **Exhibit A**. See attached manufacturer's cut sheets attached hereto as **Exhibit B**.

    13.2.  Wattles/Filter Socks

        13.2.1.  Deploy Metaloxx or equivalent absorbing wattles/filter socks in Industrial Areas as show in **Exhibit A**.

        13.2.2.  Ensure wattles/filter socks are deployed to the extent feasible to prevent stormwater from flowing around or beneath the wattles/filter socks.

    13.3.  Vehicle Fueling Areas

        13.3.1.  Fully delineate all Vehicle Fueling Areas identified in **Exhibit A** with painted markings or signage.

    13.4.  Sweeping

        13.4.1.  Monthly inspection of Industrial Areas and Vehicle Fueling Areas described in **Exhibit A** and the removal of trash and other debris by on-site personnel.

        13.4.2.  Based on the results of monthly inspections, Pacific Maritime will deploy personnel to conduct detailed sweeping with a regenerative sweeper, as well as hand sweeping of hard-to-reach areas of Industrial Areas and Vehicle Fueling Areas.

    13.5.  Housekeeping in Industrial Areas and Vehicle Fueling Areas

        13.5.1.  Close or cover all waste/trash/recycle bins when not in active

1      use.

2          13.5.2.  To the extent feasible, move, or otherwise cover, stored and

3               miscellaneous metal out of contact with rainfall and runoff.

4        13.6.  Storm Water Team personnel will conduct Pre-Rain Inspections of

5           Industrial Areas and Vehicle Fueling Areas when the NOAA station at

6           Long Beach Municipal Airport predicts a local rain in the next seventy-

7           two (72) hours of greater than one half (0.5) inches with a probability

8           of greater than fifty percent (50%).  The inspection will include the

9           following elements:

10         13.6.1.  Inspection of the Industrial Areas and Vehicle Fueling Areas

11              for any areas of dirt and debris accumulation.

12         13.6.2.  Removal of dirt and debris from areas identified in 13.6.1.

13         13.6.3.  Inspection of catch basin inserts and wattles in Industrial

14              Areas and Vehicle Fueling Areas. Replace as necessary,

15              based  upon  observations  and  manufacturers'

16              recommendations.

17         13.6.4.  Inspect for any spills or leaks in Industrial Areas and Vehicle

18              Fueling Areas and take appropriate actions.

19         13.6.5.  Confirm all waste/trash/recycle bins in Industrial Areas and

20              Vehicle Fueling Areas are closed or covered.

21       13.7.  Staff training as described in paragraphs 24-27 below.

22     14.    For the Priority Non-Industrial ("PNID") Areas of the Facility depicted in

23     **Exhibit A**, Pacific Maritime will implement the following non-structural BMPs:[1]

24       14.1.  Sweeping

25         14.1.1.  Monthly inspection and the removal of trash or debris by on-

26              site personnel.

27     

---

[1] It is Pacific Maritime's intention to implement the provisions of this section 14 to the balance of the Non-Industrial Areas at Pier J as time and resources allow in Pacific Maritime's sole and absolute discretion.

14.1.2. Based on the results of monthly inspections, Pacific Maritime will deploy personnel to conduct quarterly detailed sweeping with a regenerative sweeper, as well as hand sweeping of hard-to-reach areas.

14.2. Housekeeping

14.2.1. Close or cover all waste/trash/recycle bins when not in active use.

14.2.2. To the extent feasible, move, or otherwise cover, stored and miscellaneous metal out of contact with rainfall and runoff.

14.3. Inspections

14.3.1. Pre-rain inspections as described in paragraph 13.6 above.

14.4. Staff training as described in paragraphs 24-27 below.

15. INTENTIONALLY LEFT BLANK.

**B.** **Discharge Locations and Storm Water Sampling**

16. Discharge Locations. **Exhibit A** attached hereto identifies storm water discharge locations and one (1) storm water sample locations for Pier J ("Industrial Sample Locations"), referred to herein as the "Power Shop Sample Location," in conformity with provision XI.C.4 of the Storm Water Permit. In addition, **Exhibit A** attached hereto identifies one (1) PNID sample locations for informational purposes only, referred to herein as the "PNID Sample Location." PNID sample results will be shared with LA Waterkeeper on a confidential basis and are for informational purposes only. Should Sample Locations change, Pacific Maritime will amend the Facility site map and notify LA Waterkeeper within thirty (30) days of such a change.

17. Sampling. Pacific Maritime will implement the following industrial storm water monitoring procedures at Pier J:

17.1. Frequency.

17.1.1. Industrial Sample Location. During the life of this Consent Decree, weather permitting, Pacific Maritime shall collect

samples from the Industrial Sample Location identified on **Exhibit A** at Pier J to the extent feasible from a minimum of four (4) "qualifying storm events" that occur in a reporting year such that Pacific Maritime collects two (2) samples during the first half of the reporting year and two (2) samples during the second half of the reporting year. A "qualifying storm event" or "QSE" is a storm event that produces a discharge from a drainage area covered by the Storm Water Permit and is preceded by forty-eight (48) hours with no discharge from any drainage area. If, prior to March 1, Pacific Maritime has collected samples from fewer than two (2) storm events, Pacific Maritime shall, to the extent feasible, collect samples during as many QSEs as feasible until Pacific Maritime samples a minimum of four (4) storm events for the reporting year, if feasible. No two (2) samples may be from the same Sample Location during the same storm event.

17.1.2. <u>PNID Sample Location</u>. Except as provided below, during the life of this Consent Decree, weather permitting, Pacific Maritime shall collect samples from the PNID Sample Location as identified on **Exhibit A** at Pier J to from a minimum of four (4) QSEs that occur in a reporting year such that Pacific Maritime samples during each of the same QSEs as it samples for the Power Shop Sample Location to the extent feasible.

17.2. <u>Contained or Stored Storm Water</u>. To the extent that Pacific Maritime stores or contains storm water associated with areas of industrial activity, Pacific Maritime shall sample the stored or contained water at Pier J before it discharges the storm water from Pier J to a storm drain or Water of the United States even if not during operating hours in

conformity with provision XI.B.4.b of the Storm Water Permit.

17.3. <u>Parameters</u>. Pacific Maritime shall analyze the Industrial Area and PNID Sample Location storm water samples collected for the contaminants set forth in Table 1.

17.4. <u>Laboratory</u>. A laboratory accredited by the State of California shall analyze all samples collected pursuant to this Consent Decree.

17.5. <u>Detection Limits</u>. The laboratory shall use analytical methods adequate to detect the individual contaminants at or below Table 1Numeric Limits.

17.6. <u>Hold Time</u>. Pacific Maritime shall deliver all samples collected from Pier J to the laboratory as necessary to ensure no exceedance of the sample "hold time" for each contaminant sampled. For field measurements of pH, Pacific Maritime shall use portable instruments, and not pH paper.   Pacific Maritime will calibrate and use the instruments according to manufacturers' instructions and approved industry methodology, as specified in 40 C.F.R., Part 136.

17.7. <u>Results</u>. Pacific Maritime shall request that the laboratory report sample analysis results to Pacific Maritime within ten (10) days of laboratory receipt of the sample, or as soon as possible without incurring "rush" charges.

17.8. <u>Reporting</u>. Pacific Maritime shall upload and certify on the California Stormwater Multiple Application and Report Tracking System ("SMARTS") the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report, for all Industrial storm water samples collected at Pier J described and taken in accordance with the samples identified in paragraph 17 within ten (10) days of receiving the laboratory results, and shall notify LA Waterkeeper that the foregoing has been uploaded to SMARTS and

certified within five (5) days of certification. At the same time as such notification, Pacific Maritime shall also provide LA Waterkeeper with the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report, for the PNID Sample Location storm water samples collected at Pier J described and taken in accordance with the samples identified in paragraph 17 on a confidential basis.

18.  <u>Contaminant Reduction</u>. Pacific Maritime shall develop and implement additional BMPs to reduce pollutants in storm water discharges from Industrial Areas at Pier J, where specifically required herein, to levels below those in Table 1 under the terms of this Consent Decree set forth below ("Numeric Limits").

**Table 1. Numeric Limits**

| Analytes | Values | Source of Limit |
|---|---|---|
| Total Suspended Solids | 100 mg/L (annual); 400 mg/L (instantaneous) | Permit NAL |
| Zinc | 0.26 mg/L (annual) | Permit NAL |
| Iron | 1.0 mg/L (annual) | Permit NAL |
| Copper | 0.0332 mg/L (annual) | Permit NAL |
| Oil and Grease | 15 mg/L (annual); 25 mg/L (instantaneous) | Permit NAL |
| Aluminum | 0.75 mg/L (annual) | Permit NAL |
| pH | 6.5-8.5 s.u. (instantaneous) | Basin Plan |

19.  <u>Table 1 Exceedances</u>. An "Exceedance" of Table 1 is defined, with respect to any Industrial Sample Location and the PNID Sample Location, as any of the following:

19.1.  Where the sampling result is greater than or equal to the sum of the concentrations of any pollutant in any storm water sample from any Sample Location and all prior storm water samples collected for the same pollutant from the same Sample Location in the same reporting year demonstrate that the annual average for that pollutant from that Sample Location will exceed the applicable annual Numeric Limit

1    specified in Table 1 if that pollutant is sampled four (4) times from that

2    Sample Location in that reporting year;[2]

3    19.2.  If any pollutant is sampled fewer than four (4) times from any Sample

4    Location in a reporting year, and there was otherwise no Exceedance

5    for that pollutant at that Sample Location pursuant to paragraph 19.1

6    above, then where the average concentration of that pollutant from all

7    storm water samples from that Sample Location during that reporting

8    year exceeds the applicable annual Numeric Limit specified in Table

9    1;[3] or

10    19.3.  Where the concentration of any pollutant in any two (2) storm water

11    samples collected from that Sample Location in a Reporting Year

12    exceed any instantaneous Numeric Limit specified in Table 1, for Total

13    Suspended Solids and Oil & Grease, or are outside the range of any

14    instantaneous Numeric Limit specified in Table 1, for pH.

15  20.    <u>Analyte Reduction Strategy for Table 1 Exceedances with respect to Industrial</u>

16  <u>Sample Location</u>. If Pier J monitoring, as required herein with respect to any

17  Industrial Sample Location, reveals one (1) or more Exceedance, as defined in

18  paragraph 19 above, Pacific Maritime shall submit a plan to LA Waterkeeper for

19  reducing the level of the pollutant to the Numeric Limits specified in Table 1

20  ("Analyte Reduction Strategy" or "ARS") from the applicable drainage area.

21    20.1.  The ARS for Industrial Areas shall be prepared by a Qualified

22    Industrial Storm Water Professional ("QISP") using the template

23

---

24  [2] E.g., There is an Exceedance (a) where a sample from Sample Location #1 during the first QSE has a concentration for iron of 5 mg/L, and also (b) where samples from Sample Location #1 during the first,

25  second, and third QSEs have concentrations for iron of 2 mg/L, 0.5 mg/L, and 2.5 mg/L, respectively,

26  because, in either scenario, the  annual average based on four QSEs at Sample Location #1 would be at minimum 1.25 mg/L regardless of the concentrations in further samples from that Sample Location.

27  [3] E.g., Where samples from Sample Location #1 during the first, second and third QSEs have concentrations for iron of 1.2 mg/L, 1.1 mg/L, and 1.2 mg/L, respectively, but only three samples were

28  collected for iron from Sample Location #1 during that reporting year, because the average based on four QSEs would be less than 1 mg/L, but the average of the three samples taken is greater than 1 mg/L.

attached hereto as **Exhibit C** and must be submitted to LA Waterkeeper within thirty (30) days of Pacific Maritime's receipt of sampling data from Pier J showing an Exceedance defined in paragraph 19 above.[4] In the event of exceedances for multiple analytes and/or for multiple Sample Locations at multiple Piers, the SSA Entities may submit a single ARS addressing multiple analytes and multiple Sample Locations at multiple Piers, provided however that the SSA Entities shall be required to submit no more than one (1) ARS for each half of the Reporting Year.

20.2.  Analyte Reduction Strategy Requirements. An ARS shall be prepared on the form provided in **Exhibit C** and shall include at a minimum:  (1) the identification of the contaminant(s) discharged in excess of the Numeric Limits in Table 1; (2) an assessment of the likely source of each contaminant discharged in excess of the numeric value(s); (3) the identification of additional BMPs, including either preventing the exposure of pollutant and pollutant sources to storm water and/or further treatment of storm water associated with the Sample Location for which the Exceedance was identified prior to discharge that are intended to reduce pollutant concentrations to those below Table 1 Numeric Limits; and (4) time schedules for implementation of the proposed BMPs (if any). The time schedule(s) for implementation of additional BMPs shall ensure that the SSA Entities implement all BMPs as soon as reasonably practicable but no later than the ensuing October 1 following the preparation of the ARS for the preceding reporting year unless the

---

[4] The ARS discussed in this Consent Decree is a separate and distinct requirement from any "Action Plan" or Exceedance Response Actions discussed in the Storm Water Permit, though actions taken to comply with the ARS may be used by Pacific Maritime to demonstrate compliance with the Storm Water Permit.

Settling Parties mutually agree on a later date.

20.3.  ARS Review. LA Waterkeeper shall have thirty (30) calendar days upon receipt of the SSA Entities' ARS to provide the SSA Entities with comments on the ARS, on the form attached hereto as **Exhibit D**. Failure to provide written comments prepared by a QISP within thirty (30) calendar days shall constitute irrefutable evidence that LA Waterkeeper is satisfied with the content and conclusions set forth in the ARS.   Within thirty (30) calendar days of the SSA Entities' receipt of LA Waterkeeper's comments on the ARS, the SSA Entities shall consider LA Waterkeeper's comments and shall either incorporate them into the ARS or, if the SSA Entities decline to accept one or more of LA Waterkeeper's comments, the SSA Entities shall meet with LA Waterkeeper to discuss the reasons for not incorporating any of LA Waterkeeper's suggestions.

20.4.  The SSA Entities' decision not to adopt any of LA Waterkeeper's suggestions regarding an ARS shall not impact the otherwise applicable schedule for implementing any other revision to the SWPPP or MIP set forth in the ARS. The Settling Parties shall resolve any disputes as to the adequacy of the ARS in addressing the requirements of Paragraph 20.2 herein pursuant to the dispute resolution provisions of this Consent Decree as set out in Section VI below.

20.5.  All communications described in Paragraph 20 herein shall be deemed confidential. The SSA Entities shall not be required to upload the ARS to SMARTS. LA Waterkeeper shall not use the ARS, or any other document described in Paragraph 20 herein for any purpose other than as a confidential and informational communication, or as necessary as evidence in any dispute resolution

1    proceeding.

2        20.6.  ARS Plan Payments. Pacific Maritime shall pay LA Waterkeeper a

3        onetime ARS Review Fee of Two Thousand Dollars ($2,000) for the

4        costs and fees which may be incurred for reviewing and commenting

5        on any ARS submittals associated with Pier J for the term of this

6        Consent Decree.  Pacific Maritime shall submit the payment within

7        thirty (30) days of the effective date of the Consent Judgement.

8        Pacific Maritime shall make the payment payable to "Los Angeles

9        Waterkeeper" and addressed to Los Angeles Waterkeeper, 360 E 2nd

10       Street Suite 250, Los Angeles, CA  90012. Failure to submit a

11       payment as required under this paragraph will constitute a breach of

12       the Consent Decree.

13   21.  Analyte Reduction Strategy for Table 1 Exceedances with respect to PNID Sample

14   Location. If Pier J monitoring, as required herein with respect to PNID Sample

15   Location reveals one (1) or more Exceedances, as defined in paragraph 19 above,

16   Pacific Maritime shall review the good housekeeping measures set forth in

17   paragraph 15 above and consider the implementation of additional BMPs in its sole

18   and absolute discretion and provide a memorandum to LA Waterkeeper within thirty

19   (30) days of Pacific Maritime's receipt of sampling data showing the Exceedance

20   defined in paragraph 19 above using the template attached hereto as **Exhibit D** that

21   includes the following elements: (1) the identification of the contaminant(s)

22   discharged in excess of the Numeric Limits in Table 1; (2) an assessment of the

23   sampling methodology and likely source of each contaminant discharged in excess

24   of the numeric value(s); and (3) if additional good housekeeping BMPs are feasible,

25   an explanation of whether or not such BMPs would reasonably reduce pollutant

26   concentrations, and if and when the SSA Entities will implement such BMPs. In the

27   event of exceedances in samples collected from a single QSE from PNID sample

28   locations for multiple analytes and/or for multiple Piers, the SSA Entities may

submit a single memorandum addressing multiple analytes and multiple PNID sample locations at multiple Piers, provided however that the SSA Entities shall be required to submit no more than one (1) memorandum for each half of the Reporting Year.

    21.1.  All communications described in Paragraph 21 herein shall be deemed confidential. The SSA Entities shall not be required to upload the memorandum to SMARTS.   LA Waterkeeper shall not use the memorandum, or any other document described in Paragraph 21 herein for any purpose other than as a confidential and informational communication.

22.    <u>Visual Observations</u>. Pacific Maritime shall conduct all visual observations in accordance with the terms of the Storm Water Permit. Visual observations include the following:

    22.1.  <u>Storm Water Discharge Observations</u>. Pacific Maritime shall conduct visual observations at each point where Pier J discharges storm water from Industrial Drainage Areas and Vehicle Fueling Areas during each QSE pursuant to Section XI.A.1 of the Storm Water Permit.

    22.2.  <u>Non-Storm Water Discharge Observations</u>. Pacific Maritime shall conduct monthly non-storm water visual observations at each industrial discharge point pursuant to Section XI.A.1 of the Storm Water Permit.

23.    Pacific Maritime shall maintain logs of the visual observations consistent with Paragraph 22 herein. Pacific Maritime shall make these records available for LA Waterkeeper's review via email within five (5) business days of the request for said documents by LA Waterkeeper.

## C.    **Employee Training.**

24.    Within forty-five (45) days of the Effective Date, Pacific Maritime shall conduct additional employee training to familiarize the members of the Storm Water Team designated in the SWPPP with the requirements of the Storm Water Permit and this

Consent Decree. The training program shall include use of written training materials needed for effective implementation of the training program. Pacific Maritime shall also ensure that there are Storm Water Team members to implement the BMPs and conduct other compliance activities required by the SWPPP and this Consent Decree.

25. The training program shall require at least the following:

25.1. <u>Non-Storm Water Discharge Training</u>. Pacific Maritime shall train Storm Water Team members on the Storm Water Permit's prohibition of non-storm water discharges, so that employees know what non-storm water discharges are, which can result from improper practices that may produce non-storm water discharges at Pier J, and how to detect and prevent them.

25.2. <u>BMP Training</u>. Pacific Maritime shall train Storm Water Team Members on BMP implementation and maintenance to ensure effective BMP implementation to prevent or minimize the exposure of industrial pollutants to storm water, to prevent or minimize the discharge of contaminated storm water, and to ensure the proper treatment of storm water, where required herein, at Pier J.

25.3. <u>Sampling Training</u>. Pacific Maritime shall designate an adequate number of Storm Water Team members or consultants to ensure the collection of storm water samples required by this Consent Decree and/or the Storm Water Permit. The training shall include the proper sampling protocols, including chain of custody requirements, to ensure that individuals engaged in sampling activities properly collect, store, and submit the samples to a certified laboratory properly.

25.4. <u>Visual Observation Training</u>. Pacific Maritime shall provide training to all Storm Water Team members performing visual observations at Pier J pursuant to this Consent Decree and/or the Pier J SWPPP that includes required visual observations, the distinct types of visual observations

1     required, and instruction on proper record keeping.

2     26.    Pacific Maritime shall provide training on an annual basis, or as otherwise required, to ensure compliance the Storm Water Permit, by a private consultant or a representative of Pacific Maritime who is a registered QISP familiar with the requirements of this Consent Decree and the Storm Water Permit. Pacific Maritime shall repeat the training as necessary to ensure that Storm Water Team members identified in the Pier J SWPPP are familiar with the requirements of this Consent Decree and Pier J SWPPP and/or MIP, as appropriate to the employee's job descriptions. Any new Storm Water Team member who is responsible for implementation of any portion of the Pier J SWPPP, the MIP, or compliance with other terms of the Storm Water Permit or Consent Decree shall receive training within thirty (30) business days after being identified in the Pier J SWPPP as a Storm Water Team member.

27.    Pacific Maritime shall maintain training records to document compliance with the Storm Water Permit and shall make these records available for LA Waterkeeper's review via email within ten (10) business days of the request by LA Waterkeeper.

**D.**    <u>**Storm Water Pollution Prevention Plan and Monitoring Implementation Plan**</u>.

28.    Within sixty (60) days of the Effective Date of this Consent Decree, Pacific Maritime shall revise the Pier J SWPPP and/or MIP as necessary to include:

     28.1.   All BMPs utilized at Pier J for Industrial Drainage Areas and Vehicle Fueling Areas as identified on **Exhibit A**.

     28.2.   All BMPs identified and developed pursuant to this Consent Decree and/or the Storm Water Permit for Industrial Drainage Areas and Vehicle Fueling Areas as identified on **Exhibit A.**

     28.3.   The specific individual(s) or positions responsible for compliance with the Storm Water Permit.

     28.4.   A detailed site map that includes at a minimum all information required by the Storm Water Permit and this Consent Decree.

28.5.  A description of each industrial activity, all potential pollutant sources, and each potential pollutant associated with each industrial activity and/or pollutant source.

28.6.  Incorporation of the requirements of the Storm Water Permit and this Consent Decree as applicable.

29.  <u>Additional and Ongoing Revisions to SWPPP and/or MIP</u>. Pacific Maritime shall revise the SWPPP and/or MIP as more fully described in the Permit Fact Sheet at II.I. Pacific Maritime shall notify LA Waterkeeper of any revised SWPPP and/or MIP uploaded and certified to SMARTS within ten (10) business days of submittal to SMARTS.

29.1.  For any SWPPP or MIP revisions that are not the result of an ARS, LA Waterkeeper shall provide comments, if any, to Pacific Maritime within thirty (30) days of notification of any revisions to the SWPPP or MIP. If no comments are received within thirty (30) days, the revisions shall be conclusively presumed to be acceptable to LA Waterkeeper.   Within thirty (30) days of receiving comments from LA Waterkeeper, Pacific Maritime shall consider LA Waterkeeper's comments and shall either incorporate LA Waterkeeper's comments into any revised SWPPP and/or MIP or shall meet with LA Waterkeeper to discuss the reasons for not incorporating any of LA Waterkeeper's suggestions. The Parties shall resolve any disputes as to the completeness of the SWPPP and/or MIP as set forth in the Permit Fact Sheet at II.1 pursuant to the dispute resolution provisions of this Consent Decree, set out in Section VI below.

29.2.  All communications described in Paragraph 29 and 30 herein shall be deemed confidential.  The Parties shall not use communications or documents described in Paragraphs 29 or 30 herein for any purpose other than as a confidential and informational

communications, or as necessary as evidence in any dispute resolution proceeding regarding the completeness of the SWPPP or MIP.

**E.** **Alternative Means of Compliance**

30.  <u>Notice of Termination/Notice of Non-Applicability/CII</u>. The Settling Parties agree that if Pier J satisfies the requirements of and receives an approval for a "Notice of Termination/Notice of Non-Applicability" or through compliance with the yet to be adopted Commercial, Institutional and Industrial ("CII") permit as those terms are defined in the Storm Water Permit or the Commercial, Institutional or Industrial Permit, and all monetary obligations in this Consent Decree have been met, Pacific Maritime shall be considered to be in full compliance with the terms of this Consent Decree and the provisions of Section III of this Consent Decree shall not apply so long as the Notice of Termination/Notice of Non-Applicability or CII Permit coverage remains in effect.

**IV.**   **COMPLIANCE MONITORING AND REPORTING**

31.  The SSA Entities shall allow LA Waterkeeper one (1) virtual site inspection in the first calendar year following the Effective Date. After the first year, if the SSA Entities are required to prepare an ARS related to Industrial Sample Locations, LA Waterkeeper shall be permitted to conduct one (1) additional virtual site inspection to inspect any newly implemented BMPs described in the ARS. The SSA Entities shall allow only one (1) site inspection during each calendar year of this Consent Decree. All such site inspections shall be conducted virtually, unless agreed upon by the Settling Parties.

32.  Any virtual Site Inspection shall occur during normal business hours at a time mutually agreed upon by the Settling Parties. LA Waterkeeper will provide the SSA Entities with as much notice as possible of its request for a virtual site inspection, which shall not be unreasonably denied by the SSA Entities, and shall provide the SSA Entities with a list of those areas LA Waterkeeper wishes to inspect. LA Waterkeeper shall make its request at least twenty-four (24) hours' notice prior to any

proposed Virtual Site Inspection in anticipation of wet weather, and seventy-two (72) hours' notice during dry weather. For any Site Inspection requested to occur in wet weather, the Settling Parties shall meet and confer during normal business hours regarding any adjustment in the timing which shall not be unreasonably denied in the event the forecast changes and anticipated precipitation appears unlikely or the need to allocate storm water team personnel to take required QSE samples as more fully described in Paragraph 17 above, and thus frustrates the purpose of a virtual inspection in wet weather. If a Virtual Site Inspection is infeasible due to sampling constraints described above, the Settling Parties shall consider alternative options during the meet and confer including but not limited to: (1) photo documenting the sampling event; or (2) delaying the Virtual Site Inspection until after the sampling activities set forth in Paragraph 17 have been completed.  Notice will be provided by telephone and electronic mail to the individual(s) designated below at paragraph 49.

33.   <u>Reporting and Documents</u>. During the life of this Consent Decree, Pacific Maritime shall copy LA Waterkeeper on all non-privileged documents related to storm water quality at Pier J that Pacific Maritime submits to the Regional Board, the State Board, and/or any State or local agency or municipality, which are not uploaded to SMARTS.

34.   <u>Compliance Monitoring and Oversight</u>. Pacific Maritime shall pay a one-time fee of Six Thousand Dollars ($6,000) to compensate LA Waterkeeper for costs and fees to be incurred for monitoring compliance with this Consent Decree. Pacific Maritime shall make the payment within thirty (30) business days of the Effective Date to "Los Angeles Waterkeeper" and addressed to Los Angeles Waterkeeper, 360 E 2nd Street Suite 250 Los Angeles, CA  90012.

///

///

///

///

///

## V.   Environmental Project and Reimbursement of Litigation Fees and Costs

35.   Environmental Project. Pacific Marine agrees to make a payment totaling Twenty Thousand Dollars ($20,000) to the City of Long Beach Municipal Urban Stormwater Treatment ("MUST") Program[5] to allow the program to continue to plan and design for general expansions of the MUST Program. Payment shall be made within sixty (60) days of the Effective Date, payable to the City of Long Beach and sent via overnight mail to City of Long Beach, c/o City Manager, 411 W. Ocean Blvd., 10th Floor, Long Beach, CA 90802.

36.   For all missed deadlines included in this Consent Decree not excused by Force Majure, Pacific Maritime shall make a stipulated payment of Five Hundred Dollars ($500) ("Stipulated Payment") provided, however, that LA Waterkeeper shall provide Pacific Maritime with notice of any alleged missed deadline and Pacific Maritime shall have ten (10) business days to cure the missed deadline without penalty. Payments for a missed deadline shall fund environmental project activities. Pacific Maritime shall make the Stipulated Payment to the City of Long Beach MUST Program, payable to the City of Long Beach and sent via overnight mail to City of Long Beach, c/o City Manager, 411 W. Ocean Blvd., 10th Floor, Long Beach, CA 90802, and such funds shall be used for the purposes described in Paragraph 35 above. Pacific Maritime shall provide LA Waterkeeper with a copy of such payment concurrently with the payment.  Pacific Maritime shall make the Stipulated Payment within thirty (30) days of a missed deadline unless LA Waterkeeper agrees in writing to an extension of that deadline.

37.   Reimbursement of LA Waterkeeper's Fees and Costs. Pacific Maritime shall pay a total of Two Hundred Seven Thousand Dollars ($207,000) to LA Waterkeeper to reimburse LA Waterkeeper for its investigation fees and costs, expert/consultant fees and costs, and attorneys' fees incurred because of investigating and preparing the lawsuit and negotiating this Consent Decree. Pacific Maritime shall make the payments within thirty

---

[5] Funding for the Long Beach MUST Program or another alternative City Program intended to achieve the same or similar goals may be incorporated into the Permit Option 1 Program pending final adoption of the CII Permit.

(30) business days of the Effective Date and payable to Environmental Advocates Attorney Client Trust Account and sent via overnight mail to Environmental Advocates c/o Christopher A. Sproul, 5135 Anza Street, San Fransisco, CA 94121.

## VI.   **DISPUTE RESOLUTION**

38.     This Court shall retain jurisdiction over this matter until the final termination date defined above for the purposes of implementing and enforcing the terms and conditions of this Consent Decree and adjudicating all disputes among the Settling Parties that may arise under the provisions of this Consent Decree, unless there is an ongoing dispute at the time of the final termination date, in which case this Consent Decree will terminate upon final resolution of the dispute. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

39.     If a dispute under this Consent Decree arises, or either Settling Party believes that a breach of this Consent Decree has occurred, the Settling Parties shall schedule a meet and confer within ten (10) business days of receiving written notification from the other party of a request for a meeting to determine whether a violation of this Consent Decree has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. If the Settling Parties are unable to resolve the dispute through this meet and confer process, the Settling Parties agree to request a settlement meeting before the Magistrate Judge assigned to this action. The Settling Parties agree to file any waivers necessary for the Magistrate Judge to preside over any settlement conference pursuant to this Paragraph. If the Settling Parties cannot resolve the dispute by the conclusion of the settlement meeting with the Magistrate Judge, the Settling Parties agree to submit the dispute via motion to the District Court. In resolving any dispute arising from this Consent Decree, the Court shall have discretion to award attorneys' fees and costs to either Settling Party. The relevant provisions of the then-applicable CWA and Rule 11 of the Federal Rules of Civil Procedure shall govern the allocation of fees and costs in connection with

1   the resolution of any disputes before the Court.  The Court shall award relief limited to
2   compliance orders and awards of attorneys' fees and costs, subject to proof.

3       40.   <u>Force Majeure.</u> No Settling Party shall be considered to be in default in the
4   performance of any of its obligations under this Consent Decree when performance
5   becomes impossible due to circumstances beyond the Settling Party's control, including
6   Force Majeure, which includes, but is not limited to, any act of god, pandemic/epidemic,
7   war, fire, earthquake, windstorm, flood or natural catastrophe; civil disturbance, vandalism,
8   sabotage, or terrorism; restraint by court order or public authority or agency; inability to
9   proceed due to pending litigation under the California Environmental Quality Act; action
10  or non-action by, or inability to obtain the necessary authorizations, approvals, or permits
11  from, any governmental agency or private party except insofar as caused by any lack of
12  reasonable diligence in applying for or otherwise procuring such permit; or inability to
13  obtain equipment or materials from the marketplace if such materials or equipment are not
14  reasonably available. Impossibility and/or Force Majeure shall not include normal
15  inclement weather, economic hardship, or inability to pay. Any Settling Party seeking to
16  rely upon this paragraph to excuse or postpone performance shall have the burden of
17  establishing that it could not reasonably have been expected to avoid the impossibility or
18  Force Majeure event and by exercise of due diligence has been unable to overcome the
19  failure or performance. Delay in compliance with a specific obligation under this Consent
20  Decree due to impossibility and/or Force Majeure as defined in this paragraph shall not
21  excuse or delay compliance with any or all other obligations required under this Consent
22  Decree.

23      40.1.  If Pacific Maritime claims compliance was or is impossible, it shall
24              notify LA Waterkeeper in writing as soon as possible, but in no event
25              more than five (5) business days of the date that Pacific Maritime learns
26              of the event or circumstance that caused or would cause a violation of
27              this Consent Decree (hereinafter referred to as the "Notice of
28              Nonperformance").

40.2.  Within ten (10) business days of sending the Notice of Nonperformance, Pacific Maritime shall send LA Waterkeeper a detailed description of the reason for the nonperformance and the specific obligations under the Consent Decree that are or have been affected by the Force Majeure. It shall describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures Pacific Maritime took or will take to prevent or minimize the delay, the schedule by which the measures shall be implemented, and the anticipated date of compliance. In no event shall the deadline be extended beyond the length of the delay caused by the Force Majeure event. Pacific Maritime shall adopt all reasonable measures to avoid and minimize such delays and shall provide LA Waterkeeper with notice of a reasonable date certain of completion of the prior nonperformance of a specific obligation under the terms of this Consent Decree within fifteen (15) days of discovery of the date certain for completion.

40.3.  The Settling Parties shall meet and confer in good faith concerning the non-performance and, where the Settling Parties concur that performance was or is impossible due to an event or matter covered under the Force Majeure provisions of this Consent Decree, despite the timely good faith efforts of Pacific Maritime, the establishment of new deadlines.

40.4.  If LA Waterkeeper disagrees with Pacific Maritime's Notice of Nonperformance, or if the Settling Parties cannot timely agree on the terms of new performance deadlines or requirements, either party shall have the right to invoke the dispute resolution procedure pursuant to Section VI.

41.   <u>Administrative Delay</u>. Pacific Maritime shall diligently pursue any approvals required for compliance with this Consent Decree. Should such diligent pursuit of approvals required for compliance be unavailing due to actions of or inaction on the part of the any governmental or regulatory entity with jurisdiction over Pacific Maritime, and Pacific Maritime reasonably demonstrates that these delays are not attributable to any action or inaction on the part of the Pacific Maritime, any relevant compliance deadlines set forth in this Consent Decree shall be tolled until such time as Parties agree to an alternative means of compliance with the Consent Decree pursuant to the Force Majeure clause herein.

## VII.   **MUTUAL RELEASE OF LIABILITY**

42.   <u>LA Waterkeeper's Release</u>. Upon the Effective Date of this Consent Decree, LA Waterkeeper, on its own behalf and on behalf of its current and former officers, directors, employees, and each of their successors and assigns, and their agents, attorneys, and other representatives, release all persons including, without limitation, Pacific Maritime (and each of its direct and indirect parent and subsidiary companies and affiliates, and their respective current and former officers, directors, members, employees, shareholders, and each of their predecessors, successors, and assigns, and each of their agents, attorneys, consultants, and other representatives) from and waives all claims alleged in the Notice Letter and/or Complaint, FAC, and SAC up to the termination of this Consent Decree.

43.   <u>Pacific Maritime's Release</u>. Upon the Effective Date of this Consent Decree, Pacific Maritime, on its own behalf and on behalf of its current and former officers, directors, employees, members, and each of their successors and assigns, and their agents, attorneys, and other representatives releases LA Waterkeeper (and its current and former officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and their agents, attorneys, and other representatives) from and waives all claims which arise from or pertain to this action, including all claims for fees (including fees of attorneys, experts, and others), costs,

expenses, or any other sum incurred or claimed for matters related to LA Waterkeeper's Notice Letter and Complaint up to the termination of this Consent Decree by the Court.

44.     <u>Covenant Not to Sue</u>.  As of the Effective Date of this Agreement, and for a period up to and including the Termination Date of this Agreement, Plaintiff agrees that LA Waterkeeper, its officers, directors, executive staff, members of its governing board, and any individuals and organizations under the control of LA Waterkeeper, its officers, executive staff, or members of its governing board, will not serve any 60-day Notice of Violations or Intent to Sue or file any lawsuit against Pacific Maritime, the City of Long Beach, or their respective  affiliates, current or former officers, directors, members, employees, shareholders, or any of their predecessors, successors, and assigns, or any of their agents, attorneys, consultants, or any other of their representatives for alleged violations related to Pier J that were or could have been raised in its Notice Letter, Complaint, FAC, and/or SAC.

## VIII. <u>MISCELLANEOUS PROVISIONS</u>

45.     <u>No Admission of Liability</u>. Neither this Consent Decree, the implementation of additional BMPs, nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, admission, or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. Pacific Maritime maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

46.     <u>Construction</u>. The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Storm Water Permit, the Clean Water Act, or specifically herein.

47.     <u>Choice of Law</u>. The laws of the United States and the State of California shall govern this Consent Decree.

48.     <u>Severability</u>. If the Court holds any provision, paragraph, section, or sentence of this Consent Decree to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

49.   <u>Correspondence</u>. Unless specifically provided for in this Consent Decree, all notices required herein or any other correspondence pertaining to this Consent Decree shall be sent by U.S. mail or electronic mail as follows:

<u>If to LA Waterkeeper:</u>

Los Angeles Waterkeeper
Attn: Benjamin Harris, Barak Kamelgard, Madeleine Siegel
360 E 2nd Street Suite 250
Los Angeles, CA  90012
ben@lawaterkeeper.org
barak@lawaterkeeper.org
madeleine@lawaterkeeper.org

<u>With a copy to</u>

Environmental Advocates
Attn: Christopher Sproul, Brian Orion, Marla Fox
5135 Anza Street
San Francisco, CA 94121
csproul@enviroadvocates.com
borion@enviroadvocates.com
mfox@enviroadvocates.com

<u>If to Pacific Maritime:</u>
Pacific Maritime Services, LLC
Attn: Candice M. Woods
SSA Marine, Inc.
Deputy General Counsel
1131 SW Klickitat Way
Seattle, WA 98134
206.654.3587 phone
206.515.4192 fax
Candice.Woods@SSAMarine.com
Legal@Carrix.com

<u>With a copy to:</u>

Environmental Law Group LLP
Attn: S. Wayne Rosenbaum
225 Broadway, Suite 1900
San Diego, CA 92101
swr@envirolawyer.com

50.     Notifications of communications shall be deemed submitted three (3) business days after having been sent via U.S. mail or the day of sending notification or communication by electronic mail. Any change of address or addressees shall be communicated in the manner described above for giving notices.

51.     Counterparts. The Settling Parties may execute this Consent Decree in any number of counterparts, all of which together shall constitute one original document. Telecopy, email of a .pdf signature, and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

52.     Modification of the Consent Decree. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Settling Parties. If any Settling Party wishes to modify any provision of this Consent Decree, the Settling Party must notify the other Settling Party in writing at least twenty-one (21) days prior to taking any step to implement the proposed change.

53.     Full Settlement. This Consent Decree constitutes a full and final settlement of this matter.

54.     Integration Clause. This is an integrated Consent Decree. The Settling Parties intend this Consent Decree to be a full and complete statement of the terms of the agreement between the Settling Parties and expressly supersedes all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

55.     Authority. The undersigned representatives for LA Waterkeeper and Pacific Maritime each certify that they are authorized by the Settling Party whom they represent to enter the terms and conditions of this Consent Decree.

56.     The Settling Parties certify that their undersigned representatives are fully authorized to enter this Consent Decree, to execute it on behalf of the Settling Parties, and to legally bind the Settling Parties to its terms.

57.   The Settling Parties, including any successors or assigns, agree to be
bound by this Consent Decree and not to contest its validity in any subsequent
proceeding to implement or enforce its terms.

**IN WITNESS WHEREOF**, the undersigned have executed this Consent
Decree as of the date first set forth below.

## APPROVED AS TO CONTENT

Dated:     April 3, 2024                   By: _____

Bruce Reznik
Executive Director
Los Angeles Waterkeeper

Dated:     April 4, 2024                   By: _Randy Galosic_

Randy Galosic
General Manager
Pacific Maritime Services, LLC

## APPROVED AS TO FORM

Dated:     April 1, 2024                   By: _Christopher a. sproul_

Christopher Sproul
Environmental Advocates
Attorney for LA Waterkeeper

Dated:     April 3, 2024                   By: _____

Barak Kamelgard
LA Waterkeeper
Attorney for LA Waterkeeper

Dated:     April 8, 2024                   By: _S. Wayne Rosenbaum_

S. Wayne Rosenbaum
Environmental Law Group
Attorney for Pacific Maritime Services, LLC

**IT IS SO ORDERED.**
Dated: May 7, 2024

_____
Hon. Fred. W. Slaughter

# EXHIBIT A



## Legend

**Sample Locations**
- ✚ PNID Sampling Location
- ✱ Industrial Areas
- Vehicle Fueling Area
- Priority Non Industrial Area

**BMP TYPE**
- ■ Drop Inlets
- ◖ Metalox wattles
- ↑ Flow Direction

PIER J ENTRANCE CHANNEL

LONG BEACH HARBOR

MAIN CHANNEL

SOUTH EAST BASIN

**Drainage Areas and BMPs**

Client: SSA Marine
Site: Pier J Terminal

**EXHIBIT A**

3771 Long Beach Blvd, Annex Bldg
Long Beach, CA 90807
P: 562.495.5777  www.nv5.com

Sitemap Prepared as Exhibit A to the Consent Decree to which it is attached and is not intended for any other purpose.

**STORMWATER SITE MAP WITH ADDITIONAL INFORMATION**
**SSA PCT TERMINAL | 1521 PIER J PLAZA | LONG BEACH**

DATE REVISED: 01/30/2024

© 2023 Microsoft Corporation © 2023 Maxar ©CNES (2023) Distribution Airbus DS © 2023 TomTom, Port of Los Angeles, City of Long Beach, County of Los Angeles, California State Parks, Esri, HERE, Garmin, SafeGraph, FAO, METI/NASA, USGS, Bureau of Land Management, EPA, NPS

Coordinate System: NAD 1983 StatePlane California V FIPS 0405 Feet

# EXHIBIT B

# Enpurion FlexBasin™


**NEW!**

## Stormwater pillows offer low-cost, versatile and effective treatment

**Combine engineered media pillow materials to fit your site's needs**

### Proven Results

- Select engineered media for specific pollutants
- Pick textiles for influent characteristics
- Reduce heavy metals
- Capture turbidity and suspended solids
- Eliminate emulsified oils and hydrocarbons
- Change pillows to adapt to site conditions instantly
- Manage your own maintenance quickly, easily and cost-effectively

### Advantages

- Flexible and effective stormwater treatment
- Low-cost, easy to use and maintain
- Scalable and modular
- Can be configured for any combination or pollutant

### Applications

- Parking lots
- High traffic areas
- Production and material storage areas

Enpurion MT media for metals and oils

Enpurion MX media for phosphorus, pH

Enpurion BioBlend for organics

ZnIX ion exchange for zinc, and copper

Enpurion CLR for turbidity and TSS



Engineered media for site-specific pollutants

High capacity design

Up to 5 different sorption media

Optional sample port

Liner captures oils and debris

Mesh base prevents clogging

**Target pollutants:**

- ✓ Zinc & copper
- ✓ Turbidity & pH
- ✓ Pb, Al and Fe
- ✓ Phosphorus
- ✓ Emulsified oils
- ✓ Suspended solids

info@enpurion.com
253-922-8823

www.enpurion.com
©2022 Lean Environment Inc



# EXHIBIT C

CONFIDENTIAL – NOT FOR DISTRIBUTION

# Analyte Reduction Strategy Report

Qualifying Storm Event Sample Date(s):_____

Date(s) Sample Analyses Received:_____

| Sample Results (only enter if applicable Numeric Limit exceeded) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Constituent | TSS (mg/L) | O&G (mg/L) | Aluminum (mg/L) | Copper (mg/L) | Iron (mg/L) | Lead (mg/L) | Zinc (mg/L) | pH (s.u.) |
| Numeric Limit | 100 (annual); 400 (instant) | 15 (annual); 25 (instant) | 0.75 | 0.0332 | 1.0 | 0.262 | 0.26 | 6.5-9.5 |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |

| Additional BMPs Planned | Estimated Date of Implementation | Los Angeles Waterkeeper Comments if any (attach additional pages if necessary) | Response to Comments if any (attach additional pages if necessary) |
|---|---|---|---|
| | | | |
| | | | |

CONFIDENTIAL – NOT FOR DISTRIBUTION

| | | | |
|---|---|---|---|
| | | | |

Date Sent to Los Angeles Waterkeeper:_____

Preparer: _____

QISP ID Number: _____

Date Comments Received (no later than 30 days from LAW receipt of report):
_____

Los Angeles Waterkeeper comments received by: _____

Date Response to comments sent to Waterkeeper: _____.

Preparer: _____

QISP ID Number: _____

# EXHIBIT D

CONFIDENTIAL – NOT FOR DISTRIBUTION

# PNID Reduction Strategy Report

Qualifying Storm Event Sample Date(s):_____

Date(s) Sample Analyses Received:_____

| Sample Results (only enter if applicable Numeric Limit exceeded) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Constituent | TSS (mg/L) | O&G (mg/L) | Aluminum (mg/L) | Copper (mg/L) | Iron (mg/L) | Lead (mg/L) | Zinc (mg/L) | pH (s.u.) |
| Numeric Limit | 100 (annual); 400 (instant) | 15 (annual); 25 (instant) | 0.75 | 0.0332 | 1.0 | 0.262 | 0.26 | 6.5-9.5 |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |
| [LOCATION] | | | | | | | | |
| Likely Source(s) of Excess Contamination | | | | | | | | |

| Additional BMPs Planned | Estimated Date of Implementation |
|---|---|
| | |
| | |
| | |
| | |

Date Sent to Los Angeles Waterkeeper:_____

Preparer: _____